UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TWO ROADS DEVELOPMENT LLC, TRILAR : 
HOLDINGS LLC, and FLAGLER SOUTH : 
DEVELOPMENT LLC, : 
               *Plaintiffs*, : 
    v. : 
PALM BEACH ATLANTIC UNIVERSITY INC., : 
FRISBIE GROUP LLC, FH3 LLC, WILLIAM : 
M.B. FLEMING, JR., PATRICK C. KOENIG, :   Case No. 9:21-cv-82067-AMC
DAVID W. FRISBIE, ROBERT N. FRISBIE JR., : 
and CODY S. CROWELL : 
               *Defendants*. : 

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                    :
                                    :
                                    x


## <u>AMENDED COMPLAINT</u>


DOMNICK CUNNINGHAM & WHALEN
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Telephone: (561) 625-6260
Facsimile: (561) 625-6269

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.6235

**TABLE OF CONTENTS**

NATURE OF THE CASE ................................................................................................ 1

PARTIES ....................................................................................................................... 5

JURISDICTION AND VENUE ..................................................................................... 6

FACTUAL ALLEGATIONS ......................................................................................... 7

    A.   West Palm Beach: A Real Estate Boom ........................................................ 7

    B.   Plaintiffs Identify The Opportunity to Build Luxury Waterfront Condos in West Palm Beach and Develop 1309 South Flagler Drive ....................................... 8

    C.   Plaintiffs Identify and Pursue A Unique Opportunity to Develop Adjoining Parcels Owned By PBA at 1315 and 1401 South Flagler Drive ................................. 11

    D.   Plaintiffs Approach PBA With a Plan to Purchase and Develop the PBA Parcels, And Enter Into a Binding LOI With PBA ....................................... 12

    E.   The Parties Negotiate, Finalize, and Enter Into a Purchase and Sale Agreement for the Parcels .......................................................................................... 15

    F.   The Scheme to Defraud and Misrepresentations Relating to the PBA Parcels ........... 20

    G.   The Easement *Quid Pro Quo* and the Continuing Scheme to Defraud Plaintiffs ......... 26

CAUSES OF ACTION ................................................................................................ 31

    FIRST CLAIM FOR RELIEF (Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants PBA, Frisbie Group, William M.B. Fleming, Jr., Patrick C. Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell) .................................. 31

    SECOND CLAIM FOR RELIEF (Breach of Contract of Letter of Intent, Exclusivity Provision – Against Defendant PBA) .......................................................... 46

    THIRD CLAIM FOR RELIEF (Breach of Contract of Letter of Intent, Confidentiality Provision – Against Defendant PBA) ................................................ 48

    FOURTH CLAIM FOR RELIEF (Breach of Contract, Purchase and Sale Agreement – Against Defendant PBA) ......................................................................... 49

    FIFTH CLAIM FOR RELIEF (Fraud – Against Defendants PBA and Patrick C. Koenig) ................................................................................................................ 50

SIXTH CLAIM FOR RELIEF (Aiding and Abetting Fraud – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell)........... 52

SEVENTH CLAIM FOR RELIEF (Negligent Misrepresentation – Against Defendants PBA and Patrick C. Koenig).................................................................... 53

EIGHTH CLAIM FOR RELIEF (Promissory Estoppel – Against Defendants PBA and Patrick C. Koenig)........................................................................................ 55

NINTH CLAIM FOR RELIEF (Violations of 18 U.S.C. § 1832 – Against All Defendants) ......................................................................................................... 55

TENTH CLAIM FOR RELIEF (Violation of Fla. Stat. §§ 688.001 *et seq.* – Against All Defendants)................................................................................................... 57

ELEVENTH CLAIM FOR RELIEF (Common Law Conversion of Confidential Business Information – Against All Defendants) .......................................... 58

TWELFTH CLAIM FOR RELIEF (Tortious Interference with Contract – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell) ............................................................................................................ 59

THIRTEENTH CLAIM FOR RELIEF (Tortious Interference with Business Relationship – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell).......................................................................... 61

FOURTEENTH CLAIM FOR RELIEF (Unjust Enrichment – Against All Defendants) ......................................................................................................... 62

FIFTEENTH CLAIM FOR RELIEF (Specific Performance – Against All Defendants) ......................................................................................................... 63

JURY TRIAL DEMAND ........................................................................................... 64

PRAYER FOR RELIEF ............................................................................................. 65

Plaintiffs Two Roads Development, LLC ("Two Roads"), Trilar Holdings LLC ("Trilar") and Flagler South Development LLC (together with Two Roads and Trilar, "Plaintiffs"), for its complaint against Palm Beach Atlantic University Incorporated ("PBA"), Frisbie Group LLC ("Frisbie Group"), William M.B. Fleming, Jr., Patrick Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody Crowell (collectively, "Defendants") alleges as follows:

## NATURE OF THE CASE

1.      This is an action to remedy and prevent the further implementation of an unlawful and fraudulent real estate development scheme perpetrated by Defendants in connection with Plaintiffs' development of parcels at 1309 and 1311 South Flagler Drive and 134 Acacia Road (as assembled, the "Forté Site") and two adjoining parcels owned by Defendant PBA located at 1315 and 1401 South Flagler Drive (the "PBA Parcels").  Plaintiffs are experienced real estate developers who identified a unique opportunity to build a set of luxury waterfront condominium high-rises on the PBA Parcels, one of the last undeveloped and geographically significant lots on South Flagler Drive in West Palm Beach.  Plaintiffs also sought to develop their Forté Site and the PBA Parcels as an enlarged campus that could enhance and beautify the neighborhood. Plaintiffs' plan to acquire and develop the PBA Parcels began during the years that Plaintiff spent assembling, financing, and developing the Forté Site.  Understanding the significant market and community value that Plaintiffs would create at the Forté Site, PBA initially arranged to sell the PBA Parcels to Plaintiffs and to facilitate the development of both sites.  However, after inducing Plaintiffs to (i) share their valuable plans for the both the PBA Parcels and Forté Site, (ii) plan and rely upon PBA to cooperate in the development of both sites to the parties' mutual benefit, and (iii) negotiate for nine (9) months to a formal conclusion and signature on the terms for sale of the PBA Parcels, PBA—taking great pains to maintain secrecy—enlisted

Frisbie Group, and Frisbie Group assisted PBA, with the participation of the other Defendants, to steal the entire planned opportunity for the project out from under Plaintiffs.

2. Defendants' multi-party scheme to defraud Plaintiffs had its base in Florida and tentacles reaching to Massachusetts and New York. Plaintiffs were engaged in what they believed were extended, good faith, and exclusive negotiations for the PBA Parcels—which abut Plaintiffs' Forté development and therefore are uniquely and irreplaceably valuable to them—culminating in a completed Purchase and Sale Agreement with PBA. But from the commencement of the scheme in early 2019, if not earlier, until the present, Defendants knew that these had become faux negotiations designed to extract trade secrets and confidential business information from Plaintiffs—namely, Plaintiffs' creative and valuable zoning, development, budget, and capitalization plans for the parcels, which were developed at great cost to Plaintiffs. Defendants knew further they needed to hide and delay the discovery of their collaboration in wrongdoing, breach of the covenants of exclusivity and confidentiality by which PBA was bound, and delivery of the PBA Parcels instead to the Frisbie Group.

3. Throughout this period, Defendants were secretly scheming behind Plaintiffs' backs to have Frisbie Group step into Plaintiffs' shoes, with PBA eventually reneging on its completed deal with Plaintiffs and instead contracting to sell the valuable and irreplaceable parcels to Frisbie Group. Frisbie Group would develop two luxury high-rise condominium buildings using Plaintiffs' comprehensive development plan for the property. The units in these buildings are worth hundreds of millions of dollars; when sold, Defendants will reap all of the benefits of Plaintiffs' experience, wisdom, sweat equity, and expenditures without paying them a dime.

4.     While Plaintiffs were negotiating in good faith with PBA, PBA was secretly meeting with the Frisbie Group to plan and execute this scheme—even during the period in which PBA had committed to deal exclusively and confidentially with Plaintiffs in a binding Letter of Intent.  At the request of PBA, Plaintiffs, executed and delivered the completed and mutually approved Purchase and Sale Agreement, unaware PBA would not sign it if it could instead sign with Frisbie Group, with whom they were negotiating at the same time.  And PBA's method for delaying its signature and later purporting to back out of the completed Purchase and Sale Agreement with Plaintiffs is as shameful as it is shocking:  PBA's attorney (Larry B. Alexander), and its Trustee and representative (Defendant Patrick C. Koenig), represented to Plaintiffs that PBA's President (Defendant William M.B. Fleming, Jr.) had cancer, and could not physically countersign the signature page of the final, "all approved" document.  But on information and belief, Defendants used the President's illness as an excuse to back out of the completed contract so it could then enter into a substantially similar contract with Frisbie Group.

5.     After Plaintiffs confronted Frisbie Group, Defendants David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell lied to and misled Plaintiffs about their secret dealings with PBA to cover their tracks, and then proposed a partnership that Plaintiffs believed Frisbie Group was pursuing in good faith as an olive branch to make amends for its prior bad acts.  But to Plaintiffs' great dismay and irreparable harm, that turned out to be yet another phase of the ongoing scheme to defraud Plaintiffs and steal their trade secrets and confidential plans for the development of the PBA Parcels.

6.     In furtherance of the scheme to defraud, and proof of their consciousness of guilt, Defendants then conditioned the provision of routine easements needed by Plaintiffs for their development of the Forté on two unacceptable demands:  that Plaintiffs waive their right to take

any legal action against Defendants for the scheme, and that Plaintiffs provide a blanket approval of future development plans for the PBA Parcels, sight unseen.  With these easements withheld, Plaintiffs have had to spend millions of dollars redesigning aspects of the Forté project.  And Defendants' scheme continues to this day.  Frisbie Group continues to push a false narrative of the events in question, brushing aside Plaintiffs' reasonable requests for the easements in an effort to extract approvals and support from Plaintiffs for the very project that was stolen from them.  Even more egregious, Frisbie Group has threatened to damage the reputation of the Forté by telling brokers to abandon the building if Plaintiffs do not go along with Defendants' development plan, and David Frisbie, on behalf of himself and Frisbie Group, threatened to a Two Roads principal that if Plaintiffs came out against Frisbie Group's project, it would mean "war."

7.      To add insult to injury, in May 2021, Frisbie Group submitted its plans to the city of West Palm Beach for the development of the "Flagler Towers" to be built on the PBA Parcels stolen from Plaintiffs.  The plan encompasses key elements of the plan developed by Plaintiffs, including ideas too specific and unique to reasonably deny their source.  But unlike Plaintiffs' plan, it disregards the City's established requirements for development and zoning waivers, height requirements, boundary setbacks, and neighborhood impacts, otherwise observed by all of the similarly situated developments on Flagler Drive, to the detriment of the surrounding community and most dramatically the Forté Site.  If realized, this plan will inflict monetary damage on Plaintiffs, along with unquantifiable and irreparable harm to their business reputations, customer relationship, and public image.  This harm will carry forward and adversely impact not only the Forté project, but all future projects that Plaintiffs are involved in. In other words, as the capstone to their elaborate scheme to defraud, it appears that Defendants

have designed their so-called "Flagler Towers" project to wreak significant havoc and harm on Plaintiffs, in order to destroy their competitor along the West Palm Beach waterfront.

8.      For all of these reasons, Plaintiffs bring this action for violations of the civil RICO statute, fraud, breach of contract, tortious interference with business relationships, theft of trade secrets and confidential business information, and related causes of action.  They seek compensatory and punitive damages, treble damages pursuant to the civil RICO statute, and additional relief necessary to unwind and return the fruits of Defendants' racketeering.  As part of this relief, Plaintiffs seek specific performance of their Purchase and Sale Contract with PBA, in the form of an order entitling Plaintiffs to take ownership and possession of the PBA Parcels, in light of the fact that real property is inherently unique as a matter of law.

9.      Finally, Frisbie Group has not yet broken ground on the PBA Parcels, but continues to move rapidly in an effort to obtain the necessary approvals.  An injunction halting Frisbie Group's application for development and zoning waivers for the PBA Parcels, or any construction on the PBA Parcels, would ensure that Defendants do not affect irreparable changes to the property, and irreparable harm to Plaintiffs, during the pendency of this action.  Injunctive relief, followed by specific performance, is particularly appropriate in light of the fact that there is no adequate remedy at law for the harms inflicted by Defendants, as real property cannot be replaced—all the more so here, where the parcels at issue are adjacent to the property Plaintiffs are already developing, and Defendants' plans for the parcels appear to harm that development.

## PARTIES

10.      Plaintiff Two Roads Development LLC is a Florida limited liability company.

11.      Plaintiff Trilar Holdings LLC is a Delaware limited liability company.

12.      Plaintiff Flagler South Development LLC is a Delaware limited liability company.

13.     Defendant Palm Beach Atlantic University Incorporated is a Florida company, with its principal place of business in West Palm Beach, Florida.

14.     Defendant Frisbie Group LLC is a Florida limited liability company.  Upon information and belief, its members are Cody Crowell and Robert Frisbie Jr.

15.     Defendant FH3 LLC is a Florida limited liability company.  Upon information and belief, its registered agents are Cody Crowell and Robert Frisbie Jr.

16.     Defendant William M.B. Fleming, Jr., is the former President of Palm Beach Atlantic University.

17.     Defendant Patrick C. Koenig is a real estate broker, co-founder of Flagler Realty & Development, Inc., a developer and manager of real estate projects, a Trustee of Palm Beach Atlantic University, and the Chair of its Real Estate Committee.

18.     Defendant David W. Frisbie is a founder of Frisbie Group LLC.

19.     Defendant Robert N. Frisbie Jr. is a Managing Director of Frisbie Group LLC.

20.     Defendant Cody S. Crowell is a Managing Director of Frisbie Group LLC.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Plaintiffs' claims under 18 U.S.C. § 1962(c) and 18 U.S.C. § 1832.

22.     This Court has supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Defendant Palm Beach Atlantic University because its principal place of business is in West Palm Beach and it is incorporated in the state of Florida.

24.     This Court has personal jurisdiction over Defendant Frisbie Group because it has personal jurisdiction over members Cody Crowell and Robert Frisbie Jr., who have offices and regularly transact business in Palm Beach County and in the Southern District of Florida.

25.     This Court has personal jurisdiction over Defendant FH3 because it has personal jurisdiction over its registered agents Cody Crowell and Robert Frisbie Jr., who have offices and regularly transact business in Palm Beach County and in the Southern District of Florida.

26.     This Court has personal jurisdiction over Defendants William M.B. Fleming, Jr., Patrick C. Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell because each lives in, has offices in, committed tortious acts in, and/or regularly transacts business in Palm Beach County and in the Southern District of Florida.

27.     Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred, and it is the district in which property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

### A.  West Palm Beach: A Real Estate Boom

28.     Located on the eastern shore of the Florida Treasure Coast, West Palm Beach is a waterfront city that lies immediately to the west and adjacent to the town of Palm Beach.  West Palm Beach is separated from Palm Beach by three bridges and the Intracoastal Waterway. Flagler Drives runs along the length of West Palm Beach's waterfront.

29.     Although once viewed as a relatively sleepy residential community, West Palm Beach is now one of the fastest-growing cities in the country.  In recent years, it has experienced a real estate and business boom, fueled by an influx of new businesses and residents seeking to take advantage of the area's year-round warm weather, lack of personal-income tax, and miles of beaches and waterfront properties overlooking the Atlantic Ocean.  Investors have poured

hundreds of millions of dollars into revitalizing West Palm Beach's commercial and business centers to offer new residents a range of cultural, recreational and shopping opportunities.

30.     The COVID-19 pandemic has only accelerated West Palm Beach's growth.  The acceptance of remote work arrangements has spurred the migration of wealthy out-of-state buyers who now have the option of working far from their offices.  While the pandemic decimated the commercial and residential real estate markets in many metropolitan cities, it has instead fueled demand for new homes in West Palm Beach.  That demand is expected to remain strong in coming years.

31.     But in 2016 and 2017, this boom was only just beginning.

**B.  Plaintiffs Identify The Opportunity to Build Luxury Waterfront Condos in West Palm Beach and Develop 1309 South Flagler Drive**

32.     The principals of Two Roads and Trilar Holdings have over 150 years of combined experience in developing, financing and marketing residential and commercial real estate projects that span some of the most sought-after metropolitan areas in Florida, New York, Texas and Connecticut.  These projects include office buildings, luxury high-rise condominiums, hospitality, market rate development, land development and urban revitalization projects. Plaintiffs have a proven track record of success in their real estate projects, and have had significant financial backing and consistently strong relations with the contractors they have employed.

33.     Beginning in or around 2016, Plaintiffs identified an opportunity and began to explore the possibility of building one or more ultra-luxury high-rise waterfront condominiums in a small area of West Palm Beach bounded by the Intercoastal Waterway to the east, PBA's campus to the north, a residential community of single-family homes to the south, and U.S. Route 1 to the west.  The development of any such properties in this area would require

significant creativity from a zoning and planning perspective, due to strict zoning rules that prohibit the development of the kind of high-rise buildings Plaintiffs envisioned. The area, moreover, has very limited development opportunities due to its geographical constraints.

34.     Not to be deterred, Plaintiffs identified four waterfront parcels for potential development: 1309, 1311, 1315 and 1401 South Flagler Drive, respectively. These parcels, which abut one another, each face east towards the Intercoastal Waterway, Palm Beach, and the Atlantic Ocean. The parcels were occupied by various buildings that were constructed before the West Palm Beach real estate boom, including a dental office, PBA residence hall, parking garages, and smaller and older condominiums. The parcels also neighbor the Family Church and the Norton Museum, which underwent a significant renovation and expansion announced in 2013, but only begun in 2018, and completed in 2019.

35.     Plaintiffs' first project together is a condominium development located at 1309 – 1311 South Flagler Drive, which has subsequently become known as the Forté. Plaintiffs' plan for the 1.3-acre waterfront site is to create a world-class residential building rising 25 stories. Each floor will have only two units—one facing north and one facing south. The apartments would range from 4,200 to 8,400 square feet and feature such luxury amenities as continuous glass walls, over 1,000 square feet of private outdoor space, and sweeping, unobstructed city and ocean views from every residence. After further investigation, Plaintiffs identified a 1.38-acre parcel of land located at 1309 South Flagler Drive as the ideal site for the new condominium.

36.     At the time the Forté initially started to materialize, building an ultra-luxury high-rise condominium in this area carried significant risk. While luxury homes have long-defined the lifestyle of Palm Beach, the same was not true for West Palm Beach. Given West Palm Beach's reputation as the less flashy and less desirable neighbor to Palm Beach, many

developers believed that wealthy buyers would have no desire to spend millions of dollars for a condominium that overlooked the Intracoastal Waterway instead of the Atlantic Ocean.  In contrast to the multi-million dollar mansions lining the coast of Palm Beach, West Palm Beach's residential communities, including those along Flagler Drive, consisted predominantly of single-family homes catering to middle-income residents.

37.     There were also significant zoning hurdles.  The proposed high-rise condominium would be far taller and larger than the single-family homes and small condo projects that the West Palm Beach's Planning and Zoning Board had traditionally permitted on similarly sized lots.  Because the 25-story condominium would be far bigger than city regulations allowed on a lot that was built on fewer than 1.4 acres, Plaintiffs would have to obtain a zoning waiver for the building.  In order to do so, Plaintiffs would have to persuade city officials that the project's benefits justified the zoning waiver.  Furthermore, certain community members, including a nonprofit organization, Citizens for Thoughtful Growth, publicly opposed the project, on the grounds that a high-rise condominium would purportedly harm surrounding low-to-mid-rise neighborhoods.  Citizens for Thoughtful Growth had previously been successful in convincing the Planning and Zoning Board to reject other proposals for the construction of luxury condominiums on South Flagler Drive.

38.     Notwithstanding these challenges, Plaintiffs recognized the rare opportunity of constructing a condominium on one of the last available lots of waterfront property in West Palm Beach.  Plaintiffs thus moved forward with plans for developing the condominium, believing that they had the resources and expertise to generate sufficient demand from potential buyers.

39.     On or about December 15, 2017, Plaintiffs purchased the parcel of land located at 1309 South Flagler Drive.  Trilar and Two Roads formed a joint venture to develop the

condominium, sharing the role as developers.  The estimated cost of the project is in excess of $200 million.

40.     Two large residential towers, the Bristol and La Clara, have been launched in recent years along the West Palm Beach waterfront in the vicinity of the Forté.  In 2016 and 2017, these building were still in development, with the Bristol only starting to sell units, and La Clara not even breaking ground until 2019.  The Bristol initially struggled to sell units, demonstrating that success along the waterfront would be no easy task.

41.     Regulatory and logistical challenges, geographic constraints, and tepid early sales from a similar project would scare off most developers.  But Plaintiffs had a vision to transform the West Palm Beach waterfront, and were willing to take an enormous risk to see it through. The Forté would only be the first step in bringing this vision to fruition.

### C.  Plaintiffs Identify and Pursue A Unique Opportunity to Develop Adjoining Parcels Owned By PBA at 1315 and 1401 South Flagler Drive

42.     PBA owns two neighboring parcels of land in West Palm Beach that are adjacent to Plaintiffs' property at 1309 South Flagler Drive.  As noted, the PBA Parcels are located at 1315 South Flagler Drive and 1401 South Flagler Drive.

43.     Plaintiffs recognized that the PBA Parcels presented a unique opportunity.  The Parcels are one of the last remaining tracts of waterfront land in the area that could be developed into a luxury high-rise condominium.  As such, the PBA Parcels hold significant value to any developer.  But the PBA Parcels also hold tremendous value to Plaintiffs specifically, as the Parcels adjoin Plaintiffs' Forté Site.  Controlling the adjacent property would provide a number of benefits to Plaintiffs.  The benefits include, but are not limited to, the following:  First, the PBA Parcels in and of themselves were of tremendous inherent value for purposes of developing the land and selling residential units.  Second, Plaintiffs could use the PBA Parcels as staging

grounds for their upcoming $200 million construction project on the Forté Site.  This would smooth the project immensely, streamlining the physical construction process, alleviating construction approval issues, and reducing interference with traffic.  Third, the Parcels would facilitate the planned development of the Forté Site and the PBA site as a single coordinated campus that would share public amenities and benefit the community.  Fourth, control of the PBA Parcels would enable Plaintiffs to protect their building's sight lines and view corridors to the ocean.  Finally, the PBA Parcels would allow Plaintiffs to protect their ability to relocate utility easements running through each site both to facilitate construction design and staging and to avoid bad faith interference.  Without control of the easements and coordination of the utility locations, malicious neighbors could use their veto power over the easements as leverage against a neighbor, just as PBA and Frisbie Group eventually did.

44.     But unlocking the value and security that the PBA Parcels could provide would not be easy.  Plaintiffs would have to develop a comprehensive blueprint to develop the property, navigate zoning and city laws, and raise tens of millions of dollars in capital.

### D.  Plaintiffs Approach PBA With a Plan to Purchase and Develop the PBA Parcels, And Enter Into a Binding LOI With PBA

45.     As early as in or around 2016, Plaintiffs began informal discussions with PBA about development of the PBA Parcels (also referred to as the "Parcels").  Then, in or about 2017, representatives of Plaintiffs made two presentations to PBA about purchasing the Parcels. Also in or about 2017, representatives of Plaintiffs met with PBA to discuss the potential for the development of the PBA Parcels.  Once Plaintiffs closed the massive Forté deal, PBA understood that Plaintiffs had the vision, expertise, and resources to handle development of the PBA Parcels as well.  Shortly after the Forté closing, PBA Trustee Patrick Koenig reached out to Plaintiffs to open negotiations for a deal for the Parcels.

46.     In or about January 2018, Two Roads managing partner Taylor Collins met with Koenig and attorney Larry Alexander, who represented PBA.  Collins laid out Plaintiffs' extensive track record on large developments and its business and finance partners.  He also explained how one of the most reputable asset managers in the world would fully fund the project; PBA would rely on Plaintiffs to put together a financing package as the school did not have the means to do so.  After the meeting, PBA invited Plaintiffs to formally present their vision to develop the Parcels to a broader set of PBA Board Trustees.

47.     In preparation, Plaintiffs began to draw up a unique, creative, out-of-the-box plan to acquire and develop the Parcels.  They prepared a detailed, 24-page "Land Purchase and Preliminary Development Plan."  The proposal contained a detailed development plan; a detailed zoning analysis and proposal for "legislative steps" to permit the proposed development despite noncompliance with current zoning—including multiple amendments to relevant planning, land use, and zoning laws, and the rezoning of the property; a detailed capital plan timeline; and a "purchase proposal" with a proposed "Purchase Price" of $36,0000,0000 and a contract and due diligence period of 90 days.  On January 25, 2018, Collins and a Two Roads attorney presented this plan to PBA President William Fleming, Board Trustee Jim Jenkins, Koenig, and other PBA Trustees and personnel.  Later that same day, Collins emailed the presentation to PBA's Chief Operating Officer, John Kautz III, referencing "our offer to PBA on the subject property."

48.     Under this plan, Plaintiffs would work with the City of West Palm Beach to re-zone the PBA Parcels and amend its land use restrictions.  This involved a complicated process. Plaintiffs would move to amend the PBA Parcels' land use restrictions that barred large multi-family development.  They would also move to rezone the Parcels from community service to multifamily use, and then to rezone the Parcels from multi-family use to residential planned

13

development.  This would require three public hearings and presentations to the city's Planning

Board and the City Commission.  Finally, after that process was completed, Plaintiffs would be

able to break ground on the site to build their residential towers.  In doing so, they would utilize

top architecture, landscaping, and construction firms, as well as many local West Palm Beach

businesses and professionals.

49.     PBA wanted to move forward with Plaintiffs' plan.  The parties worked together

over the next month to turn the initial offer into a formal proposal.  These discussions included

numerous presentations to Koenig and Alexander.

50.     The parties then negotiated a Letter of Intent ("LOI") for the sale of the PBA

Parcels to Plaintiffs.  A Two Roads' attorney drafted the LOI, and this attorney and Collins

exchanged numerous drafts with PBA's counsel Larry Alexander.  The key terms on which the

parties negotiated were purchase price and timing.

51.     On or about June 11, 2018, Plaintiffs and PBA entered into the LOI, which the

parties agreed "shall serve as the basis to move forward with negotiating more definitive

documents, including a Purchase and Sale Agreement ('PSA'), to evidence and govern the

transaction."  The LOI contained a Purchase Price of $41,500,000, and closing date "[o]n or

before May 15, 2021, it being understood that if closing occurs prior to such date, Seller shall

retain possession of the Property until May 15, 2021."  In other words, the parties understood

and agreed that they would negotiate and enter into a Purchase and Sale Agreement, which

would culminate in the transfer of ownership of the Property to Plaintiffs, and that this process

would take a considerable amount of time.

52.     The LOI included a confidentiality provision specifying that the "terms of th[e]

LOI and the parties' discussions and exchanged written materials relating to the proposed

transaction," including the "terms of the proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]" and "due diligence information and documents relating to the [PBA Parcels]," are proprietary and confidential, and may not "be shown or disclosed by either party . . . to any other person or entity, except to those employees, attorneys, accountants or advisors who have a need to know as a result of being involved in the proposed transaction."

53.     The LOI also included an exclusivity provision stating:

> On acceptance of this LOI, [PBA] shall not entertain or enter into any other purchase agreement or financing for the [PBA Parcels] and each party agrees to negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the date of this LOI.  In the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other, in which event, neither party hereto shall therefore have any further liability, responsibility or obligation to the other under this LOI.

54.     Based on the plain terms of the LOI, the parties unambiguously intended that in the event that no agreement were reached during the initial 90-day period of the LOI, the exclusivity agreement would continue unless and until one of the parties "terminate[d] the negotiations and this LOI . . . upon written notice to the other."  Any liabilities, responsibilities or obligations that the parties had to each other, including those related to exclusivity, would continue to apply until such written termination.

55.     As detailed below, and unbeknownst to Plaintiffs until much later, PBA soon after took advantage of Plaintiffs, in violation of both the confidentiality provision and the exclusivity provision, by opening up negotiations with the Frisbie Group to sell them the parcels, and by sharing the substance of Plaintiffs' proposal with the Frisbie Group.

**E.  The Parties Negotiate, Finalize, and Enter Into a Purchase and Sale Agreement for the Parcels**

56.     Plaintiffs and PBA formally negotiated the Purchase and Sale Agreement (the "PSA" or the "Agreement") from in or about June 2018 through in or about April 2019, when it

was signed by Flagler South Development LLC (on behalf of itself and the other Plaintiffs) and delivered to PBA.  Plaintiffs prepared and sent PBA the first draft of the Agreement of Purchase and Sale on or about August 20, 2018, and the parties extensively negotiated and revised the Agreement over the next four months, exchanging multiple drafts primarily between PBA counsel Larry Alexander and Two Roads General Counsel Daniel G. Hayes.  On or about December 6, 2018, Plaintiffs met with PBA at the Jones Foster law office to negotiate additional terms relating to insurance, deed restrictions, and fixed deadlines for hard deposits.  Formal negotiations with PBA counsel extended to contract negotiations on PBA's required deed restrictions with the Boston counsel for Plaintiffs' capital fund partner and to counsel for Plaintiffs on PBA's required brokerage releases (from an individual named Marius Fortelni and others).  Discussions also continued informally throughout this period.

57.    Two Roads managing partner Taylor Collins frequently spoke with PBA Board Trustee Patrick Koenig about the impending deal, both in person and by telephone.  The fact that PBA was putting a deal together with Plaintiffs for the PBA Parcels was known to the Frisbie Group.  In or about December 2018, the topic of the negotiations between Plaintiffs and PBA on the acquisition of the Parcels was brought up in a discussion between Koenig, Collins, and Frances Frisbie Criddle at a charity fundraiser at ER Bradley's in West Palm Beach.

58.    Throughout this period, Plaintiffs continued to invest extensive time, effort, and resources in anticipation of the project.  Plaintiffs assembled the presentation and due diligence materials required to secure various capital partners and financing to underwrite the $43 million purchase.  They developed a comprehensive plan to comply with city zoning and land use requirements.  They hired an architect to create a full model massing of the building and with Plaintiffs' civil engineer to prepare a plan for the building footprint and orientation, spending in

16

excess of $100,000 in out-of-pocket costs, in addition to countless hours of in-house staff time.  Plaintiffs had prepared conceptual drawings, a shade analysis, and view corridor analysis of the proposed development to maximize the views of the buildings on the PBA site.  They developed a plan to acquire and develop a waterfront parcel adjacent to the PBA Parcels, 1301 South Flagler, owned by Joseph Nasser (the "Nasser Parcel").  As planned, a scenic art walk would loop around the property, featuring a sculpture garden and a large signature art piece on the Nasser Parcel waterfront that would serve as a cultural landmark for the neighborhood.  As part of this preparation, Plaintiffs commissioned a study to determine the cost and feasibility of placing a marina on the Nasser Parcel waterfront.  Plaintiffs also developed a creative vision for the campus as a whole, including the PBA Parcels with the Forté Parcels.  The Nasser Parcel sculpture garden would tie into the Art Walk on the Forté Parcels and continue around to connect with the Norton Art District.  Along South Flagler Drive the property would include street-level amenities including a café, a public park, and an outdoor movie theater.  The campus would connect to the adjacent Pioneer Park and Norton Museum, further tying the area together. Plaintiffs also had a proposal to co-brand the property with the neighboring Norton Museum.  In pursuit of this vision, Collins met with the CEO and Deputy Director of the Norton Museum to discuss how Plaintiffs would offer open greenspace on the southern parcel leading to the Museum in exchange for the Museum's endorsement and support of the campus plan.  Collins also spoke with West Palm Beach city staff about renaming the area the "Norton Art Walk District."  He also approached the Mayor of West Palm Beach and select City Commissioners to lay the political groundwork for a zoning expansion of the Forté Residential Development Plan, premised on Plaintiffs' plan to transform the area into a cultural hub.  Collins shared all of these plans and ideas in frequent conversations with Koenig.

17

59.     In or about March 2019, the parties made concluding revisions to the Agreement, designating an escrow agent to receive and hold deposits for the transaction.  Plaintiffs' counsel then sent the final Agreement to Alexander for approval.  In response, on April 5, 2019, Alexander represented in writing, on behalf of PBA, that the deal was "all approved" and asked Plaintiffs to forward the executed agreement.

60.     On Thursday, April 18, Collins signed the Agreement, took a picture of the executed signature page, and sent it to Koenig, congratulating him on completion of the deal.  Two Roads General Counsel Hayes also emailed the executed counterpart of the Agreement to Alexander on April 18 and physically hand delivered two original counterparts to his office the following day.

61.     On Friday, April 19, PBA requested a last-minute final release of brokerage and procurement fees from Marius Fortelni, which Plaintiffs arranged for and which was subsequently signed and delivered to PBA by email.  After sixteen months of discussions and twelve drafts of the PSA, the parties had a final deal.

62.     On Wednesday, April 24, Alexander wrote to Hayes to "acknowledge receipt of your original Buyer executed Agreements."  He also stated that he had "passed the pdf copy to the Seller, however the University was closed for Easter last Friday and Monday."  Later that same day, Hayes wrote to Alexander to arrange for the delivery of the fully counter-signed Purchase and Sale Agreement "[n]ow that the University is open."  He also informed Alexander that he had already "called capital to fund the Initial Deposit" with the escrow agent.  But PBA went silent.

63.     Finally, on or about May 2, Alexander wrote to Hayes that the delay was due to unspecified "health challenges" purportedly facing PBA president William Fleming.  But

Alexander reassured Plaintiffs that Fleming had approved the final Agreement before his indisposition.  PBA representatives repeated these representations, both directly and indirectly—in writing and verbally—throughout the month of May.  In a face-to-face meeting, Koenig told Collins that the specific health challenge was that Fleming had been diagnosed with cancer. Collins responded that he hoped Fleming was doing okay, that Koenig should let him know if Plaintiffs could help in any way, and he offered to connect Fleming with a cancer doctor.  But out of respect for Fleming, he did not press for additional details.  And over the next few weeks, out of concern and respect, Plaintiffs did not push for the return of the missing countersigned signature pages.  At the same time, Plaintiffs were concerned about the delay and surprised that no one else from PBA had countersigned the agreement in Fleming's stead.

64.     Suddenly, and without any explanation, on or about May 29, 2019, Larry Alexander sent a letter to Plaintiffs purportedly terminating the LOI and PBA's other "obligations."  The termination letter stated in relevant part:  "Please be advised that pursuant to Section 8 of the LOI, as no purchase and sale agreement has been entered into within ninety (90) days from the date of the LOI, PBA hereby terminates negotiations under the LOI, as well as all obligations either party has to the other.  PBA may elect to enter into further negotiations with you regarding the purchase and sale of the property in the future and appreciates the opportunity it has had to work with you."

65.     This letter broke off sixteen months of progress and work, after the parties had already reached a deal.  Based on PBA's repeated representations, Plaintiffs understood that the parties were working collaboratively and operating in good faith toward finalizing Plaintiffs' purchase of the PBA Parcels.  Indeed, Plaintiffs and PBA understood that they were continuing to work under the LOI and its confidentiality and exclusivity obligations.  That is why, when

19

PBA attempted to reverse the approval of the Purchase and Sale Agreement and end the exclusivity period, it sent a letter "terminat[ing] negotiations under the LOI, as well as all obligations either party has to the other."

66.     Relying on this understanding and what it believed to be PBA's good faith representations, Plaintiffs invested considerable time and resources to negotiate and finalize the deal.  Among other things, they secured capital partners, devised a comprehensive plan to comply with city zoning and land use requirements, spent $100,000 on an architect to create a full model of the building and map its placement, and developed a creative vision to tie the property together with a scenic art walk and to co-brand the property with the Norton Museum. And throughout these negotiations, Plaintiffs shared all of these trade secrets and confidential information with PBA under the mistaken belief, based on PBA's representations, that PBA would act in good faith and in conformance with its confidentiality and exclusivity obligations pursuant to the LOI.

### F.  The Scheme to Defraud and Misrepresentations Relating to the PBA Parcels

67.     While Plaintiffs believed that PBA was engaged in good faith negotiations with them over this entire period, culminating in a binding and "all approved" Purchase and Sale Agreement, they would later learn that PBA, the Frisbie Group, and the other Defendants were in fact secretly working together to execute an elaborate and sophisticated scheme to defraud Plaintiffs.

68.     Specifically, while the above events were unfolding, and no later than March 2019, the Frisbie Group and members of the Frisbie family began secret discussions with PBA and its representatives about Frisbie Group's interest in purchasing the PBA Parcels.  Robbie Frisbie Jr. and Cody Crowell, both employees of Frisbie Group and members of the Frisbie

family, admitted as much to Collins on or about February 20, 2020.  Specifically, in response to a question from Collins, Frisbie Jr. stated that the Frisbie Group had started talking with PBA in March 2019.  Frisbie Group's negotiations with PBA thus began, at the latest, while Plaintiffs and PBA were finalizing their own PSA, *prior* to PBA's May 2019 written termination of obligations under the LOI.  PBA's negotiations with Frisbie Group violated the mutual oral and written understandings between Plaintiffs and PBA, and all notions of fair dealing.  Adding insult to injury, on information and belief, PBA passed along Plaintiffs' trade secrets and confidential information to Frisbie Group in order to make their deal.  On information and belief, Frisbie Group accepted these trade secrets and this confidential information with knowledge that it came from Plaintiffs.  Further, on information and belief, Frisbie Group swooped in on the nearly finalized deal to capitalize on Plaintiffs' significant investment in their trade secrets.

69.     Frisbie Group and members of the Frisbie family have close and longstanding personal and business relationships with Fleming, Koenig, and other PBA Trustees and community members.  On information and belief, among other things, the Frisbie Group has now done multiple deals with PBA and made significant donations to the university.  These deals and donations built the relationships and provided the avenues of communications that enabled, provided an opportunity for, and resulted in the scheme to defraud Plaintiffs.  These deals and donations also served as incentive and reward to both parties (with respect to the deals) and to PBA (with respect to the donations) for participating in the scheme.  The Frisbie family also spent recreational time with Fleming and others affiliated with PBA, and Fleming has even traveled to socialize with the Frisbie family at their compound in Nantucket, Massachusetts.  During these get-togethers, the parties had the motive and opportunity to plan and advance their scheme to defraud Plaintiffs.

70.     Plaintiffs were not aware of these underhanded dealings.  Each of PBA's representations that the deal was near execution amounted to a lie to buy time.  By roping Plaintiffs along as long as possible, PBA could continue to motivate them to spend time and money finalizing the plans for the project and pump them for confidential business information.  And if PBA's negotiations with Frisbie Group fell through, they could fall back on Plaintiffs' undertakings in its signed PSA.  By May 29, 2019, knowing that Frisbie Group would take over and supplant Plaintiffs in the deal, PBA abruptly sent a termination letter to Plaintiffs, acting as if the Purchase and Sale Agreement had not been finalized and "all approved."

71.     In or about July 2019, while traveling in Europe, a Two Roads principal was informed that the Frisbie Group had the PBA Parcel project "under contract."  The principal immediately called David Frisbie looking for answers and requesting that they meet to discuss Frisbie Group's conduct.  Despite the fact that an integral member of Frisbie Group and Frisbie family, Frances Frisbie Criddle, had already learned of the negotiations between Plaintiffs and PBA long before—in or about December 2018—David Frisbie did not admit to any knowledge that Plaintiffs had been negotiating with PBA and claimed that PBA had approached Frisbie Group.  David Frisbie invited Plaintiffs to visit the Frisbie family compound in Nantucket, Massachusetts, for a meeting.

72.     On or about August 6, 2019, Two Roads' principals flew to Nantucket, Massachusetts, to meet with members of the Frisbie Group and family at their compound, including David Frisbie, Suzanne Frisbie, Cody Crowell, Robert Frisbie Jr., and Richard D.W. Frisbie.  Over dinner, the Two Roads principals expressed their bewilderment that Frisbie Group had a deal with PBA given that Plaintiffs already had a contract and a done deal with PBA, as well as a capital partner.  In response, David Frisbie and Robert Frisbie Jr. denied any knowledge

of Plaintiffs' dealings with PBA.  This was a lie: as noted, an integral member of Frisbie Group

and Frisbie family had learned of these negotiations in December 2018.  The Two Roads

principals also shared that Plaintiffs had negotiated the price with PBA down to a certain figure,

and asked if Frisbie Group was in the "same ballpark."  David Frisbie responded, in sum and

substance, "yes, the same ballpark."  David Frisbie and Robert Frisbie Jr. also claimed that they

had a nondisclosure agreement with PBA that limited what they could say about the issue and

made it so they could not discuss the issue any further.

73.     At this meeting, the parties present also discussed working together as co-

developers; Plaintiffs begrudgingly entertained this notion given the reality that Frisbie Group

now had the contract for the development that Plaintiffs had put so much time, money, and

expertise into designing and developing.  Plaintiffs expressed their objections to this turn of

events, but with the Frisbie Group now seemingly in control of the project, there appeared to be

no other way to bring to fruition the ideas and plans for the properties that Plaintiffs had been

developing for sixteen months, and no other way not to lose out entirely on their investments and

efforts.  Working together as co-developers, moreover, could benefit Plaintiffs, the Frisbie

Group, and the greater community.  A development partnership could also reduce hurdles and

headaches in the continuing construction and development of Forté.  Frisbie Group could invest

in Forté, and Plaintiffs could reciprocally invest in the project on the PBA Parcels.  Preliminary

discussions for this partnership continued for the next few months.

74.     On or about January 8, 2020, Koenig told Plaintiffs that PBA had executed a sale

contract with another developer.  Sensing an opportunity to extract favorable terms to use as

leverage in PBA's dealings with Frisbie Group, Koenig urged Plaintiffs to submit a back-up

contract.  Koenig even told Plaintiffs the business terms to include.  On or about January 10,

2020, Plaintiffs submitted a proposed contract that included Koenig's suggested terms.  On or about January 15, 2020, PBA finally informed Plaintiffs that the PBA Parcels were not available for sale.

75.     Soon thereafter, Frisbie Group and Plaintiffs began more serious discussions about the proposed co-development.  Plaintiffs could not imagine that Defendants would use this apparent olive branch of a partnership to extract and steal confidential and proprietary business information from Plaintiffs.  In February 2020, Cody Crowell visited the Two Roads office in furtherance of this apparent partnership, which Plaintiffs believed Frisbie Group was pursuing in good faith.  At Collins's suggestion, Crowell agreed to get PBA to match the contingencies and closing period in its contract for the PBA Parcels with the previously announced terms and provisions for the Forté contract, which mutually benefitted both parties.  Understanding based on Crowell and Frisbie Group's words and actions that Frisbie Group was pursuing a mutually beneficial partnership, and operating under an understanding of confidentiality, Collins then shared Plaintiffs' detailed plans for the PBA Parcels, developed over a period of sixteen months. He shared the underwriting arrangements, disclosing their capital partners and explaining how the project would have been financed.  Collins shared key details about the building, including the planned square footage, subterranean parking design, and subcontracting bids Plaintiffs had already received.  Showing how the siting of the Flagler Towers buildings could benefit both developments, and hoping that the parties could reach a mutually beneficial agreement on siting, he shared Plaintiffs' detailed siting map for the PBA Parcels.  Plaintiffs even reviewed Frisbie Group's projections for the project and offered revised estimates based on their own work on the Forté.

76.     Collins also shared key information relating to the project's anticipated aesthetic and branding, including details about Plaintiffs' vision for street level amenities, including a café, the art walk, and connectivity to Pioneer Park.  Collins shared details about the planned coordination with the Norton Museum, as well as Plaintiffs' efforts to market the cultural plan to the Mayor and City Commissioners.  Collins also suggested that Frisbie Group and Plaintiffs could integrate the landscaping for the Forté and the new project so that it flowed as one campus.  He explained that the neighboring waterfront property at 1301 South Flagler Drive was owned by Joseph Nasser and shared his timeline for buying out the Nasser Parcel to build a unique dock that could extend to front both properties.  The planned art walk, featuring the sculpture garden and signature art piece, would encompass this waterfront property.  Collins also provided Plaintiffs' information on various citizens groups and neighbors, with suggestions on how to approach and win over each player.  In a subsequent meeting, Cody Crowell and Robert Frisbie Jr. visited the Two Roads office in Miami, where they met others involved in Plaintiffs' plans and toured the Two Roads Miami sales center.

77.     In April 2020, after receiving this valuable and confidential trade secret information, Frisbie Group expressed a desire to recruit Hines Development, of which David Frisbie previously served as vice president and lead developer; Frisbie Group and Plaintiffs would serve as co-developers.  Soon after, in May 2020, Frisbie Group cut out Plaintiffs from the co-development.  Frisbie Group now merely offered that Plaintiffs could be passive investors in their project.  But Frisbie Group would have complete control over the project.

78.     Plaintiffs, blindsided and bewildered, protested that they had already taken numerous concrete steps to implement the integration and shared valuable trade secrets and confidential information on the understanding and belief that Frisbie Group was acting in good

faith.  But Frisbie Group would not reconsider; instead, they cut Plaintiffs out the moment they felt that they had squeezed every bit of valuable information they could from Plaintiffs.  On information and belief, this was Frisbie Group's plan all along.  Far from acting as a "steward of the community," Frisbie Group committed these acts in furtherance of the scheme to defraud Plaintiffs and steal their plans for the PBA Parcels.

79.     In July 2020, Robert Frisbie Jr. and Cody Crowell created FH3 LLC.  This entity is currently processing Frisbie Group's application for government approval of their development plans for the Parcels.

80.     In or about May 2021, Frisbie Group submitted plans to the city of West Palm Beach calling for the creation of two 27-story towers, called the "Flagler Towers," to be built on the PBA Parcels, featuring 109 units, consisting of 100 condominiums and nine ground floor townhouses.  Each floor is proposed to have two units, with the average unit totaling about 5,000 square feet.  All units will have views of the city, the Intracoastal Waterway, Palm Beach and the Atlantic Ocean.  The plan includes a street level café, an art walk looping around the property, connectivity to Pioneer Park, and a partnership with the Norton Museum to develop the property—all as Plaintiffs had disclosed to Frisbie Group.

**G. The Easement *Quid Pro Quo* and the Continuing Scheme to Defraud Plaintiffs**

81.     After sending the termination letter, PBA dangled its power to consent to the routine relocation of utility easements needed by Plaintiffs in an attempt to prevent Plaintiffs from taking any adverse legal action against PBA and Frisbie Group and to extract from Plaintiff a blanket approval of future development on the PBA Parcels.

82.     In or about August 2019, Plaintiffs, their engineering group Kimley-Horn, and Florida Power & Light ("FPL"), reached out to PBA seeking a customary relocation of utility easements crossing Plaintiffs' development parcel to benefit the PBA Parcels.  The proposal

prepared by Plaintiffs and Kimley-Horn provided that PBA would receive the same utility service with changes made at Plaintiffs' expense.  On or about September 26, 2019, without explanation, PBA's counsel formally rejected any cooperation by PBA with Plaintiffs on relocation of the utility easements.

83.     On or about February 4, 2020, Plaintiffs renewed their request that PBA consent to the relocation of the utility easements.  Larry Alexander informed Plaintiffs that in exchange for its consent, PBA first required that Plaintiffs deliver a legal release of any of Plaintiffs' claims against PBA for termination of the LOI—a request clearly reflecting PBA's consciousness of wrongdoing and desire to evade the legal consequences of its prior bad acts. Second, PBA demanded that Plaintiffs provide blanket approval of any proposed development of the PBA Parcels.  With such blanket approval, Frisbie Group could build their towers in a way that could crowd the Forté and potentially obstruct its views.

84.     On or about May 15, 2020, Larry Alexander, counsel for PBA, repeated the conditions that PBA set forth in February 2020.  Plaintiffs later relayed this conversation to Frisbie Group.  Frisbie Group told Plaintiffs that there was a misunderstanding and that Frisbie Group would work to clear it up.  But Frisbie Group never followed up with Plaintiffs to clear up this supposed misunderstanding.

85.     For another year, PBA refused to budge on the easements.  At this point, Plaintiffs were boxed in.  They needed to move forward on the Forté project, but Defendants were determined to hold up construction until they extracted the blanket development approval and a release of legal claims relating to their scheme.  Not willing to be bullied into submission, Plaintiffs redesigned and reengineered the Forté so that it would not require the easements—at great effort and a cost of what will end up being approximately $2 million.  If the easements are

now granted, Plaintiffs will be saved from some of these expenses, but Defendants' actions will still cost them approximately $1.5 million, as much of this money has already been spent or is not recoverable.

86.     On or about April 21, 2021, Plaintiffs emailed Frisbie Group asking if there was some reason why PBA refused to cooperate with FPL on the relocation of the utility easements given that the request was "quite ordinary" and had "no impact or cost for the school or [Frisbie's] development."  That same day, Frisbie Group responded that PBA was "simply waiting on [Plaintiffs'] support" for Frisbie Group's proposed development on the PBA Parcels and surrounding initiatives "before consenting to the easement."

87.     On May 13, 2021, members of Two Roads and Trilar visited the Frisbie compound in Palm Beach to continue discussions over the easements.  There they had a meeting with various members of the Frisbie family.  At this meeting, Suzanne Frisbie threatened, in sum and substance, that if Plaintiffs did not go along with Frisbie Group's unseen plan for the development, Frisbie Group would convince brokers in the market to abandon the Forté project.  Her threat amounts to extortion under Florida law.  This would not be the only time a representative of the Frisbie Group and member of the Frisbie family in sum and substance threatened to harm Plaintiffs' reputations; in fact, this happened multiple times after the Frisbie Group turned on Plaintiffs.

88.     On information and belief, Frisbie Group and PBA are working in concert and scheming together to pressure Plaintiffs into giving up their right to object to the adverse impact of the Frisbie Group's plan on Plaintiffs' valuable rights as the developer of an adjacent parcel (such as their buildings' sight lines), and to pursue their legal remedies.  Frisbie Group and PBA

28

were cynically using the easements to twist Plaintiffs' arm even though it would not harm or inconvenience them at all to relocate the easements.

89.      In an August 15, 2021 email to Plaintiffs, David Frisbie tried to rewrite and whitewash the Frisbie Group and the Frisbie family members' bad behavior and their (as well as PBA's) involvement in the scheme to defraud Plaintiffs.  This was done in furtherance of the scheme to create a false record and narrative and undermine Plaintiffs' legal claims.  In spite of its prior egregious behavior relating to the scheme to defraud Plaintiffs, the theft of Plaintiffs' development deal, the utility easements, and the threat to hurt the Forté's sales if Plaintiffs did not go along with Frisbie Group's development plan, David Frisbie brazenly positioned Frisbie Group as an amiable neighbor, including in being "helpful" with the easements.  David Frisbie also highlighted the "magnitude" of supposed "benefits" it claims it provided to Plaintiffs, alongside Frisbie Group's investment in the Cultural Quarter of the surrounding area, as reasons for Plaintiffs to write a letter of recommendation supporting Frisbie Group's Flagler Towers project.

90.      On September 30, 2021, Frisbie Group again postured as a good neighbor on a call with Plaintiffs and a capital partner, purporting to offer Plaintiffs the relocation of the easements they had previously sought with "no strings attached."  Frisbie Group only made this offer once Plaintiffs had found a way around the easements through the costly reengineering of the Forté.  In other words, Frisbie Group only offered to relocate the easements once it lost its value as a lever to extract approval of the development and a release of legal claims arising from the PSA negotiations and related events.  Having lost that lever, Frisbie Group switched to feigned magnanimity in an effort to win Plaintiffs over, and head off their legal claims, through other means.  But, revealing its falsity, Frisbie Group has failed to follow through on this offer.

91.     Frisbie Group's threats and bad faith behavior only continues.  On November 12, 2021, David Frisbie told a Two Roads principal that Frisbie Group refused to move their towers "even an inch" despite Plaintiffs' requests.  If Plaintiffs came out against Frisbie Group's development, David Frisbie explained, it would mean "war":  Frisbie Group would move its Flagler Towers forward, completely blocking Forté's views.  Rather than having to explain to their buyers that their view was slightly blocked by the Frisbie Group tower, David Frisbie emphasized, Plaintiffs would be forced to tell their buyers that the tower entirely blocks their southern facing views.  David Frisbie also doubled down on Suzanne Frisbie's threat, warning the Two Roads principal that if Plaintiffs did not go along with Frisbie Group's plans, Frisbie Group would tell buyers not to purchase units in the Forté.

92.     Plaintiffs spent sixteen months and large sums of money developing a comprehensive plan for the development of the PBA Parcels.  While assuring Plaintiffs that a deal was imminent, PBA broke its contractual obligations and began to negotiate with Frisbie Group.  Frisbie Group and PBA then entered a contract substantially similar to Plaintiffs' PSA, with Frisbie Group later falsely denying any knowledge of Plaintiffs' prior negotiations with PBA.  Frisbie Group then promised to partner with Plaintiffs on a combined development; after extracting even more confidential information from Plaintiffs, Frisbie Group discarded them. Defendants went on to condition necessary easements on Plaintiffs' release of claims arising from the termination of the LOI and a blanket approval of their development.  Defendants even threatened to hurt the sales of the Forté if they did not comply.  As a direct result of Defendants' actions, Plaintiffs have lost an invaluable, irreplaceable development project, years of work, and many millions of dollars in out-of-pocket costs.  They now face the risk that Frisbie Group could

build the towers stolen from Plaintiffs in a way that irreparably damages their adjacent Forté project.

93.      At this time, Frisbie Group has not broken ground on the PBA Parcels.  Frisbie's Flagler Towers, if permitted to complete construction according to current plans, will inflict significant monetary damage on Plaintiffs, along with unquantifiable and irreparable harm to their business reputations, ongoing and anticipated business and contractual relationships, customer relationships, and public image.  This harm will carry forward and adversely impact not only the Forté project, but all future projects that Plaintiffs are involved in.  Thus, no amount of money can make up for the damages occasioned if Defendants' scheme is permitted to be completed.

94.      An order enjoining performance of the terms and provisions of the contract for the sale of the PBA Parcels between Frisbie Group and PBA, including without limitation the application for permits and development entitlements, rezoning, waivers, construction, and the like, would ensure that Frisbie Group does not affect irreparable changes to the property at a time when ownership of the Parcels is highly disputed.  Frisbie Group continues to move rapidly in an effort to obtain the necessary approvals and begin construction on the property; swift action from this court is needed to avoid irreparable harm to Plaintiffs.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants PBA, Frisbie Group, William M.B. Fleming, Jr., Patrick C. Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell)**

95.      Plaintiffs incorporate by reference Paragraphs 1-94 above, and Paragraphs 173-178 below, as if fully set forth herein.

96.     At all relevant times, Plaintiffs were and are each a "person" within the meaning of 18 U.S.C. § 1961(3).

97.     At all relevant times, the "RICO Defendants"—PBA, Frisbie Group, William Fleming, Patrick Koenig, David Frisbie, Robert Frisbie Jr., and Cody Crowell—were and are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c).

*The RICO Enterprise*

98.     PBA, William Fleming, COO John Kautz III, Patrick Koenig, Jim Jenkins, Larry Alexander, the Frisbie Group, David Frisbie, Robert Frisbie Jr., Cody Crowell, Suzanne Frisbie, Frances Frisbie Criddle, Robert Frisbie Sr., and FH3 LLC, along with additional individuals and entities whose existence, identities and roles have been concealed from Plaintiffs by the RICO Defendants, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

99.     The members of the Enterprise are a group of persons associated together for the common purpose of carrying on an ongoing enterprise.  In particular, the Enterprise has a common goal of defrauding Plaintiffs through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct; material misrepresentations; breaches of trust; misuse of trade secrets and confidential and proprietary information; and extortion.

100.    The members of the Enterprise have long-standing and ongoing relationships rooted in familial connections, common ownership, common control, ongoing business dealings, and mutual interest and participation in common activities.

101.    The Enterprise has longevity sufficient to permit the RICO Defendants to pursue the Enterprise's goal of defrauding Plaintiffs to the RICO Defendants' profit.  The Enterprise's scheme has been in operation since at least early 2019, and it is ongoing and continuing.

102.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and command structure, operating in, and directed from, the United States.  While the organization of the Enterprise may have changed over time, and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of its scheme.

103.    The Enterprise was created and used as a tool to effectuate the RICO Defendants' pattern of racketeering activity.

104.    Each RICO Defendant was and is responsible for command and control of the Enterprise; held and holds positions of responsibility within the Enterprise; or was and is otherwise responsible for the operation and management of the Enterprise and its affairs.

105.    Each RICO Defendant was involved in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the Enterprise.

  a.  Defendant David W. Frisbie maintains command and control of the Enterprise on a strategic level.  He has taken actions, and directed other members of the enterprise to take actions, necessary to accomplish the overall aims of the enterprise, including as described herein and above.  From and through his business and familial relationships, including his position as a founder of Frisbie Group, his status as the patriarch of the Frisbie family, and his business and social relationships with PBA, Fleming and Koenig, he has conducted and participated in the operation and management of the enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs.  In particular,

David Frisbie oversaw Frisbie Group's effort to negotiate with PBA on the PBA Parcels with knowledge that Plaintiffs and PBA had an established business relationship and were finalizing a contract for the Parcels; he coordinated Frisbie Group's scheme to falsely deny knowledge of Plaintiffs' negotiations with PBA; he oversaw Frisbie Group's effort to induce Plaintiffs to hand over trade secrets and confidential business information under the pretense of a partnership, and finally, he coordinated Frisbie Group's cooperation with PBA to dangle the relocation of the easements to extract concessions from Plaintiffs and shield Defendants from liability for their misconduct.  David Frisbie benefitted from the scheme as Frisbie Group displaced Plaintiffs on the contract for the PBA Parcels and received Plaintiffs' valuable trade secrets and confidential information; he will personally reap significant financial rewards from Frisbie Group's development of the PBA Parcels.

b.  Defendant Robert N. Frisbie Jr. shares responsibility for command and control of the Enterprise on a tactical level.  He has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the Enterprise, including as described herein and above.  From and through his business and familial relationships, including his position as a Managing Director of Frisbie Group, his status as a member of the Frisbie family, and his business and social relationships with PBA, Fleming and Koenig, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the

orchestration, planning, and execution of the scheme to defraud Plaintiffs.  In particular, Robert Frisbie Jr. took a lead role in falsely denying Frisbie Group's knowledge of Plaintiff's negotiations with PBA over the PBA Parcels.  Robert Frisbie Jr. also benefitted from the scheme as Frisbie Group displaced Plaintiffs on the contract for the PBA Parcels and received Plaintiffs' valuable trade secrets and confidential information; he will personally reap significant financial rewards from Frisbie Group's development of the PBA Parcels.

c.   Defendant Cody S. Crowell shares responsibility for command and control of the Enterprise on a tactical level.  He has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the Enterprise, including as described herein and above.  From and through his business and familial relationships, including his position as a Managing Director of Frisbie Group, his status as a member of the Frisbie family, and his business and social relationships with PBA, Fleming and Koenig, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs.  In particular, Crowell took a lead role in inducing Plaintiffs to hand over trade secrets and confidential business information under the pretense of a partnership.  Crowell benefitted from the scheme as Frisbie Group displaced Plaintiffs on the contract for the PBA Parcels and received Plaintiffs' valuable

trade secrets and confidential information; he will personally reap significant financial rewards from Frisbie Group's development of the PBA Parcels.

d.  Directly and through its agent officers and employees, Defendant Frisbie Group has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs.  In particular, Frisbie Group has been responsible for knowingly interfering with Plaintiffs' and PBA's business relationship, falsely denying knowledge of Plaintiffs' negotiations with PBA over the PBA Parcels, inducing Plaintiffs to hand over trade secrets and confidential business information under the pretense of a partnership, threatening to scare off potential buyers for the Forté if Plaintiffs did not go along with Frisbie Group's development plan, and cooperating with PBA to withhold the easements to extract concessions from Plaintiffs.  Frisbie Group benefitted from the scheme as Frisbie Group displaced Plaintiffs on the contract for the PBA Parcels and received Plaintiffs' valuable trade secrets and confidential information; the Frisbie Group will also reap significant financial rewards from its development of the PBA Parcels.

e.  Directly and through its agent officers and employees, Defendant PBA has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs.  In particular, PBA has been responsible for misleading Plaintiffs that a deal was imminent

36

and completed during the Spring 2019 PSA negotiations while coordinating

negotiations with Frisbie Group, misleading Plaintiffs as to the reason for the

delay in returning a countersigned signature page and moving forward with

the project, misleading Plaintiffs into submitting another offer in January

2020, and conditioning easements needed by Plaintiffs on the release of legal

claims and support of future developments on the property, in furtherance of

the scheme.  PBA benefitted from the scheme as PBA stole Plaintiff's

valuable trade secrets and confidential information, which it then used in

doing a similar deal with the Frisbie Group, currying favor with the Frisbie

Group and members of the Frisbie family.  This resulted, *inter alia*, in

donations to PBA and additional potentially lucrative deals with the Frisbie

Group.

f.   Defendant Patrick Koenig has been involved in, and held positions of

responsibility with respect to, the planning and execution of the scheme to

defraud Plaintiffs.  He has taken actions, and directed other members of the

Enterprise to take actions, necessary to accomplish the overall aims of the

Enterprise, including as described herein and above.  From and through his

business and social relationships, including his position as a Trustee of the

PBA Board and Chair of its Real Estate Committee and his business and

social relationships with Fleming, David Frisbie, Robert Frisbie Jr., and

Crowell, he has conducted and participated in the operation and management

of the Enterprise and its affairs, and has been a central participant in the

orchestration, planning, and execution of the scheme to defraud Plaintiffs.  In

particular, Koenig helped to mislead Plaintiffs that a deal was imminent and completed during the Spring 2019 PSA negotiations while coordinating a deal with Frisbie Group, mislead Plaintiffs as to the reason for the delay in returning a countersigned signature page and moving forward with the project, and misled Plaintiffs into submitting another offer in January 2020.  Koenig benefitted from the scheme by currying favor with PBA, Fleming, the Frisbie Group, and members of the Frisbie family.

g.   Defendant William Fleming has been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to defraud Plaintiffs.  He has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the Enterprise, including as described herein and above.  From and through his business and social relationships, including his position as President of PBA and his business and social relationships with Koenig, David Frisbie, Robert Frisbie Jr., and Crowell, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs.  In particular, Fleming oversaw the Enterprise's actions in misleading Plaintiffs that a deal was imminent and completed during the Spring 2019 PSA negotiations while coordinating negotiations with Frisbie Group.  Fleming benefitted from the scheme by currying favor with the Frisbie Group and members of the Frisbie family, which resulted in donations to PBA and additional potentially lucrative deals with the Frisbie Group, and

38

through PBA's receipt of Plaintiff's valuable trade secrets and confidential

information.

106.    At all relevant times, each RICO Defendant was, and is, a person who exists

separate and distinct from each other RICO Defendant.

107.    At all relevant times, each member of the RICO Enterprise was, and is, a person

who exists separate and distinct from each other member of the RICO Enterprise.

108.    At all relevant times, each RICO Defendant was, and is, a person who exists

separate and distinct from the RICO Enterprise.

109.    At all relevant times, the Enterprise engaged in, and its activities affected,

interstate commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise's fraudulent

scheme entailed business communications and negotiations via email and telephone spanning

three states—Florida, Massachusetts, and New York—and Europe.  On information and belief,

the Enterprise, moreover, held and transferred funds and assets across state lines and using

national and international financial institutions in furtherance of the scheme.

*Pattern of Racketeering Activity*

110.    Each RICO Defendant has conducted and participated in, directly or indirectly,

the management or operation of the Enterprise and its affairs through a pattern of racketeering

activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), in violation of 18 U.S.C. § 1962(c).

The RICO Defendants have consistently and regularly committed acts of racketeering activity

spanning a period from at least early 2019 to the present; only the RICO Defendants know when

precisely their scheme commenced, and their scheme is continuing.  These multiple acts shared a

common or related purpose, goal, result, participants, victims, and methods of commission.

111.   RICO Defendants, through and using the Enterprise, engaged in a wide-ranging scheme to defraud and deceive Plaintiffs concerning the sale, purchase, and development of the PBA Parcels and the related development of the Forté project; they eventually sought to extort Plaintiffs to obtain approval for, block the discovery of, and free themselves from liability from, their scheme.  This pattern of racketeering activity includes a pattern of fraudulent misrepresentations and material omissions during the contract negotiations; mail and wire fraud; theft and misappropriation of trade secrets and confidential business information concerning the development of the PBA Parcels in violation of the Defense of Trade Secrets Act; a concerted effort to cover up its fraudulent behavior by conditioning the relocation of necessary utility easements on Plaintiffs' release of legal claims and a blanket approval on any future development of the PBA Parcels; and extortionary threats to injure Plaintiffs' reputation and the value of Plaintiffs' Forté project if Plaintiffs did not support Defendants' development plan.

112.   RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to defraud and deceive the Plaintiffs.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods.  In its early stages, the Enterprise schemed to mislead Plaintiffs into believing that the PBA Parcels deal would be finalized.  Meanwhile, from at least March 2019 onwards, the Enterprise facilitated negotiations between PBA and Frisbie Group for the purchase of the property in question.  On information and belief, the Enterprise roped Plaintiffs along to encourage them to keep pouring resources into plans for the development and documentation for the PSA.  On information and belief, PBA also roped Plaintiffs along to keep them as a backup offer and to maintain leverage in their negotiations with Frisbie Group; on information and belief, Frisbie Group, understanding PBA's business reality, and sensing an opportunity to take Plaintiffs' comprehensive plans for

the project, accepted this arrangement.  As part of this scheme, the Enterprise induced Plaintiffs to share trade secrets and confidential business information regarding the development of the PBA Parcels during Plaintiffs' negotiations with PBA from March 2019 to May 2019, and in January 2020.  And as part of this scheme, PBA would share these trade secrets with Frisbie Group.  PBA's theft of these trade secrets, along with Frisbie Group's knowing use of these stolen trade secrets, constitute violations of 18 U.S.C. § 1832.

113.    RICO Defendants, through and using the Enterprise, endeavored to keep these underhanded negotiations a secret through fraud and deception.  From March to May 2019, Larry Alexander and Patrick Koenig affirmatively misled Plaintiffs into believing a deal was imminent and completed while negotiating with Frisbie Group.  PBA also committed fraud by omission in violating its duty to disclose material facts.  Because PBA undertook to disclose information concerning its intentions for the sale and development of the PBA Parcels, and Plaintiffs had no opportunity to learn of its negotiations with Frisbie Group, PBA should have disclosed that it was negotiating with another party and did not intend to sell the Parcels to Plaintiffs.  In August 2019, at their meeting at the Frisbie family compound in Nantucket, David Frisbie and Robert Frisbie Jr. lied to Plaintiffs when asked if they had known about the negotiations between Plaintiffs and PBA.  Plaintiffs relied on this representation to their detriment by trusting  Frisbie Group and PBA in their continued dealings.

114.    Starting in August 2019, RICO Defendants, through and using the Enterprise, sought to extract and steal even more trade secrets and confidential business information relating to the development of the PBA Parcels.  David Frisbie, Robert Frisbie Jr., and Crowell represented that Frisbie Group had agreed to partner with Plaintiffs to integrate the properties and reduce development headaches, but in fact this was a ruse intended for (and actually

resulting in) the extraction and theft of more of Plaintiffs' valuable trade secrets and confidential information related to the development of the PBA Parcels, including through Crowell's meetings with Plaintiffs.

115.   RICO Defendants' scheme, through and using the Enterprise, continues to this day.  Frisbie Group and FH3 LLC continue to apply for government approval for the project using trade secrets and confidential information stolen from Plaintiffs.  Crowell, Robert Frisbie Jr., and John Kautz III continue to try to cover up this fraudulent scheme by conditioning the necessary and routine relocation of utility easements on Plaintiffs' release of legal claims relating to the PBA Parcel negotiations and Plaintiffs' blanket approval of developments on the PBA Parcels.  Suzanne Frisbie has threatened that the Frisbie Group would tell brokers to abandon the Forté if Plaintiffs do not go along with Defendants' development plan.  David Frisbie has threatened to tell potential Forté buyers the same and to site the Flagler Towers in a way that completely blocks the Forté's views if Plaintiffs do not bow to their demands.  These threats amount to acts of extortion under Florida law.

116.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. 1343 (relating to wire fraud).  A scheme to defraud includes any plan to deprive a person of something of value by trick, deceit, chicanery or overreaching, including through affirmative misrepresentations, material omissions of fact, or any deceptive or dishonest behavior.  As part of and in furtherance of the scheme, the RICO Defendants made repeated use of, or caused members of the Enterprise to repeatedly make use of, the U.S. Postal Service and/or the interstate wires to transmit various documents, communications, or payments, including with knowledge that the use of mails or wires would follow in the ordinary course of business or where such use could be reasonably

foreseen. Each transmission constituted the transmittal by means of mail or wire communication in interstate commerce of signals, sounds or writings for the purpose of executing or attempting to execute the predicate acts or the scheme to defraud articulated above.

117. For example, in furtherance of the scheme to defraud Plaintiffs, Alexander (on behalf of PBA) and Koenig, with the knowledge and permission of PBA and Fleming, sent numerous email messages to Plaintiffs that crossed interstate lines; these email messages were transmitted from Florida to New York and Massachusetts. These messages affirmatively misled Plaintiffs into believing that PBA would countersign the heavily negotiated and "all approved" PSA with Plaintiffs and complete the sale of the Parcels to Plaintiffs. Plaintiffs' counsel for these negotiations, Ropes & Gray, was in Boston during these negotiations, and communicated with Alexander and/or Koenig by email and telephone calls that crossed state lines.

118. In furtherance of the scheme to defraud Plaintiffs, in or about July 2019 David Frisbie spoke on the phone with a Two Roads principal, who was in Europe at the time, and misrepresented his knowledge of Plaintiff's negotiations with PBA. Members of the Frisbie family and the Frisbie Group also frequently emailed Plaintiffs from Massachusetts in furtherance of the scheme, when Plaintiffs and their employees were located in Florida and New York. In furtherance of the scheme to defraud Plaintiffs, on information and belief, the RICO Defendants and the members of the Enterprise communicated regularly with one another by email and telephone where at least one individual was in one state and another individual was in another state, including Florida, Massachusetts, and New York.

119. On information and belief, further discovery will reveal that, in furtherance of the scheme to defraud Plaintiffs, the RICO Defendants and other members of the Enterprise, including individuals associated with Frisbie Group and PBA, engaged in numerous additional

email and phone communications that crossed state lines, including between and among

Massachusetts, Florida, and New York, to coordinate and perpetuate the ongoing scheme.

Further discovery will also reveal additional actions taken by the RICO Defendants in

furtherance of the scheme to defraud Plaintiffs, including emails and other communications

between and among the RICO Defendants and the members of the Enterprise, and interstate wire

payments and bank transfers in furtherance of the scheme.  *Cf. Hill v. Morehouse Med. Assocs.,

Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ("Rule 9(b)'s heightened pleading

standard may be applied less stringently. . . when specific factual information about . . . fraud is

peculiarly within [a] defendant's knowledge or control" as long the pleading party accompanies

its legal theory with factual allegations that make the "theoretically viable claim plausible.");

*Omnipol, A.S. v. Worrell*, 421 F. Supp. 3d 1321, 1344 (M.D. Fla. 2019) ("Rule 9(b)'s pleading

standard may be relaxed when evidence of the fraud is exclusively within the defendant's

possession.").

120.    Section 1961(1) of RICO also provides that "racketeering activity" includes any

act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets).  As set forth herein, in

furtherance of the scheme to defraud Plaintiffs, the RICO Defendants engaged in numerous acts

in violation of 18 U.S.C. § 1832, including as set forth in Paragraphs 112-115 above and

Paragraphs 172-178 below.

121.    Section 1961(1) of RICO also provides that "racketeering activity" includes "any

act or threat involving . . . extortion" that is "chargeable under State law and punishable by

imprisonment for more than one year."  In furtherance of the scheme to defraud Plaintiffs, on

May 13, 2021 Suzanne Frisbie, on behalf of herself, the Frisbie Group, and the other members of

the Frisbie family who were present, threatened to damage the reputation of Plaintiffs' Forté

project by telling people not to buy units in the building if Plaintiffs do not go along with Defendants' development plan.  She thus maliciously threatened injury to Plaintiffs, their property, and their reputations, with the intent to extort a pecuniary advantage for the Frisbie Group and other RICO Defendants, as well as with the intent to compel Plaintiffs to take actions, and refrain from taking actions, against their will.  *See* Fl. S. 836.05.

122.     In furtherance of the scheme to defraud Plaintiffs, on November 12, 2021 David Frisbie, on behalf of himself and Frisbie Group, offered a Two Roads principal to purchase multiple units in the Forté if Plaintiffs came out in support of the Flagler Towers project.  In the same conversation, David Frisbie threatened to a Two Roads principal that if, on the other hand, Plaintiffs came out against Frisbie Group's development, it would mean "war":  Frisbie Group would move its towers forward, completely blocking Forté's views.  David Frisbie also doubled down on Suzanne Frisbie's threat, warning the Two Roads Principal that if Plaintiffs did not go along with Frisbie Group's plans, Frisbie Group would tell buyers not to purchase units in the Forté.  He thus maliciously threatened injury to Plaintiffs' property interests with the intent to extort a pecuniary advantage for the Frisbie Group and other RICO Defendants, as well as with the intent to compel Plaintiffs to take actions, and refrain from taking actions, against their will. *See* Fl. S. 836.05.

123.     During the course of the scheme, representatives of the Frisbie Group and members of the Frisbie family in sum and substance also threatened to harm Plaintiffs' reputations in multiple other instances.

124.     The RICO Defendants made or caused to be made these transmissions, and made these threats, by and through members of the RICO Enterprise, with the specific intent of

coordinating and effectuating the scheme to defraud Plaintiffs, defrauding Plaintiffs, and stealing Plaintiffs' trade secrets and confidential business information.

125.    This pattern of racketeering began at least in early 2019 and is ongoing and open-ended.  Each predicate act is part of the same continuous and overarching scheme.  These instances of racketeering took place after 1970 and the last act occurred within ten years after the commission of a prior act of racketeering.

*Injury and Causation*

126.    The racketeering activity set forth herein was the direct and proximate cause of plaintiff's injuries, including because the scheme to defraud Plaintiffs led to Plaintiffs' loss of possession and ownership of (and the associated development opportunities for) the PBA Parcels, and the theft of their trade secrets and confidential business information.

127.    Plaintiff's injuries include the lost expectancy of the PBA Parcels; the profits derived from the transaction; their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels; and the $2,000,000 spent or committed to reengineer the Forté after the RICO Defendants refused to relocate the utility easements unless Plaintiffs agreed to waive their legal rights to pursue claims against the RICO Defendants for their wrongful conduct, which was done in furtherance of the scheme to defraud Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract of Letter of Intent, Exclusivity Provision –**
**Against Defendant PBA)**

128.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

129.    PBA entered into the LOI with Two Roads on or about June 11, 2018.  The LOI was a binding contract between the parties, for which consideration was given by each.

130.     The LOI bound the parties to an exclusivity provision, under which the parties could "not entertain or enter into any other purchase agreement or financing for the [PBA Parcels] and each party agrees to negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the date of this LOI.  [I]n the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other, in which event, neither party hereto shall thereafter have any further liability, responsibility or obligation to the other under this LOI."

131.     PBA negotiated with Two Roads and Trilar under the exclusivity provision of the LOI from June 11, 2018 to May 29, 2019.  Based on the terms of the LOI, the parties unambiguously intended that in the event that no agreement was reached during the initial 90-day period of the LOI, the exclusivity agreement would continue unless and until one of the parties "terminate[d] the negotiations and this LOI . . . upon written notice to the other."  Any liabilities, responsibilities or obligations that the parties had to each other, including those related to exclusivity, would continue to apply until such termination.  PBA's May 29, 2019 letter explicitly terminating negotiations *under the LOI* further proves this mutual understanding.

132.     PBA breached the exclusivity provision by starting negotiations with Frisbie Group in or about March 2019, two months prior to terminating negotiations under the LOI.

133.     Plaintiffs were injured and suffered damages as a result of PBA's breach of the exclusivity provision, in an amount to be determined at trial.

134.     Plaintiff's injuries include the lost expectancy of the PBA Parcels, the lost profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the

proposed development of the PBA Parcels, the terms of the PSA, and all due diligence

information and documents relating to the PBA Parcels.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract of Letter of Intent, Confidentiality Provision – Against**
**Defendant PBA)**

135.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth

herein.

136.    The LOI, entered into by Plaintiffs and Two Roads on June 11, 2018—a binding

contract between the parties, for which consideration was given by each—also included a

confidentiality provision, which stated that the "terms of th[e] LOI and the parties' discussions

and exchanged written materials relating to the proposed transaction," including the "terms of the

proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]" and

"due diligence information and documents relating to the [PBA Parcels]," are proprietary and

confidential, and may not "be shown or disclosed by either party . . . to any other person or

entity, except to those employees, attorneys, accountants or advisors who have a need to know as

a result of being involved in the proposed transaction."

137.    On information and belief, PBA breached the confidentiality provision by sharing

with Frisbie Group "the terms of the proposed [PSA]; the proposed development of the [PBA

Parcels], and due diligence information and documents relating to the [PBA Parcels]."  This

information, by the terms of the LOI, was confidential and proprietary.

138.    Two Roads and the other Plaintiffs were injured and suffered damages as a result

of PBA's breach of the LOI's confidentiality provision, in an amount to be determined at trial.

139.    Plaintiffs' damages consist of their significant investments in producing the plan

for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence

information and documents relating to the PBA Parcels.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract, Purchase and Sale Agreement –**
**Against Defendant PBA)**

140.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth

herein.

141.    On May 2, 2019, PBA and Flagler South Development LLC (on behalf of itself

and the other Plaintiffs) formed a valid and enforceable contract for the purchase and sale of the

PBA Parcels, for which each party provided consideration.

142.    On or about April 5, 2019, PBA counsel Larry Alexander represented that the

deal was "all approved" and asked the purchaser to forward the executed agreement.  On

Thursday, April 18, Collins signed the Agreement, took a picture of the executed signature page,

and sent it to Koenig, congratulating him on completion of the deal.  Two Roads General

Counsel Hayes also emailed the executed counterpart of the Agreement to attorney Alexander on

April 18 and physically hand delivered two original counterparts to his office the following day.

On April 19, PBA requested a last-minute final release of brokerage and procurement fees from

Marius Fortelni, which Plaintiffs arranged exactly as requested.  Plaintiffs then reached out to

PBA to prepare for the delivery of the final fully executed agreement.  On May 2, PBA

represented that their President's health issues were causing delays, but confirmed that the

Agreement had been approved.

143.    At this point, the parties had mutually agreed on all terms.  These terms covered

every part of the deal: insurance, deed restrictions, fixed deadlines for hard deposits, and the

designation of an escrow agent.  PBA had represented that the deal was "all approved" as early

as April 5, and the last minute condition related to brokerage and procurement concerns with

Marius Fortelni was satisfied in the form provided by PBA counsel Larry Alexander.  By May 2,

PBA had represented that their president had approved the "final" version of the contract.

144.     PBA breached this contract by failing to perform the purchase and sale as dictated by its terms, and in particular by failing to complete the sale and transfer of the PBA Parcels to Plaintiffs.

145.     Flagler South Development LLC and the other Plaintiffs were injured and suffered damages as a result of Defendant PBA's breach of the Purchase and Sale Agreement, in an amount to be determined at trial.

146.     Plaintiff's injuries as a result of this breach include the lost expectancy of the PBA Parcels, the lost profits derived from the transaction, and their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**FIFTH CLAIM FOR RELIEF**
**(Fraud –**
**Against Defendants PBA and Patrick C. Koenig)**

147.     Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

148.     In April and May 2019, PBA and Koenig repeatedly represented to Plaintiffs that the terms of the PSA had been finalized, that the PSA was "all approved," and that PBA planned and intended to move forward with Plaintiffs as its development partner.  Larry Alexander (as attorney for PBA) and Koenig also repeatedly represented that the reason why PBA were not countersigning the PSA was due to the ill health of its President.

149.     Alexander's and Koenig's representations were false, and they knew them to be false.  PBA began negotiating with Frisbie Group for the purchase of the PBA Parcels in March 2019.  While telling Plaintiffs that the deal was "all approved," PBA continued to negotiate the sale of the PBA Parcels with Frisbie Group.  As explained above in Paragraphs 67-70, PBA had no firm intention of executing the contract with Plaintiffs provided it concluded its deal with

50

Frisbie Group (but retaining at all times Plaintiffs' executed contract and its obligations thereunder). PBA made these misrepresentations and omissions to Plaintiffs so that Plaintiffs would rely and act upon them. PBA succeeded: Plaintiffs trusted PBA's representations that the deal would be finalized, and reasonably relied on them. Having tricked Plaintiffs into waiting for execution, PBA could use their negotiations with Plaintiffs as leverage in their negotiations with Frisbie Group. Multiple representations in May 2019 that the delay in execution was due to the ill health of PBA's President were tactics to buy time until PBA was comfortable with its prospects with Frisbie Group.

150.    In addition to these affirmative misrepresentations, PBA violated its duty to disclose the material fact that it was negotiating with another party and did not intend to sell the Parcels to Plaintiffs. This duty arose because PBA undertook to disclose information concerning its intentions for the PBA Parcels transaction, and because Plaintiffs had no opportunity to learn of these negotiations with Frisbie Group. Plaintiffs reasonably relied on the affirmative misrepresentations and the lack of information about PBA's secret dealings to its detriment.

151.    In January 2020, PBA continued its pattern of fraud when it urged Plaintiffs to put forward another offer on the property. Koenig suggested the terms, and Plaintiffs complied, submitting an offer with those terms. Again, PBA roped Plaintiffs along, using the Plaintiffs' terms as leverage in its negotiations with Frisbie Group. PBA's negotiations with Frisbie Group crystallized into a finalized deal with Frisbie Group just days after PBA asked for Plaintiff's backup offer. PBA had no firm intention of contracting with Plaintiffs; instead, it just wished to pump Plaintiffs for valuable information and discard them after extracting all it could.

152.    PBA's representations and omissions with respect to their commitment to the

negotiations were material as they amounted to promises that the execution of a massive real

estate transaction would be finalized.

153.    Plaintiffs justifiably relied upon the above misrepresentations and omissions of

material fact in April and May of 2019.  Having been told that the deal was "all approved" and

repeatedly assured that the deal would go through, Plaintiffs reasonably continued to spend time

and money preparing to acquire and develop the Parcels.  In January 2020, Plaintiffs again

reasonably relied upon PBA's suggestion that they still had a chance at purchasing the Parcels, as

Plaintiffs were submitting their backup offer on the terms and with exactly the concessions PBA

requested.

154.    Plaintiffs were injured and suffered damages as a result of their reasonable

reliance on PBA's and Koenig's misrepresentations and omissions, in an amount to be

determined at trial. In particular, among other things, PBA's misrepresentations and omissions

were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its

acquisition and development of the PBA Parcels.

155.    Plaintiff's injuries include the lost expectancy of the PBA Parcels, the profits

derived from the transaction, their significant investments in producing the plan for the proposed

development of the PBA Parcels, the terms of the PSA, and all due diligence information and

documents relating to the PBA Parcels.

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting Fraud –**
**Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S.**
**Crowell)**

156.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth

herein.

157.    Defendants Frisbie Group, David Frisbie, Robert Frisbie Jr., and Cody Crowell aided and abetted the fraud committed by PBA and Koenig.  These Defendants were aware of and engaged in a scheme to defraud Plaintiffs.  In May 2020, they provided substantial assistance to PBA by affirmatively assisting PBA to conceal its fraud.  In a July 2019 phone call to a Two Roads principal, David Frisbie misrepresented his knowledge that Plaintiffs and PBA had been negotiating for the Parcels.  David Frisbie, Robert Frisbie Jr., and Cody Crowell affirmatively denied any knowledge of these negotiations to the Two Roads principals during their visit to the Frisbie family compound in Nantucket on August 6, 2019.  This was a lie, as Frances Frisbie Criddle—an integral member of the Frisbie Group and Frisbie family—was told about the negotiations in December 2018.

158.    Plaintiffs were injured and suffered damages as a result of these Defendants' aiding and abetting of PBA's and Koenig's fraud, in an amount to be determined at trial.  In particular, among other things, PBA's and Koenig's misrepresentations and omissions, which were aided and abetted by these Defendants, were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

159.    Plaintiff's injuries include the lost expectancy of the PBA Parcels, the profits derived from the transaction, their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

### SEVENTH CLAIM FOR RELIEF
**(Negligent Misrepresentation –**
**Against Defendants PBA and Patrick C. Koenig)**

160.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

161.    PBA and Koenig made a series of misrepresentations to Plaintiffs relating to the purchase of the PBA Parcels, as described above in Paragraphs 148-152, which are incorporated by reference as if fully set forth herein.

162.    Among other things, PBA and Koenig engaged in negotiations with Frisbie Group while representing to Plaintiffs that PBA had approved and was finalizing the sale of the Parcels to Plaintiffs.  No reasonably prudent business exercising due care would make definite representations that a sale was imminent while negotiating with another party for that same property.  At the very least, given the circumstances PBA should have known not to affirmatively promise that the deal would reach execution.

163.    In addition to these affirmative misrepresentations, PBA violated its duty to disclose the material fact that it was negotiating with another party and did not intend to sell the Parcels to Plaintiffs.  This duty arose because PBA undertook to disclose information concerning its intentions for the sale and development of the PBA Parcels, and because Plaintiffs had no opportunity to learn of these secret negotiations with Frisbie Group.

164.    As described above in Paragraph 153, Plaintiffs justifiably relied upon the above misrepresentations and omissions of material fact.

165.    Plaintiffs were injured and suffered damages as a result of PBA's and Koenig's negligent misrepresentations and omissions, in an amount to be determined at trial.  In particular, among other things, these misrepresentations and omissions were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

166.    Plaintiff's injuries include the lost expectancy of the PBA Parcels, the profits derived from the transaction, their significant investments in producing the plan for the proposed

development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

## EIGHTH CLAIM FOR RELIEF
### (Promissory Estoppel –
### Against Defendants PBA and Patrick C. Koenig)

167.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

168.     PBA and Koenig made definite and substantial promises by representing throughout the negotiations, among other things, that the sale of the Parcels to Plaintiffs would be finalized and, in April 2019, that the contract for the PBA Parcels was "all approved."

169.    Plaintiffs reasonably relied on such promises, as they were definite in nature and repeated consistently throughout the parties' negotiations.

170.    Plaintiffs were injured and suffered damages as a result of their reasonable reliance on PBA's and Koenig's promises, in an amount to be determined at trial.  In particular, PBA's and Koenig's promises were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

171.    Plaintiffs' damages consist of the lost expectancy of the Parcels, the lost profits derived from the transaction, Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

## NINTH CLAIM FOR RELIEF
### (Violations of 18 U.S.C. § 1832 –
### Against All Defendants)

172.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

173.     Plaintiffs incurred significant costs to develop trade secrets with independent economic value unique to the Parcels.  These include, *inter alia*, the terms of the PSA; all due diligence documentation; the siting and massing plan, including blueprints, maps, and the work product of an architect; the comprehensive plan to comply with city zoning and land use requirements; plans to build a marina and dock on the Nasser Parcel; plans for integrating the property with its surroundings, including details about the art walk and co-branding with the Norton Museum, and strategic information on various citizens groups and neighbors.

174.     These trade secrets involved interstate commerce and related to a product that was intended for use in interstate commerce.  The plans involved out of state actors and resources, involved capital partners located outside the state of Florida, and involved a condominium that would be marketed beyond Florida.

175.     Plaintiffs took reasonable measures to keep this information a secret.  Plaintiffs did not publicize this information and maintained adequate security to protect their computers, files, documents, and other records that stored information relating to these trade secrets.  Plaintiffs included a confidentiality provision in the LOI between Two Roads and PBA in an attempt to protect this information.

176.     PBA, Koenig, and Fleming misappropriated this information when they misrepresented their intentions to consummate the PSA with Plaintiffs.  PBA, Koenig, and Fleming continued to indicate their intentions of completing the deal with Plaintiffs while dealing with Frisbie Group, all the while receiving Plaintiffs' trade secrets and confidential business information throughout these negotiations.  On information and belief, PBA, Koenig, and Fleming violated their confidentiality obligations by sharing this information with Frisbie Group as early as March 2019.  On information and belief, Frisbie Group, David W. Frisbie,

Robert N. Frisbie Jr., Crowell, and FH3 LLC used these trade secrets, which they knew were acquired by improper means, to reach an agreement with PBA and to plan Frisbie Group's and FH3's development of the PBA Parcels.

177.    Starting in or around August 2019, Plaintiffs and Frisbie Group, with the involvement and under the direction of David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell, began serious discussions around co-developing the PBA Parcels, under an implied confidentiality understanding.  Unbeknownst to Plaintiffs, Frisbie Group, with the involvement and under the direction of David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell, misrepresented Frisbie Group's intent to co-develop the property with Plaintiffs to obtain Plaintiffs' trade secrets and confidential business information.  Pursuant to this relationship, Plaintiffs shared their trade secrets and confidential information with Frisbie Group.  Frisbie Group and FH3 LLC enjoy the use of this valuable stolen information as they move forward with the development of the Flagler Towers.

178.    Plaintiffs were injured and suffered damages as a result, in an amount to be determined at trial.  Plaintiffs' damages consist of their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**TENTH CLAIM FOR RELIEF**
**(Violation of Fla. Stat. §§ 688.001 *et seq.* –**
**Against All Defendants)**

179.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

180.    Plaintiffs incurred significant costs to develop trade secrets with independent economic value unique to the Parcels, as set forth in Paragraph 173 above, which is incorporated by reference as if fully set forth herein.

181.     Plaintiffs took reasonable measures to keep this information a secret, as set forth in Paragraph 175 above, which is incorporated by reference as if fully set forth herein.

182.     Defendants misappropriated this information, as set forth in Paragraphs 176-177 above, which are incorporated by reference as if fully set forth herein.

183.     Plaintiffs were injured and suffered damages as a result, in an amount to be determined at trial.  Plaintiffs' damages consist of their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**ELEVENTH CLAIM FOR RELIEF**
**(Common Law Conversion of Confidential Business Information –**
**Against All Defendants)**

184.     Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

185.     Defendants engaged in conversion of confidential business information.

186.     Plaintiffs consider the following to be confidential and proprietary: the terms of the PSA; all due diligence documentation; the siting and massing plan, including blueprints, maps, and the work product of an architect; the comprehensive plan to comply with city zoning and land use requirements; plans to build a marina and dock on the Nasser Parcel; plans for integrating the property with its surroundings, including details about the art walk and co-branding with the Norton Museum, and strategic information on various citizens groups and neighbors.

187.     These Defendants knew that Plaintiffs considered this information to be confidential and proprietary, as it reflected significant investment to gather, develop, and process.  PBA also signed the LOI, and as such, agreed that this information was confidential and proprietary.

58

188.     PBA, Koenig, and Fleming wrongfully acquired Plaintiffs' proprietary and confidential trade secret information by inducing Plaintiffs to turn over the information during purported good faith negotiations between March and May of 2019, as well as in January 2020. This was a fraud:  PBA, Koenig and Fleming used Plaintiffs as a bargaining chip and provided Plaintiffs' information to Frisbie Group.

189.     Starting in August 2019, David Frisbie, Robert Frisbie Jr., and Crowell agreed to partner with Plaintiffs to integrate the properties and reduce development headaches.  These Defendants leveraged this apparent partnership to induce Plaintiffs to share the following: terms of the proposed Agreement; the plan for the proposed development of the PBA Parcels, including blueprints, maps, and the work product of an architect; plans for integrating the property with its surroundings, including details about the art walk, co-branding with the Norton Museum, plans for a buy-out of the waterside property that would feature a sculpture garden with a signature art piece, as well as a dock and marina; details on which citizens groups and neighbors could block or support the development; and due diligence information and documents relating to the PBA Parcels.  FH3 enjoys the use of this valuable stolen information as it processes government applications for the Flagler Towers project.

190.     Plaintiffs' damages consist of their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**TWELFTH CLAIM FOR RELIEF**
**(Tortious Interference with Contract–**
**Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and**
**Cody S. Crowell)**

191.     Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

192.    Plaintiffs and PBA were bound by two valid and enforceable contracts.  The June 2018 LOI was a binding agreement that signaled their formal intent to enter into a PSA for the Parcels.  Plaintiffs and PBA then formed a valid and enforceable contract for the purchase and sale of the PBA Parcels.

193.    On information and belief, Frisbie Group knew of these contracts.

194.    Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell intentionally and unjustifiably interfered with these contracts when Frisbie Group engaged with PBA to negotiate to purchase the Parcels.  On information and belief, these defendants engaged with PBA despite knowing PBA and Plaintiffs were bound by an exclusivity agreement and confidentiality agreement.  These defendants saw an opportunity to reach a quick deal with PBA by utilizing Plaintiffs' detailed plan for the development, terms of the PSA, and due diligence documentation.  Frisbie Group's later involvement in using the easements to extract legal claims for PBA demonstrates that the Frisbie Group and PBA deal was built, either explicitly or implicitly, on an improper quid pro quo: Frisbie Group would get the PBA Parcel deal with Plaintiffs, but Frisbie Group would help PBA evade the probable legal consequences of PBA's decision to scrap the "all approved" PSA with Plaintiffs.  Together, these actions amount to the improper behavior necessary for tortious interference with contract.

195.    These defendants' interference resulted in PBA violating the LOI and purporting to back out of the PSA with Plaintiffs.  Plaintiffs' damages include the lost expectancy of the Parcels, the profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**THIRTEENTH CLAIM FOR RELIEF**
**(Tortious Interference with Business Relationship –**
**Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S.**
**Crowell)**

196.     Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth

herein.

197.     Plaintiffs and PBA had a business relationship from at least January 2018 until at

least May 2019, evidenced by their intensive negotiations throughout this period, which

culminated in the May 2019 PSA.

198.     Frisbie Group, David Frisbie, Robert Frisbie Jr., and Cody Crowell knew of this

business relationship by at least December 2018, when an integral member of the Frisbie Group

and Frisbie family, Frances Frisbie Criddle, heard about the negotiations in a conversation with

Koenig and Collins at a party, six months after PBA and Plaintiffs entered into the LOI.

199.     Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell intentionally and

unjustifiably interfered with this business relationship when Frisbie Group engaged with PBA to

negotiate to purchase the Parcels.  On information and belief, these Defendants engaged with

PBA despite knowing PBA and Plaintiffs were bound by an exclusivity agreement and

confidentiality agreement.  These defendants saw an opportunity to reach a quick deal with PBA

by utilizing Plaintiffs' detailed plan for the development, terms of the PSA, and due diligence

documentation.  Frisbie Group's later involvement in using the easements to extract legal claims

for PBA demonstrates that the Frisbie Group and PBA deal was built, either explicitly or

implicitly, on an improper quid pro quo: Frisbie Group would get the PBA Parcel deal with

Plaintiffs, but Frisbie Group would help PBA evade the probable legal consequences of PBA's

decision to scrap the "all approved" PSA with Plaintiffs.  Together, these actions amount to the improper behavior necessary for tortious interference with a business relationship.

200.    These defendants' interference resulted in PBA terminating its business relationship with Plaintiffs and purporting to back out of the PSA with Plaintiffs.  Plaintiffs' damages include the lost expectancy of the Parcels, the profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**FOURTEENTH CLAIM FOR RELIEF**
**(Unjust Enrichment –**
**Against All Defendants)**

201.    Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

202.    As the intended and expected result of their actions, all Defendants have profited and benefited from the confidential business information taken from Plaintiffs and from Plaintiffs' loss of the PBA Parcels and the associated development project.  Using Plaintiffs' confidential business information, Defendants were able to develop a plan to develop the Parcels and terms of the PSA quickly and with little investment.  And armed with Plaintiffs' confidential business information, Defendants now have a blueprint to apply for government approval and a vision to develop the property.

203.    Plaintiffs did not receive any pecuniary benefit for providing this information.

204.    PBA continued to indicate its intentions of completing the deal with Plaintiffs while dealing with Frisbie Group, all the while receiving Plaintiffs' confidential business information throughout these negotiations.  On information and belief, PBA violated its confidentiality obligations by sharing Plaintiffs' confidential business information with Frisbie

Group as early as March 2019.  On information and belief, Frisbie Group engaged with PBA with knowledge that PBA was bound by an exclusivity and confidentiality agreement and with the intent of using Plaintiffs' work on the development of the Parcels to its own benefit.

205.   The circumstances surrounding Defendants' receipt of Plaintiffs' confidential information is such that, in equity and good conscience, Defendants should not retain the value of this information and any resulting profits or benefits, including the profits and benefits of the development of the PBA Parcels.  The fraud and deception underlying this receipt of information, including as outlined in further detail in Paragraphs 56-80 above, is such that in equity and good conscience, Defendants should not retain the benefit of their inequitable conduct.

206.   Plaintiffs are entitled in equity to restitution of Defendants' wrongful profits and benefits received as a result of their improper behavior.  This restitution would include Plaintiffs' considerable time and expense invested in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels, as well as all profits and other benefits received by Defendants from the contract entered into between PBA and Frisbie Group and the anticipated development of the Parcels by Frisbie Group and FH3 LLC.

**FIFTEENTH CLAIM FOR RELIEF**
**(Specific Performance –**
**Against All Defendants)**

207.   Plaintiffs incorporate by reference Paragraphs 1-94 above, as if fully set forth herein.

208.   Plaintiffs are entitled to the PBA Parcels, including because Two Roads completed the Letter of Intent with PBA and Flagler South Development LLC completed the Purchase and Sale Agreement with PBA for the purchase of the parcels.  Plaintiffs were

financially able and willing to purchase the PBA Parcels for the agreed-upon price, having already obtained financing for the purchase.  Plaintiffs are also clearly entitled to the PBA Parcels for the additional legal and equitable reasons set forth herein, including their reasonable reliance on PBA's promises and representations.

209.    There is no adequate remedy at law, as the PBA Parcels are unique parcels of land that cannot be replaced, including because land is inherently a unique commodity as a matter of law; because there is a severe shortage of property available for development as water-facing luxury projects in West Palm Beach, and an even greater shortage in the specific area of West Palm Beach in which the PBA Parcels are located, with the PBA Parcels constituting the last available parcels suitable to such development in that area; because of the unquantifiable vision, energy, time, and other resources Plaintiffs have already infused into the project (which were stolen by Defendants); and because Plaintiffs already own and are already developing the adjoining property, such that no other property can replace or take the place of the PBA Parcels, including because of: the multiplier effects and efficiencies across a number of areas of owning and developing these adjoining properties; the unquantifiable harm that will be caused by the Frisbie Group's development of the PBA Parcel; and the potential for the development of a unique waterfront and dock that would stretch across the waterfront area in front of both projects.

210.    Justice requires specific performance in the form of an order entitling Plaintiffs (through Flagler South Development LLC) to take ownership and possession of the PBA Parcels and directing Defendants to take such steps and actions as are necessary to effectuate the transfer to Plaintiffs (through Flagler South Development LLC) of such ownership and possession, including specific performance of the Purchase and Sale Agreement.

## **JURY TRIAL DEMAND**

211.    Plaintiffs demand a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants on all claims, and request a judgment providing the following relief:

A.      Judgment in Plaintiffs' favor and against Defendants on all causes of actions;

B.      For compensatory damages in an amount to be proven at trial;

C.      For punitive damages and exemplary damages according to proof at trial;

D.      For treble damages pursuant to 18 U.S.C. § 1964(c);

E.      For specific performance in the form of an order entitling Plaintiffs (through Flagler South Development LLC) to take ownership and possession of the PBA Parcels and directing Defendants to take such steps and actions as are necessary to effectuate the transfer to Plaintiffs (through Flagler South Development LLC) of such ownership and possession, including specific performance of the Purchase and Sale Agreement;

F.      For an order enjoining any transfer of title to the PBA Parcels, or any closing relating to the PBA Parcels, between PBA and Frisbie Group, FH3 LLC, or any related entity, and enjoining or unwinding any related closings or contracts, to the extent necessary to effectuate the other relief requested;

G.      For an order, pursuant to 18 U.S.C. § 1964(a), directing Defendants to divest themselves of any interest, direct or indirect, in the RICO Enterprise and its profits, including in the PBA Parcels;

H.      For an order, pursuant to 18 U.S.C. § 1964(a), prohibiting Defendants from engaging with one another in the same type of endeavor as the Enterprise engaged in previously, namely development of real property;

I.      For costs of suit incurred herein;

65

J.      For prejudgment interest;

K.      For attorneys' fees and costs, including as warranted by applicable laws; and

L.      For such other and further relief as the Court may deem to be just and proper.

Dated:
December 1, 2021

DOMNICK CUNNINGHAM & WHALEN

By:  /s/ Sean Domnick
    Sean C. Domnick
      sean@dcwlaw.com
    Matthew T. Christ
      mtc@dcwlaw.com

    2401 PGA Boulevard, Suite 140
    Palm Beach Gardens, FL 33410
    Telephone: (561) 625-6260
    Facsimile: (561) 625-6269


GIBSON, DUNN & CRUTCHER LLP

    Reed Brodsky
      RBrodsky@gibsondunn.com
      (*pro hac vice*)
    Akiva Shapiro
      AShapiro@gibsondunn.com
      (*pro hac vice*)
    Diane Chan
      DChan@gibsondunn.com
      (*pro hac vice*)
    Michael McQueeney
      MMcQueeney@gibsondunn.com
      (*pro hac vice*)

    200 Park Avenue
    New York, NY 10166-0193
    Telephone: (212) 351-4000
    Facsimile: (212) 351-6235

    *Attorneys for Plaintiffs Two Roads*
    *Development LLC, Trilar Holdings LLC and*
    *Flagler South Development LLC*