**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 21-82067-CIV-CANNON**

**TWO ROADS DEVELOPMENT LLC,**
**TRILAR HOLDINGS LLC**, and
**FLAGLER SOUTH DEVELOPMENT LLC,**

       Plaintiffs,

v.

**PALM BEACH ATLANTIC UNIVERSITY INC., et al.**,

       Defendants.

_____/

**ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

       **THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss [ECF No. 38].

The Court has reviewed Plaintiffs' Response in Opposition [ECF No. 51] and Defendants' Reply

[ECF No. 54].  The Court also held a hearing on Defendants' Motion to Dismiss [ECF No. 55].

For the following reasons, Defendants' Motion to Dismiss [ECF No. 38] is **GRANTED IN PART**

**AND DENIED IN PART.**

**FACTUAL BACKGROUND**[1]

       This case arises from a dispute between Plaintiffs, Two Roads Development LLC, Trilar

Holdings LLC, and Flagler South Development LLC ("Plaintiffs"), and Defendant Palm Beach

Atlantic University ("PBA" or "the University") regarding the proposed sale of two plots of land

in West Palm Beach owned by the University.

---

[1] The following facts are drawn from the Amended Complaint and are accepted as true at this stage
[ECF No. 11].

According to the Amended Complaint, Plaintiffs intended to build luxury apartments on a plot of land they owned in Palm Beach, Florida, and sought to purchase the adjacent lots on either side of the development—which were owned by PBA—to create a large apartment/shopping campus [ECF No. 11 ¶ 1].  In January 2018, Plaintiffs formally presented their 24-page "Land Purchase and Preliminary Development Plan" to PBA, which contained:

> [A] detailed development plan; a detailed zoning analysis and proposal for "legislative steps" to permit the proposed development despite noncompliance with current zoning—including multiple amendments to relevant planning, land use, and zoning laws, and the rezoning of the property; a detailed capital plan timeline; and a "purchase proposal" with a proposed "Purchase Price" of $36,0000,0000 and a contract and due diligence period of 90 days.

 [ECF No. 11 ¶ 47].

On June 11, 2018, after negotiating the terms of the purchase, Plaintiffs and PBA signed a Letter of Intent ("LOI"), which the parties agreed would "serve as the basis to move forward with negotiating more definitive documents, including a Purchase and Sale Agreement ('PSA'), to evidence and govern the transaction" [ECF No. 11 ¶ 51].  The LOI contained a Purchase Price of $41,500,000, and closing date of "[o]n or before May 15, 2021 [ECF No. 11 ¶ 51].  The LOI contained the following exclusivity provision:

> On acceptance of this LOI, [PBA] shall not entertain or enter into any other purchase agreement or financing for the [PBA Parcels] and each party agrees to negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the date of this LOI.  In the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other, in which event, neither party hereto shall therefore have any further liability, responsibility or obligation to the other under this LOI.

[ECF No. 11 ¶ 53].

The LOI also contained a confidentiality provision, specifying that the "terms of the LOI and the parties' discussions and exchanged written materials relating to the proposed transaction,"

including the "terms of the proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]," and "due diligence information and documents relating to the [PBA Parcels]" are proprietary and confidential and may not "be shown or disclosed by either party . . . to any other person or entity, except to those employees, attorneys, accountants or advisors who have a need to know as a result of being involved in the proposed transaction" [ECF No. 11 ¶ 52].

On or about March 2019, more than a year after the LOI was signed, counsel for Plaintiffs sent a purchase agreement to PBA for approval, and PBA's counsel responded via email on April 5, 2019, that the deal was "all approved" [ECF No. 11 ¶ 59].  On April 18, 2019, Plaintiffs signed the purchase agreement and hand delivered the original counterparts to PBA for signature [ECF No. 11 ¶ 60].  On April 24, 2019, PBA wrote to Plaintiffs to "acknowledge receipt of your original Buyer executed Agreements" [ECF No. 11 ¶ 62].  On May 2, 2019, PBA still had not signed the purchase agreement, and PBA told Plaintiffs that the delay was due to unspecified "health challenges" purportedly facing PBA president William Fleming, whose signature to the contract was required before the purchase agreement could be completed [ECF No. 11 ¶ 63].

Three weeks later, on May 29, 2019, PBA sent a letter to Plaintiffs stating: "Please be advised that pursuant to Section 8 of the LOI, as no purchase and sale agreement has been entered into within ninety (90) days from the date of the LOI, PBA hereby terminates negotiations under the LOI, as well as all obligations either party has to the other" [ECF No. 11 ¶ 64].

Two months later, in July 2019, Plaintiffs discovered that Defendant Frisbie Group had entered into an agreement with PBA to purchase the same two parcels of land [ECF No. 11 ¶ 71]. According to the Amended Complaint, although Plaintiffs believed that PBA had been working in good faith, "they would later learn that PBA, the Frisbie Group, and the other Defendants were in

fact secretly working together to execute an elaborate and sophisticated scheme to defraud Plaintiffs" [ECF No. 11 ¶ 67].

On August 6, 2019, Plaintiffs flew to Nantucket, Massachusetts, to meet with members of the Frisbie Group to discuss the PBA purchase agreement [ECF No. 11 ¶ 72].  At the meeting, "David Frisbie did not admit to any knowledge that Plaintiffs had been negotiating with PBA and claimed that PBA had approached Frisbie Group" to develop the land [ECF No. 11 ¶ 72].  Instead, the Frisbie Group discussed the possibility of working with Plaintiffs to build out Plaintiffs' plan for an apartment/shopping campus [ECF No. 11 ¶ 73].  The proposed partnership was further discussed in February 2020, when Defendant Cody Crowell, an employee of the Frisbie Group, visited Plaintiff Two Roads' Office [ECF No. 11 ¶ 75].  At the meeting, in an effort to work collaboratively with the Frisbie Group, a Two Roads employee, Collins, "shared Plaintiffs' detailed plans for the PBA Parcels" with Crowell, including "the underwriting arrangements," "their capital partners," and "key details about the building, including the planned square footage, subterranean parking design, and subcontracting bids Plaintiffs had already received" [ECF No. 11 ¶ 75].

In May 2020, after Plaintiffs shared many other key details about their proposals, Defendant Frisbie Group cut Plaintiffs out of their partnership to develop the plots of land and opted instead to work with a separate group named Hines Development—"merely offer[ing] that Plaintiffs could be passive investors" in the project [ECF No. 11 ¶ 77].  One year later, in May 2021, the Frisbie Group submitted plans to the city of West Palm Beach for approval of luxury apartments that included nearly identical plans for a campus/shopping center as envisioned by Plaintiffs, including plans for "a street level café, an art walk looping around the property, connectivity to Pioneer Park, and a partnership with the Norton Museum to develop the property"

[ECF No. 11 ¶ 80].  These plans were allegedly identical to the plans that Plaintiffs had first shared with PBA and later with the Frisbie Group via the meeting between Crowell and Collins [ECF No. 11 ¶ 80].

Despite this turn of events, Plaintiffs proceeded with their own construction project on the land located in between the two parcels of land that PBA sold to the Frisbie Group [ECF No. 11 ¶ 85].  Plaintiffs needed to acquire easements to move utilities for this project, but PBA allegedly refused to provide the easements until Plaintiffs delivered a legal release of any of Plaintiffs' claims against PBA for the termination of the LOI [ECF No. 11 ¶ 86].  Plaintiffs refused to sign such a release [ECF No. 11 ¶ 85].

On May 13, 2021, members of Two Roads and Trilar visited members of the Frisbie Group to continue discussions over the easements [ECF No. 11 ¶ 87].  At the meeting, Suzanne Frisbie (wife of David Frisbie) "threatened, in sum and substance, that if Plaintiffs did not go along with Frisbie Group's unseen plan for the development, Frisbie Group would convince brokers in the market to abandon" Plaintiffs' own project [ECF No. 11 ¶ 87].  Several months later, David Frisbie doubled down on Suzanne Frisbie's warning, telling Plaintiffs that if they came out against Frisbie Group's development, it would mean "war" with the Frisbie Group, telling buyers not to purchase units in Plaintiffs' building [ECF No. 11 ¶ 91].

According to the Amended Complaint, the failed purchase agreement and the alleged misappropriation of Plaintiffs' development plans all were part of a coordinated scheme between PBA and members of the Frisbie Group "to have Frisbie Group step into Plaintiffs' shoes, with PBA eventually reneging on its completed deal with Plaintiffs and instead contracting to sell the valuable and irreplaceable parcels to Frisbie Group" [ECF No. 11 ¶ 3].

Based on the described allegations, Plaintiffs filed their Complaint on November 12, 2021 [ECF No. 1], later amending the Complaint to assert the following causes of action:

- <u>Count 1</u> - Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants PBA, Frisbie Group, William M.B. Fleming, Jr., Patrick C. Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell.

- <u>Count 2</u> - Breach of Contract of Letter of Intent, Exclusivity Provision – Against Defendant PBA.

- <u>Count 3</u> - Breach of Contract of Letter of Intent, Confidentiality Provision – Against Defendant PBA.

- <u>Count 4</u> - Breach of Contract, Purchase and Sale Agreement – Against Defendant PBA.

- <u>Count 5</u> - Fraud – Against Defendants PBA and Patrick C. Koenig

- <u>Count 6</u> - Aiding and Abetting Fraud – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell.

- <u>Count 7</u> - Negligent Misrepresentation – Against Defendants PBA and Patrick C. Koenig.

- <u>Count 8</u> - Promissory Estoppel – Against Defendants PBA and Patrick C. Koenig.

- <u>Count 9</u> - Violations of 18 U.S.C. § 1832 (Federal Trade Secrets) – Against All Defendants.

- <u>Count 10</u> - Violation of Fla. Stat. §§ 688.001 et seq. (Florida Trade Secrets) – Against All Defendants.

- <u>Count 11</u> - Common Law Conversion of Confidential Business Information – Against All Defendants.

- <u>Count 12</u> - Tortious Interference with Contract– Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell.

- <u>Count 13</u> - Tortious Interference with Business Relationship – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell.

- <u>Count 14</u> - Unjust Enrichment – Against All Defendants.

- <u>Count 15</u> - Specific Performance – Against All Defendants.

[ECF No. 11].

On January 18, 2022, Defendants filed the instant Motion to Dismiss Plaintiffs' Amended Complaint [ECF No. 38].  The Motion is ripe for adjudication [ECF Nos. 51, 54].

## LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6).  A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 545).  Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## DISCUSSION

Defendants move to dismiss all counts in the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Defendants focus their arguments, however, on the two claims giving rise to federal question jurisdiction in this action (1) the RICO claim in Count 1, and (2) the Federal Trade Secrets claim in Count 9.  Defendants argue that if the Court dismisses these two counts, there would be no basis for federal subject matter jurisdiction and no basis to exercise supplemental jurisdiction over the remaining state law claims.  Upon review, although Plaintiffs have failed to state a claim for violation of RICO, as discussed below, Plaintiffs

have alleged a plausible violation of the Federal Trade Secrets Act, *see* 18 U.S.C. § 1836, sufficient for the Court to exercise subject matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367.

### A. Count 1 – Violations of RICO

The Amended Complaint alleges that Defendants violated the federal RICO statute by forming an association-in-fact enterprise "[t]o take the Parcels development deal—and all related trade secrets—from Plaintiffs, cover up their bad acts, and push through the development by whatever means necessary in order to complete the scheme" [ECF No. 51 p. 17]. Defendants seek dismissal with prejudice of this Count, arguing that Plaintiffs have failed to adequately plead a plausible violation of the RICO statute [ECF No. 38 pp. 16–24].

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A plaintiff suing under RICO must allege six elements: "that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020). "If a plaintiff fails to adequately plead any one of these elements, she has failed to state a claim upon which relief may be granted, and her complaint must be dismissed." *Id.*

"Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.'" *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). "[T]o prove a pattern of racketeering activity[,] a plaintiff or

prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis added). The Eleventh Circuit has held that "a 'pattern of racketeering activity' requires proof of something beyond the two predicate acts themselves . . . [t]hat something is the threat of continuing racketeering activity." *Jones v. Childers*, 18 F.3d 899, 912 (11th Cir. 1994) (quoting *U.S. v. Gonzalez*, 921 F.2d 1530, 1545 (11th Cir.1991)). The continuity element is "crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." *Jackson*, 372 F.3d at 1265.

There are two types of continuity that may establish a RICO claim: closed-ended continuity and open-ended continuity. *H.J. Inc.*, 492 U.S. at 241. Closed-ended continuity refers to "a closed period of repeated conduct." *Id.* Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* In the Eleventh Circuit, "closed-ended continuity cannot be met with allegations of schemes lasting less than a year." *Jackson*, 372 F.3d at 1266; *see also Cisneros*, 972 F.3d at 1216 ("We measure a 'substantial period of time' in years, not in weeks."). Further, "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Jackson*, 372 F.3d at 1267.

Even if the Court were to assume, without deciding, that Defendants committed predicate acts of racketeering—wire fraud, extortion, trade secret misappropriation, as alleged—Plaintiffs' failure to plausibly allege a continuous pattern of racketeering activity, either close-ended or open-ended continuity, warrants dismissal of this count.

CASE NO. 21-82067-CIV-CANNON

As for close-ended continuity, Plaintiffs allege a single scheme, conducted over the course of approximately 14 months, designed to "[t]o take the Parcels development deal—and all related trade secrets—from Plaintiffs, cover up their bad acts, and push through the development by whatever means necessary in order to complete the scheme" [ECF No. 51 p. 17]. The Amended Complaint describes a scheme limited in duration, beginning first in March 2019 [*see* ECF No. 11 ¶ 112 (alleging that the Enterprise "roped Plaintiffs along to encourage them to keep pouring resources into plans for the development and documentation for the PSA")]; continuing to the sale of the land at issue to the Frisbie Group on January 8, 2020 [*see* ECF No. 11 ¶ 74 (alleging that PBA' counsel informed Plaintiffs that "PBA had executed a sale contract with another developer")]; leading to Defendants' alleged coverup in May 2020 [*see* ECF No. 11 ¶¶ 83–84 (alleging that PBA "demanded that Plaintiffs provide blanket approval of any proposed development of the PBA Parcels")]; until the conclusion of the alleged scheme when Frisbie Group employees misappropriated Plaintiffs' trade secrets between February and May 2020 [ECF No. 11 ¶¶ 73–75 (alleging that the Frisbie Group "cut out Plaintiffs from the co-development" after "receiving this valuable and confidential trade secret information")].

Plaintiffs maintain that the alleged scheme continued much later, including until May and November 2021, when David and Suzanne Frisbie allegedly committed extortion by telling Plaintiffs that if they came out against Frisbie Group's development, Frisbie Group would tell buyers not to purchase units in Plaintiffs' development [ECF No. 11 ¶¶ 87, 91]. But even if these isolated comments were intended to convince Plaintiffs to "refrain from taking actions" to contest Defendants' building project [ECF No. 11 ¶ 112], the natural ending point of the alleged scheme already had been completed: the Frisbie Group had secured the contract with PBA and had taken Plaintiffs' trade secrets. Plaintiffs' allegations are insufficient for closed-ended continuity because

there is "only a single scheme with a discrete goal" connecting the predicate acts.  *See Jackson*, 372 F.3d at 1267 ("[W]here the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time."); *Ferrell v. Durbin*, 311 F. App'x 253, 256 (11th Cir. 2009) (affirming district court's dismissal of complaint with prejudice because "the single scheme and the existence of only two victims" showed that the complaint failed to "sufficiently allege closed-ended continuity"); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000) ("The fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims also strikes us as 'highly relevant.'").

As for open-ended continuity, the Amended Complaint attempts to characterize the scheme as ongoing by alleging that Defendants engaged in a pattern of racketeering activity to acquire the land contract from PBA and then to steal Plaintiffs' trade secrets [ECF No. 11 ¶¶ 110–12].  It is clear, however, that the alleged predicate acts (wire fraud, trade secret misappropriation, and extortion) form the basis of a single scheme to takeover the PBA land at issue and to use Plaintiffs' construction plans to do so.  According to the Amended Complaint, that scheme had been accomplished as of January 8, 2020 [*see* ECF No. 11 ¶ 74 (alleging that PBA' counsel informed Plaintiffs that "PBA had executed a sale contract with another developer")].  *Daedalus Cap. LLC v. Vinecombe*, 625 F. App'x 973, 976–77 (11th Cir. 2015) ("We agree with the district court '[t]here is no threat that [Appellees'] alleged pattern of racketeering activity will continue into the future because their goal has been realized in the acquiring of the QU Project, and there is no longer a working relationship between the two companies giving rise to the opportunity for Defendants' pattern of predicate acts to persist into the future.'"); *see also Ferrell*, 311 F. App'x at 257 ("[I]t is clear that single schemes with a specific objective and a natural ending point can

almost never present a threat of continuing racketeering activity"); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994) ("In assessing whether a threat of continued racketeering activity exists, we have made clear that schemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity.").

Accordingly, the Court determines that Plaintiffs have failed to plausibly allege a pattern of continuing racketeering activity and therefore fail to state a claim for a RICO violation in Count 1.

## B. Count 2 – Breach of the Letter of Intent

Plaintiffs assert two causes of action stemming from PBA's breach of the LOI: Count 2, breach of the exclusivity provision, and Count 3, breach of the confidentiality provision [ECF No. 11 ¶¶ 128–34; 135–39]. Defendants fail to offer any argument specific to Count 3 in the Motion to Dismiss [ECF Nos. 38, 54], and the Court therefore limits its evaluation in this part of the Order to Defendants' Motion as to Count 2: Plaintiffs' claim for breach of the exclusivity provision [ECF No. 38 pp. 36–37].

Under Florida law, "[t]he elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992)). Here, Plaintiffs allege that it entered a valid contract when it signed the LOI with PBA in July 2018 [ECF No. 11 ¶ 129]. Section 8 of LOI contains an exclusivity provision, which states as follows:

> On acceptance of this LOI, PBA shall not entertain or enter into any other purchase agreement or financing for the Property and **each party agrees to negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the**

**date of this LOI**.  In the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other; in which event, neither party hereto shall thereafter have any further liability, responsibility or obligation to the other under this LOI.

[ECF No. 11 ¶ 130; ECF No. 38-1 p. 8 (emphasis added)].

According to Plaintiffs, PBA breached the exclusivity provision "by starting negotiations with Frisbie Group in or about March 2019, two months prior to terminating negotiations under the LOI" in May 2019 [ECF No. 11 ¶ 132].  Plaintiffs allege damages in the form of "lost expectancy of the PBA Parcels, the lost profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels" [ECF No. 11 ¶¶ 133–34].

Defendants maintain that because the LOI expired in October 2018 (90 days after the contract was signed) Plaintiffs cannot show a breach of the exclusivity provision based on alleged actions taken by PBA in March 2019 (5 months after the LOI expired) [ECF No. 38 p. 36]. Defendants further note that nothing in the plain language of the LOI "imposed a continuing exclusivity requirement beyond its express term" [ECF No. 38 p. 36].

In response, Plaintiffs assert that the 90-day limitation pertained only to the period in which the parties would negotiate and enter into a purchase and sale agreement, and that "in the event no agreement were reached during the initial 90-day period of the LOI, the exclusivity agreement would continue unless and until one of the parties 'terminate[d] the negotiations and this LOI . . . upon written notice to the other'" [ECF No. 51 p. 34].  Plaintiffs further argue that if the Court found this provision to be ambiguous, then extrinsic evidence as alleged in the Amended Complaint further shows that the parties did not intend for the LOI to expire after 90 days [ECF No. 51 p. 34].  Had "the exclusivity provision automatically expired after 90 days as

13

Defendants argue," Plaintiffs say, "PBA would not have needed to terminate the agreement after the passage of 90 days"—yet PBA's representative, Larry Alexander, sent a termination notice on May 29, 2019, six months after the 90-day period had expired [ECF No. 51 p. 34; *see also* ECF No. 11 64 (alleging that Plaintiffs received a note from PBA on May 29, 2019, stating: "pursuant to Section 8 of the LOI, as no purchase and sale agreement has been entered into within ninety (90) days from the date of the LOI, PBA hereby terminates negotiations under the LOI, as well as all obligations either party has to the other")].

Contract interpretation is typically inappropriate at the motion to dismiss stage. If, however, "the contract or settlement agreement terms are unambiguous, a court may properly consider a motion to dismiss for failure to state a claim for breach." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1312 (S.D. Fla. 2014); *see also Sarria Holdings, Inc. v. Walgreen Co.*, No. 02-23169-CIV., 2003 WL 1528711, at *2 (S.D. Fla. Jan. 31, 2003) ("If the contract covers plaintiff's claims in clear and unambiguous language, then plaintiff's ability to state a claim upon which relief may be granted, thus surviving this motion to dismiss, depends on the specific terms of the contract, which the court analyzes as a matter of law."). A contract is ambiguous where it "is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract." *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008). "If the interpretation urged by one party is unreasonable in light of the contract's plain language, the contract is not ambiguous, and the court may not use extrinsic evidence to vary the terms of the contract." *Id.*

Here, accepting all factual allegations in the Amended Complaint as true and construing them in the light most favorable to Plaintiffs, *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008), the Court determines that the exclusivity provision is susceptible to different

interpretations, rendering evaluation of these issues more appropriate for summary judgment. *Frulla*, 543 F.3d at 1252.  As Plaintiffs note, there are multiple contractual obligations discussed in Section 8 of the LOI (duty of confidentiality, a 90-day timeline to negotiate, termination procedures, and duties post-termination)—but the 90-day provision is most clearly connected to the time in which the parties were to negotiate and draft the purchase and sale agreement [ECF No. 51 pp. 34–35; *see* ECF No. 38-1 p. 8 ("[E]ach party agrees to negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the date of this LOI.")].  It is not concretely evident that the time limitation also applied to the non-disclosure clause.  In light of this ambiguity, and considering the full scope of the allegations in the operative pleading, the Court does not find Rule 12(b)(6) dismissal of Count 2 to be appropriate.  *See, e.g.*, *Novoneuron Inc. v. Addiction Rsch. Inst., Inc.*, 326 F. App'x 505, 509 (11th Cir. 2009).

**C.   Counts 4 and 15 – Breach of Purchase and Sale Agreement and Specific Performance**

According to Plaintiffs, PBA breached the Purchase and Sale Agreement, allegedly entered into by the parties on May 2, 2019 [ECF No. 11 ¶ 141].  Plaintiffs allege that, on April 5, 2019, PBA's counsel Larry Alexander "represented that the deal was 'all approved' and asked the purchaser to forward the executed agreement" [ECF No. 11 ¶ 142].  Even though the PBA University President had not signed the Purchase and Sale Agreement, the parties already had agreed on every part of the deal, including "insurance, deed restrictions, fixed deadlines for hard deposits, and the designation of an escrow agent" [ECF No. 11 ¶ 143].  As alleged, PBA breached the Purchase and Sale agreement by "failing to complete the sale and transfer of the PBA Parcels to Plaintiffs," causing damages in the form of lost profits and investments [ECF No. 11 ¶¶ 144–46].

Defendants seek dismissal of Count 4 on two grounds: (1) that the terms of the purchase and sale agreement required all parties to sign the agreement, which Plaintiffs admit did not happen, and (2) that Florida's Statute of Frauds requires all contracts for the sale of land to be reduced to writing and signed by the parties, rendering the PBA contract unenforceable [ECF No. 38 p. 34]. Defendants note that the proposed purchase agreement indicates that it would be "made and entered into as of the Effective Date," which the contract defined to mean "the date upon which this Agreement was last executed by Buyer and Seller" [ECF No. 38-1 pp. 10, 26]. This shows, Defendants argue, that the parties intended the contract to be effective only upon signature [ECF No. 38 p. 34]. Further, Defendants contend, the lack of a signed writing for the sale of land, violates Florida's Statute of Frauds [ECF No. 38 pp. 34–35]; *see* Fla. Stat. § 725.01 ("No action shall be brought . . . upon any contract for the sale of lands . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.").

In response, Plaintiffs avoid Defendants' first challenge—that the purchase agreement itself contemplated a signature to be effective—and instead contend that Florida's Statute of Frauds is satisfied because it requires only "some note or memorandum," citing to cases where Florida courts have held that email communication may satisfy the writing requirement [ECF No. 51 p. 35  (noting that PBA's counsel wrote an email saying that the deal was "all approved" but requesting an executed agreement for signature)]; *Kosterlitz v. S/V Knotta Klu*, 809 F. App'x 735, 736 (11th Cir. 2020) ("The email from Kosterlitz satisfies the statute of frauds."). Plaintiffs maintain that because PBA's counsel told plaintiffs in an email that the deal was

approved, which was in reference to the purchase agreement, the parties had a valid contract, and PBA breached that agreement [ECF No. 51 pp. 35–36].

In reviewing whether Plaintiffs have stated a plausible claim for relief in Count 4, the Court relies on the proposed Purchase and Sale Agreement at issue, which Defendants attached to their Motion to Dismiss [ECF No. 38-1 p. 10].  The Agreement is central to Plaintiffs' claim for breach of contract, and neither party disputes its authenticity.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)) ("[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed.").  The terms of the proposed Agreement state that it would become enforceable when "made and entered into as of the Effective Date," which is defined to "mean the date upon which the Agreement was last executed by Buyer and Seller" [ECF No. 38-1 pp. 10, 26].  The Agreement contains blank lines for each party to provide a signature to show where "the Parties have executed this Agreement to be effective as of the Effective Date" [ECF No. 38-1 pp. 21–22].

The unambiguous terms of the proposed Agreement clearly require a signature, and Plaintiffs' arguments to the contrary do not overcome the absence of a signed agreement.

First, it is undisputed that no signature from PBA or its officials appears on the genuine copy of the Purchase and Sale Agreement [ECF No. 38-1 p. 10].

Second, Plaintiffs themselves signed the proposed contract in accordance with its terms [*see* ECF No. 11 ¶ 59 ("Collins signed the Agreement, took a picture of the executed signature page, and sent it to [PBA trustee Patrick Koenig], congratulating him on completion of the deal.")], which took place on April 18, 2019, nearly two weeks *after* PBA's counsel emailed to say that the deal was "all approved [ECF No. 11 ¶ ("[O]n April 5, 2019, Alexander represented in writing, on

behalf of PBA, that the deal was 'all approved' and asked Plaintiffs to forward the executed agreement.")].   Rather than establishing that PBA approved the deal via email, the timeline of events as laid forth in the Amended Complaint shows, at most, that PBA's counsel indicated the existence of an agreement to a deal but then explicitly asked Plaintiffs to send the executed documents for signature.

Third, after Plaintiffs signed the documents on April 18, 2019, PBA's counsel informed Plaintiffs on April 24, 2019, that despite an earlier closure of the University which had delayed signature, it intended "to arrange for the delivery of the fully counter-signed Purchase and Sale Agreement '[n]ow that the University is open'" [ECF No. 11 ¶ 62].   Further, after PBA's counsel informed Plaintiffs on May 2, 2019, that PBA president William Fleming was unable to approve the agreement for health reasons, Plaintiffs "did not push for the return of the missing countersigned signature pages" and in fact were concerned that "**no one else from PBA had countersigned the agreement in Fleming's stead**" [ECF No. 11 ¶ 63 (emphasis added)].   Clearly, Plaintiffs anticipated that a signature from the PBA president was necessary to effectuate the contract, as spelled out in the purchase and sale agreement itself [*see* Purchase and Sale Agreement, ECF No. 38-1 pp. 10, 26 (defining the "Effective Date" to mean "the date upon which this Agreement was last executed by Buyer and Seller")].

For these reasons, Count 4 is due to be dismissed.   No signature from PBA or its officials appears on the Purchase and Sale Agreement.   The Agreement required signatures from both parties to be valid, and Plaintiffs specifically allege that they sought PBA president Fleming's signature to effectuate the contract, which never occurred.   Despite Plaintiffs' arguments to the contrary, an email from PBA's counsel stating that the deal was "all approved" did not operate to "sign" the contract but instead was accompanied by a request to send the documents for Fleming's

signature.  Accordingly, even accepting all factual allegations in the Amended Complaint, and regardless of Defendants' Statute of Frauds argument and Plaintiffs' response thereto, the lack of a signature on the proposed Agreement clearly violates the unambiguous terms of the Agreement and thus demonstrates that the parties did not form an enforceable contract.  Count 4 fails.

 In Count 15 of the Amended Complaint, Plaintiffs seek specific performance of the Purchase and Sale Agreement as detailed in Count 4 above [ECF No. 11 ¶¶ 207–10].  Defendants seek dismissal, arguing that Plaintiffs' failure to establish a breach of contract precludes specific performance [ECF No. 38 pp. 35–36].  The Court agrees with Defendants.

"It is fundamental that a prerequisite of a decree for specific performance is the existence of a valid contract."  *Rork v. Las Olas Co.*, 156 Fla. 510, 518 (1945).  "Where, as here, specific performance of a contract for the sale of real property is at issue, the contract must at the very least be 'definite, certain, and complete'" *Abundant Living Citi Church, Inc. v. Abundant Living Ministries, Inc.*, 213 So. 3d 1055, 1059 (Fla. Dist. Ct. App. 2017) (quoting *Muniz v. Crystal Lake Project, LLC*, 947 So. 2d 464, 469 (Fla. Dist. Ct. App. 2006)).  That is not the case here, again because there is no signed agreement for the reasons stated above in reference to Count 4.  Plaintiffs are not entitled to specific performance.  Count 15 is due to be dismissed.

**D.  Trade Secret Misappropriation – Counts 9 and 10**

In Counts 9 and 10 of the Amended Complaint, Plaintiffs assert claims arising under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.002 ("FUTSA"), respectively [ECF No. 11 ¶¶ 172–90].  Defendants seek dismissal of these claims on the grounds that Plaintiffs failed to allege the existence of trade secrets or any reasonable steps taken to protect such secrets [ECF No. 38 pp. 12–19].

To state a claim for trade secret misappropriation pursuant to DTSA, a plaintiff must allege facts showing that "it (i) possessed information of independent economic value that (a) was lawfully owned by the plaintiff and (b) for which the plaintiff took reasonable measures to keep secret, and (ii) the defendant used and/or disclosed that information, despite (iii) a duty to maintain its secrecy." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018). "Similarly, to state a claim under FUTSA for trade secret misappropriation, "a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310–11 (11th Cir. 2020). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'" *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1298 (11th Cir. 2018) (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978)).

Here, Plaintiffs allege that they lawfully possessed information of independent economic value, including as follows:

> [T]terms of the PSA; all due diligence documentation; the siting and massing plan, including blueprints, maps, and the work product of an architect; the comprehensive plan to comply with city zoning and land use requirements; plans to build a marina and dock on the Nasser Parcel; plans for integrating the property with its surroundings, including details about the art walk and co-branding with the Norton Museum, and strategic information on various citizens groups and neighbors.

[ECF No. 11 ¶ 127]. Plaintiffs further allege that they took reasonable measures to protect these trade secrets, explaining that Plaintiffs (1) "did not publicize this information,"[2] (2) "maintained

---

[2] To the extent that Plaintiffs shared information about their building plans with members of the public, Plaintiffs maintain that they shared only narrow and generalized aspects about such plans with local government and related entities [*see* ECF No. 11 ¶ 58 (Plaintiffs spoke to the Deputy Director of the Norton Museum about how Plaintiffs would "offer open greenspace" on the PBA Parcels); *id.* (Plaintiffs discussed zoning with the Mayor)].

adequate security to protect their computers, files, documents, and other records that stored information relating to these trade secrets," and (3) "included a confidentiality provision in the LOI between Two Roads and PBA in an attempt to protect this information" [ECF No. 11 ¶ 175]. The Amended Complaint describes how PBA "violated their confidentiality obligations by sharing this information with Frisbie Group as early as March 2019," alleging also that Frisbie Group "used these trade secrets, which they knew were acquired by improper means, to reach an agreement with PBA and to plan Frisbie Group's and FH3's development of the PBA Parcels" [ECF No. 11 ¶ 176]. Finally, the Amended Complaint alleges facts from which to plausibly conclude that Defendants used Plaintiffs' precise trade secrets for their own profit after misappropriating them. This includes the allegation, for example, that when Frisbie Group submitted plans to the City of West Palm Beach for approval, it submitted nearly identical designs to Plaintiffs' plans, including "a street level café, an art walk looping around the property, connectivity to Pioneer Park, and a partnership with the Norton Museum to develop the property— all as Plaintiffs had disclosed to Frisbie Group" [ECF No. 11 ¶ 80].

Defendants challenge whether Plaintiffs' measures were reasonable to keep its information secret, noting that Plaintiffs discussed certain aspects of their business plans with other parties and voluntarily shared information about the parcel development with the Frisbie Group [ECF No. 38 pp. 13–18]. For instance, Defendants point out that Plaintiffs' disclosure agreement in the LOI with PBA excluded any "information already in a party's possession" at the time of execution, and that the provision was limited to 90-days [ECF No 38 pp. 28–29]. As it pertains to the Frisbie Group, Defendants argue that Plaintiffs voluntarily shared information with them and failed to impose any confidentiality requirement, undercutting the argument that the information shared could be characterized as a trade "secret" [ECF No. 38 pp. 30–31].

In response, Plaintiffs argue that the non-disclosure provision contained in the LOI with PBA was a reasonable measure to protect their trade secrets because it prohibited disclosure of (1) the "terms of . . . the parties' discussions and exchanged written materials relating to the proposed" sale of the PBA Parcels, (2) the "terms of the proposed Purchase and Sale Agreement," (3) Plaintiffs' plans for "the proposed development of the" PBA Parcels, and (4) any "due diligence information and documents relating to the" PBA Parcels [ECF No. 51 p. 29; ECF No. 11 ¶ 52]. Regarding the 90-day limitation, Plaintiffs reiterate their earlier argument that, although another provision of the LOI contains a 90-day limitation, "the confidentiality provision contains no such limitation" [ECF No. 51 p. 29].

As to the information Plaintiffs shared with the Frisbie Group as part of their proposed business partnership, Plaintiffs argue that trade secrets were shared "under an implied confidentiality understanding" [ECF No. 51 p. 30]. Specifically, Plaintiffs base their theory of an implied understanding on the fact that Plaintiffs and Frisbie Group were in "serious discussions around co-developing the PBA Parcels," and Plaintiffs agreed to share trade secrets "[p]ursuant to this [business] relationship" [ECF No. 11 ¶ 177].

Construing all allegations in the Amended Complaint in the light most favorable to Plaintiffs, the Court determines that Plaintiffs have sufficiently alleged, even if in a limited way, a plausible claim for trade secret misappropriation.

First, despite Defendants' challenge regarding the sufficiency of the LOI's non-disclosure provision, the LOI prohibited disclosure of wide swaths of information related to all materials related to the proposed sale of the PBA Parcels [ECF No. 38-1 p. 8]. And, as discussed previously, there is a disagreement among the parties as to whether the non-disclosure agreement in the LOI

applies was limited to 90 days or continued indefinitely.  This question can be probed further following discovery and at summary judgment.

As to the information disclosed to the Frisbie Group, the Court acknowledges that Plaintiffs voluntarily shared this information without establishing a non-disclosure agreement, relying instead upon an implied understanding as part of the business relationship.  Although the Eleventh Circuit is "wary of any trade secret claim predicated on the existence of" implied agreements to keep trade secrets confidential, *see Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1550 (11th Cir. 1996) (explaining that a plaintiff ultimately must show evidence of the implied relationship to withstand judgment as a matter of law), the allegations in this case present factual disputes as to the scope of the parties' understanding to keep certain business information confidential.  As Plaintiffs argue, their basis for sharing confidential information with the Frisbie Group was premised on "serious discussion around co-developing the PBA parcels," and Plaintiffs agreed to share the information pursuant only to that business relationship [ECF No. 51 p. 30].  The existence of an implied understanding may be proven during summary judgment.  *See Yellowfin*, 898 F.3d at 1300 (recognizing that Florida law accepts "implied confidential relationships sufficient to trigger trade secret liability"); *Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. Dist. Ct. App. 1983) ("The lack of any express agreement on the part of the appellees not to use or disclose appellants' trade secret is not significant. The existence of a confidential relationship . . .  gives rise to an implied obligation not to use or disclose.").

Here, Plaintiffs ultimately must show the existence of this implied relationship.  But at the motion to dismiss stage, "whether a party has taken reasonable steps under the circumstances to preserve its trade secrets is a factual inquiry that cannot be resolved on a motion to dismiss," and "[w]hether information is a trade secret is a question of fact normally within the province of the

jury to decide." *PrismHR, Inc. v. Worklio, LLC*, No. 18-22841-CIV, 2019 WL 13189471, at *9 (S.D. Fla. Feb. 8, 2019); *see also Disability L. Claims, P.A. v. IM Sols., LLC*, No. 14-61177-CIV, 2014 WL 12589140, at *3 (S.D. Fla. Sept. 5, 2014) (denying motion to dismiss because the reasonableness of a party's measures to keep information secret could not be decided on a motion to dismiss).  Accordingly, without commenting on the merits of Plaintiffs' claims, Counts 9 and 10 of the Amended Complaint are adequately pled sufficient to withstand a motion to dismiss.

### E.  Misappropriation-Related Claims – Counts 5–7 & 11–14

Finally, Defendants seek dismissal of the remainder of Plaintiffs' claims in the Amended Complaint, arguing that each of the following claims should be dismissed as preempted by FUTSA: Fraud (Count 5); Aiding and Abetting Fraud (Count 6); Negligent Misrepresentation (Count 7); Common Law Conversion of Confidential Business Information (Count 11), Tortious Interference with Contract (Count 12); Tortious Interference with Business Relationship (Count 13); and Unjust Enrichment (Count 14) [ECF No. 38 pp. 38–42].

FUTSA "displace[s] conflicting tort, restitutory, and other law of [Florida] providing civil remedies for misappropriation of a trade secret."  Fla. Stat. § 688.008(1).  The statute goes on to carve out exceptions for all contractual remedies, all criminal remedies, and civil remedies that are not based upon misappropriation of a trade secret.  Fla. Stat. § 688.008(2).  Thus, the relevant question is whether Plaintiffs' non-FUTSA, non-contractual claims, constitute "conflicting . . . law" at the motion to dismiss stage under Florida Statute § 688.008(1).

According to the majority view, non-FUTSA, non-contractual civil misappropriation claims do constitute "conflicting . . . law" under Florida Statute § 688.008(1) and are preempted at the motion to dismiss stage.  *See, e.g.*, *Am. Registry, LLC v. Hanaw*, No. 13-CV-352-FTM-29CM, 2014 WL 12606501, at *5–6 (M.D. Fla. July 16, 2014) (outlining the majority view and

holding that FUTSA preempts non-contract civil claims at the motion to dismiss stage, even if it is ultimately determined that the underlying misappropriated information does not rise to the level of a "trade secret" later on in the proceedings); *Mile High Healthcare Analytics, LLC v. Med. Care Consortium Inc.*, No. 18-CV-22374, 2020 WL 9460325, at \*12 (S.D. Fla. July 29, 2020) (holding that an unjust enrichment claim was preempted by FUTSA at the motion to dismiss stage); *Taxinet, Corp. v. Leon*, No. 16-24266-CIV, 2018 WL 3405243, at \*5 (S.D. Fla. July 12, 2018) (dismissing claims for fraud and for conversion of confidential business information claim as preempted by FUTSA); *Agostinacchio v. Heidelberg Eng'g, Inc.*, No. 18-CV-60935, 2019 WL 3243408, at \*8 (S.D. Fla. Feb. 5, 2019) (holding that a breach of fiduciary duty claim was preempted to the extent that it arose from misappropriation by FUTSA at the motion to dismiss stage); *Jouria v. CE Res., Inc.*, No. 15-CV-61165, 2017 WL 3868422, at \*5 (S.D. Fla. July 17, 2017) (holding that a tortious interference claim was preempted by FUTSA at the motion to dismiss stage).[3]  The Court sees no reason to depart from the majority approach.  Therefore, the Court must determine whether "the underlying factual allegations in each of the remaining [common law] claims . . . are based on the misappropriation of information" that forms the basis of Plaintiff's FUTSA claim or whether the underlying allegations are "meaningfully distinct[]".  *Am. Registry, LLC*, 2014 WL 12606501, at \*6; *Mile High Healthcare Analytics, LLC*, 2020 WL 9460325, at \*12.

Applied here, to the extent that Plaintiffs' allegations in other Counts of the Amended Complaint implicate theft of trade secrets, those Counts are preempted by FUTSA and must be dismissed.  This applies to Count 11 of the Amended Complaint: Plaintiffs' claim for common law conversion of confidential business information [ECF No. 11 ¶¶ 184–90 ("PBA, Koenig, and

---

[3] *But see Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, No. 10-80293-CIV, 2011 WL 4591960, at \*10 (S.D. Fla. Sept. 30, 2011).

Fleming wrongfully acquired Plaintiffs' proprietary and confidential trade secret information by inducing Plaintiffs to turn over the information during purported good faith negotiations between March and May of 2019, as well as in January 2020")].   By Plaintiffs' own admission, this also applies to Count 14 of the Amended Complaint: Plaintiffs' claim for unjust enrichment against all Defendants [*see* ECF No. 51 pp. 37–38 (acknowledging that all claims "except [Plaintiffs'] unjust enrichment and conversion claims are also based in part on other conduct" than just "misappropriation of Plaintiff's trade secrets")].   But to the extent that Plaintiffs' Counts allege facts that do not arise from the same misappropriation of trade secret information that underlies Plaintiffs' FUTSA claim, those claims are not preempted.  This applies to Counts 5–7 and Counts 12–13 of the Amended Complaint.  The Court finds that the allegations contained in those Counts are sufficiently "materially distinct" to avoid dismissal based on preemption.  Instead, the Court analyzes these claims under the Rule 12(b)(6) standard.

### a.  Fraud-Related Claims – Counts 5–7

Plaintiffs bring three fraud related claims.  Count 5 is a claim for Fraud against Defendants PBA and Patrick C. Koenig [ECF No. 11 ¶¶ 147–55].  Count 6 is a claim for Aiding and Abetting Fraud brought against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell [ECF No. 11 ¶¶ 156–59].  And Count 7 is a claim of Negligent Misrepresentation brought against Defendants PBA and Patrick C. Koenig [ECF No. 11 ¶¶ 160–71].  The Court addresses Counts 5 and 7 together due to the relatedness of the claims' elements.

### i.  Counts 5 & 7 Against Defendants PBA and Patrick C. Koenig

Defendants argue that even if Counts 5 and 7 are not preempted by FUTSA, Counts 5 and 7 still warrant dismissal because Plaintiffs fail to meet the heightened pleading standard required for fraud claims under Rule 9(b) [ECF No. 38 p. 29].  In Defendants' view, Plaintiffs' "broad

allegations of having supposedly been misled" do not satisfy Rule 9, because Plaintiffs failed to plead plausible facts demonstrating that they were misled, what they lost, and "what each Defendant did or did not do" [ECF No. 38 pp. 41–42]. Defendants' second argument is that Plaintiffs failed to sufficiently plead "plausible facts showing that each Defendant had 'a duty to make [disclosures]' arising from a fiduciary relationship or a response to an inquiry imposing a duty to 'disclose the whole truth'" [ECF No. 38 p. 42 (quoting *Freidman v. Am. Guard. Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. 4th Dist. Ct. App. 2003))].

Plaintiffs offer two responses to Defendants' Rule 9(b) challenge: first, that the Amended Complaint specifically articulates the material misrepresentations made by each Defendant named in the relevant fraud counts [ECF No. 51 p. 39; *see also* ECF No. 11 ¶¶ 71–72, 84], and second, that Defendants did have a duty to disclose material facts to Plaintiffs because their "arm's length transaction" was sufficient to create a fiduciary duty once Defendants disclosed some material information to Plaintiffs [ECF No. 51 p. 40 n.20 (relying on *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. Dist. Ct. App. 1985) for the proposition that, once Defendants disclosed some material information to Plaintiffs, Defendants became obligated to disclose the whole truth)].

The Court turns first to the Rule 9(b) issues; then probes whether Plaintiffs have alleged facts demonstrating the existence of a fiduciary relationship between the parties giving rise to a duty to disclose material information; then discusses whether Plaintiffs have properly pled the elements of Counts 5 and 7, following by a discussion of Count 6.

### 1. Rule 9(b)

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). As the Eleventh Circuit has

described, Rule 9(b) requires a plaintiff to plead: (1) "precisely what statements were made in what documents or oral representations or what omissions were made"; (2) "the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [the statement]"; (3) the content of such statements and the manner in which they misled the plaintiff"; and (4) "what the defendants 'obtained as a consequence of the fraud.'" *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (citations omitted). When a plaintiff alleges fraud-based claims due to the omission of material information by a defendant, the plaintiff must also plead facts demonstrating that the defendant had a duty to disclose such information. *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. Dist. Ct. App. 2003); *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App. 1994), *cause dismissed*, 637 So. 2d 235 (Fla. 1994) ("A defendant's knowing concealment or nondisclosure of a material fact may also support an action for fraud where there is a duty to disclose."). "Where a party in an arm's-length transaction undertakes to disclose information, all material facts must be disclosed." *Friedman*, 837 So. 2d at 1166.

Upon review of the Amended Complaint, the Court is satisfied that Plaintiffs have met the heightened pleading requirements of Rule 9(b) for Counts 5 and 7. Plaintiffs allege (1) the specific statements constituting misrepresentations made by PBA, through its attorney representative Larry Alexander and Board of Trustees representative Patrick C. Koenig; (2) the content of such statements; and (3) the time associated with each of the statements [*see* ECF No. 11 ¶¶ 59, 63, 148, 162]. Specifically, according to Plaintiffs, Alexander and Koenig falsely told Plaintiffs in May 2019 that the deal was "all approved" and that PBA intended to move forward with Plaintiffs as PBA's development partner—when, in reality, PBA had no firm intent to execute the contract with Plaintiffs and actually had begun negotiating with Defendant Frisbie Group in March 2019 for the

purchase of the PBA parcels [ECF No. 11 ¶¶ 59, 63, 148–49, 162].  Plaintiffs also allege that, due

to Defendants' material misrepresentations, Defendant PBA used its negotiations with Plaintiffs

"as leverage" in its negotiations with Frisbie Group [ECF No. 11 ¶ 149].  Finally, insofar as

Plaintiffs base Counts 5 and 7 on material "omissions" rather than on overt misrepresentations, the

Amended Complaint contains sufficient facts from which to plausibly infer that a relationship of

trust existed between Defendants PBA and Koenig, on the one hand, and Plaintiffs, on the other.

The LOI and the PSA, even if not binding and enforceable, demonstrate that a relationship of trust

existed between the parties as reflected in the LOI's confidentiality and exclusivity provisions

[ECF No. 11 ¶¶ 52–53].  And Plaintiffs allege that a legal duty to disclose the "whole truth" arose

once "PBA undertook to disclose information concerning its intentions for the PBA Parcels

transaction" [ECF No. 11 ¶¶ 150, 163].[4]

        For these reasons, Plaintiffs have satisfied the requirements of Rule 9(b) for Count 5

(Fraud) and Count 7 (Negligent Misrepresentation).

## 2.  Elements of Counts 5 and 7

        Under Florida common law, to state a claim for fraud, a plaintiff must demonstrate that

(1) defendants made "a false statement concerning a material fact"; (2) defendants had "knowledge

---

[4] Under Florida law, the relevant duty to disclose under an omission-based theory of fraud is
between the alleged "primary wrongdoer," here, PBA, and Plaintiffs—not between Plaintiffs and
the alleged aiders and abettors of PBA's fraud, here, Defendants Frisbie Group, David W. Frisbie,
Robert N. Frisbie Jr., and Cody S. Crowell, so long as the aiders and abettors are alleged to have
had knowledge of the primary wrongdoer's breach [ECF No. 11 ¶ 157].  *See, e.g.*, *Taubenfeld v.
Lasko*, 324 So. 3d 529, 540 (Fla. Dist. Ct. App. 2021) (explaining that, for an aiding and abetting
claim related to a breach of a duty to disclose, the plaintiff must plead a fiduciary relationship
between the plaintiff and the primary wrongdoer and a breach of that duty, whereas the plaintiff
need only plead that the alleged aider and abettor had knowledge of the breach); *see also Hogan
v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009); *AmeriFirst Bank
v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991).

CASE NO. 21-82067-CIV-CANNON

that the presentation [was] false"; (3) defendants held an "intention that the misrepresentation induce another to act on it"; and (4) "consequent injury by the [plaintiff] acting in reliance on the representation." *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).  The elements of a claim for negligent misrepresentation are the same as above except that actual knowledge of falsity is not required; it is sufficient if "the defendant made the misrepresentation 'without knowledge of its truth or falsity' or that the defendant 'should have known the representation was false.'"  *In Re Harris*, 3 F.4th 1339, 1350 (quoting *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1259 (11th Cir. 2014)).

After accepting as true all factual allegations in the Amended Complaint, and tracking the elements of the cause of action, the Court determines that Plaintiffs have properly pled a claim for fraud under Florida common law (Count 5).  First, Plaintiffs allege that Defendants PBA and Patrick C. Koenig made false statements of material fact indicating that the Purchase and Sale Agreement was approved and finalized—i.e., that the deal between the parties was moving forward [*see* ECF No. 11 ¶¶ 59, 63, 148].  Second, as alleged, Defendants knew that such representations and statements of material fact were false when made [ECF No. 11 ¶¶ 150–51; *see also* ECF No. 51 p. 39].  Third, Plaintiffs have plausibly alleged that Defendants made such misrepresentations intending that Plaintiffs rely on the misrepresentations [ECF No. 11 ¶ 149 (alleging that Defendants tricked Plaintiffs and strung Plaintiffs along by making misrepresentations, all the while Defendants negotiated with Frisbie Group)].  And fourth, Plaintiffs allege that they justifiably relied on the alleged misrepresentations as they "continued to spend time and money preparing to acquire and develop the Parcels" [ECF No. 11 ¶ 153].

Therefore, Count 5 of the Amended Complaint is sufficient to withstand Rule 12(b)(6) scrutiny. And for the same reasons, Plaintiffs also have satisfied the lesser knowledge requirement of its claim for negligent misrepresentation in Count 7.

> ### ii. Count 6 Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell

Defendants seek to dismiss Count 6 on the same Rule 9(b) grounds raised earlier as to Counts 5 and 7: Plaintiffs have not alleged with sufficient particularity the exact misrepresentations made by each named Defendant, and the Frisbie Defendants had no duty to disclose information to Plaintiffs given the absence of a fiduciary relationship [ECF No. 38 pp. 41–42]. Defendants also argue that Count 6 should be dismissed as a matter of law, because any such allegedly misleading statements by the Frisbie Defendants were made "long after PBA had ceased negotiating with Plaintiffs" [ECF No. 38 p. 42]. In response, Plaintiffs again point to the Rule 9(b) sufficiency of the Frisbie Defendants' specific misrepresentations as alleged in the Amended Complaint and rely on the existence of a fiduciary relationship between Plaintiffs and PBA [ECF No. 51 pp. 39–40; *see also* ECF No. 11 ¶¶ 71–72, 84 (outlining the alleged material omissions made by Defendants); ECF No. 11 ¶ 157 (alleging that the Frisbie Group Defendants were aware of the scheme to defraud Plaintiffs and provided substantial assistance in affirmatively concealing PBA's fraud)].

For the same basic reasons previously stated in reference to Counts 5 and 7, Count 6 also satisfies the heightened pleading requirements of Rule 9(b). Plaintiffs allege the specific statements made by the Frisbie Defendants that constituted material misrepresentations, the content of such statements, and the time associated with such statements [*see* ECF No. 11 ¶¶ 71–72, 84 (alleging that Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell knowingly made false representations to Plaintiffs on two separate occasions by

indicating that they had no knowledge of Plaintiffs' business negotiations with PBA)].  Those allegations, coupled with the allegations in the remainder of the Amended Complaint that the Frisbie Defendants stood to gain from Plaintiffs continued efforts to develop the parcels, are sufficient to satisfy Rule 9(b) [*see* ECF No. 11 ¶¶ 68, 71].

Turning to the elements of Count 6, to state a claim for aiding and abetting fraud under Florida law, a plaintiff must allege: (1) "underlying fraud" on the part of the primary wrongdoer; (2) that the alleged aider and abettor "had knowledge of the fraud"; and (3) that the aider and abettor "provided substantial assistance to advance the commission of the fraud." *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. Dist. Ct. App. 2005).  A fraud-based claim that is premised "upon a failure to disclose material information exists only when a duty to make such a disclosure exits." *Friedman*, 837 So. 2d at 1166.  This duty arises "if one party has information which the other party has a right to know because there is a fiduciary or other relation of trust or confidence between the two parties." *Id.*  When two parties are engaged in an "arm's length transaction" and one party "undertakes to disclose information, all material facts must be disclosed." *Id.*

Count 6 fails at element 2; although the Amended Complaint contains facts demonstrating an underlying violation of law by the "primary wrongdoer" (PBA) coupled with allegations of substantial assistance on the part of the Frisbie Defendants [*see* ECF No. 11 ¶¶ 148–159], Plaintiffs have failed to sufficiently allege that Defendant Frisbie Group and the individual Frisbie Defendants had knowledge of PBA's allegedly fraudulent scheme.  Indeed, the extent of the allegations on this point are that the Frisbie Defendants knew that Plaintiffs were negotiating with PBA to develop the parcels, followed by a conclusory assertion that the Frisbie Defendants were aware of a scheme to defraud [ECF No. 11 ¶¶ 72, 157].  But knowledge of negotiations between

two parties, even under arguably suspicious circumstances, is not equivalent to knowledge that one of those parties intends to defraud the other.  And conclusory allegations are insufficient to state a claim for relief.  *See Jaharis*, 297 F.3d at 1188.  Therefore, Plaintiffs' aiding and abetting claim in Count 6 fails.

> **b. Tortious Interference Claims Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell – Counts 12 & 13**

Plaintiffs bring two counts of tortious interference against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell: Count 12 for Tortious Interference with Contract, and Count 13 for Tortious Interference with Business Relationship.  Defendants seek dismissal of both counts on two grounds: (1) Plaintiffs failed to plead the basic elements of each tort, including the existence of an enforceable contract, and (2) Defendants are protected by Florida law that affords commercial actors the right to compete and pursue their "own economic interests" [ECF No. 38 pp. 39–40].  Plaintiffs maintain that they properly plead the elements of both torts; that there need not be an enforceable contract to sustain their tortious interference claims; and that Defendants' "economic interest defense" fails because Defendants used improper means to pursue their own interests [ECF No. 51 p. 28].

Upon review, the Court finds that Plaintiffs have properly pled the elements of a claim for tortious interference with a business relationship (Count 13) but not the elements of a claim for tortious interference with a contract (Count 12).

 Turning first to Count 12, "[i]n Florida, the elements of tortious interference with a contractual relationship are: '(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach.'"  *U.S. Life Ins. Co. v.*

*Logus Mfg. Corp.*, 845 F. Supp. 2d 1303, 1320 (S.D. Fla. 2012) (quoting *Special Purpose Accts Receivable Co-op Corp. v. Prime One Cap. Co.,* 125 F. Supp. 2d 1093, 1103 (S.D. Fla. 2000)).

Defendants provide three arguments as to why Count 12 should be dismissed.  First, Defendants contend that Plaintiffs failed to plead the existence of a valid contract because the "PSA did not constitute a contract or give rise to rights" and thereby cannot "provide the basis for an inference claim" [ECF No. 38 p. 39].  Second, Defendants argue that Plaintiffs failed to plead that Defendant Frisbie Group and the other Frisbie Defendants had the requisite knowledge of an enforceable contract or its terms [ECF No. 38 p. 39].  And third, Defendants contend that Plaintiffs failed to adequately plead any breach of an enforceable contract and hence there can be no tortious interference of that contract [ECF No. 38 p. 39].  Plaintiffs disagree with these assertions and appear to take the broader position that interference with a contract should be treated like interference with a business relationship despite the absence of an enforceable contract [ECF No. 51 p. 38].

The Court agrees with Defendants that Count 12 fails because Plaintiffs failed to plead a breach of an enforceable contract.  Plaintiffs allege that Defendants' interference led to a breach of the PSA, but the PSA is not an enforceable contract based on the lack of signature as stated above.  *See infra* Discussion C.  That leaves the LOI as the only remaining contract as to which the Frisbie Defendants conceivably can be said to have tortiously interfered with [ECF No. 11 ¶¶ 192–94], but Plaintiffs do not allege that the conduct of the Frisbie Defendants resulted in a breach of the LOI [ECF No. 11 ¶ 194 (focusing on Frisbie Defendants' interference leading to breach of the PSA, not the LOI)].  Count 12 is due to be dismissed.

To state a claim for tortious interference with a business relationship claim as alleged in Count 13, a plaintiff must plead "(1) the existence of a business relationship[;] (2) knowledge of

the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).  As to the first element—the existence of a business relationship—Florida law does not require a plaintiff to "allege the existence of an enforceable contract." *Duty Free Ams.*, 797 F.3d at 1279. However, "[a] mere offer to sell" is not enough, "by itself, [to] give rise to sufficient legal right to support a claim of intentional interference with a business relationship." *Id.* at 1279–80.  Further, the third element (intentional and unjustified interference with the relationship) "requires the plaintiff to allege that 'defendant acted without justification.'" *Id.* at 1280 (citing *Sec. Title Guarantee Corp. of Balt. v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. Dist. Ct. App. 1989)).  Finally, when there is no contract right but rather just an expectancy, "a competitor has the privilege of interference in order to acquire the business for himself." *Id.* (quoting *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 657–58 (Fla. Dist. Ct. App. 1980)).  But the means a defendant employs to obtain that business must not be improper.  *Id.*

Defendants argue that Plaintiffs have not properly pled the elements of a claim for tortious interference with a business relationship under Florida law, and that even assuming otherwise, Defendants acted to "pursue their own economic interests," thereby making their alleged interference "privileged and non-actionable" under the basic economic-interest principle [ECF No. 38 p. 40; *see* ECF No. 54 p. 22].  Plaintiffs disagree on all fronts, noting (1) that an enforceable contract is not a prerequisite to bringing a claim for tortious interference with a business relationship, and (2) Defendants used improper tactics like intimidation to interfere with Plaintiffs' business relationship with PBA [ECF No. 51 p. 38; *see also* ECF No. 11 ¶¶ 6, 72, 87, 91].

Following review of Count 13 and the parties' arguments, the Court concludes as follows: Plaintiffs have pled facts sufficient to meet the elements of a claim for tortious interference with a business relationship, and the alleged improper intimidation by the Frisbie Group Defendants exceeds the scope of the economic interests qualified privilege.

First, the Amended Complaint sufficiently alleges the existence of a business relationship between Plaintiffs and PBA as evidenced by both the PSA and the LOI. *See Duty Free Ams.*, 797 F.3d at 127 (explaining that evidence of an enforceable contract is not required so long as there are plausible allegations for a jury to find an "understanding between the parties would have been completed had the defendant not interfered." (quoting *Landry v. Hornstein*, 462 So. 2d 844, 846 (Fla. Dist. Ct. App. 1985))). The Amended Complaint also alleges that Defendants knew about the business relationship between Plaintiffs and PBA [ECF No. 11 ¶¶ 57, 72, 198]. And for purposes of Rule 12(b)(6), the Court is satisfied that the Frisbie Defendants intentionally interfered with the business relationship between Plaintiffs and PBA. According to the Amended Complaint, accepted as true at this juncture, Defendants allegedly engaged in contract negotiations with PBA while knowing that PBA and Plaintiffs were bound by what Plaintiffs plausibly maintain was an enforceable exclusivity and confidentiality agreement between Plaintiffs and PBA [ECF No. 11 ¶ 199]. And not only that, the Frisbie Defendants engaged with PBA to use the detailed development plan that Plaintiffs already had formulated for the Parcels and to help PBA avoid liability for termination the PSA [ECF No. 11 ¶ 199]—ultimately leading to damages suffered by Plaintiffs [ECF No. 11 ¶ 200]. This is enough to state a claim for tortious interference with a business relationship.

Second, accepting Plaintiffs' allegations about Defendants' intimidation tactics as true, Defendants' interference with Plaintiffs' business relationship is not shielded by the qualified

privilege to interfere with a business as explicated in Florida law [ECF No. ¶¶ 6, 72, 87, 91]. Generally, "actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged." *Johnson Enerts. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998). Such protected actions include "conduct engaged in for legitimate purposes, even if tinged with animosity and malice." *Menendez v. Beech Acceptance Corp.*, 521 So. 2d 178, 180 (Fla. Dist. Ct. App. 1988). However, competitors "must abide by certain 'rules of combat' and not use improper means of competition," *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (quoting *Johnson Enters.*, 162 F.3d at 1321), such as threats, intimidation, conspiratorial conduct, or misrepresentations, *see KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (collecting cases). Here, the Amended Complaint alleges that, upon being confronted by Plaintiffs, the Frisbie Group Defendants demanded that Plaintiffs release any claims against PBA and improperly threatened to harm Plaintiffs' other projects, to block the views of Plaintiffs' properties, and to discourage buyers from purchasing units in Plaintiffs' other property [*see* ECF No. 11 ¶¶ 6, 72, 87, 91]. At this stage, these allegations are actionable notwithstanding Defendants' pursuit of their own economic interests.

### F. Promissory Estoppel – Count 8

In Response to the Motion, Plaintiffs concede that the claim for promissory estoppel in Count 8 cannot survive a motion to dismiss [ECF No. 51 p. 38 n.17]. Count 8 is therefore dismissed.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss [ECF No. 38] is **GRANTED IN PART AND DENIED IN PART**.

   a. The Motion to Dismiss [ECF No. 38] is **DENIED** to the extent it seeks dismissal of Counts 2, 3, 5, 7, 9, 10, and 13 of the Amended Complaint.

   b. The Motion to Dismiss [ECF No. 38] is **GRANTED** to the extent it seeks dismissal of Counts 1, 4, 6, 8, 11, 12, 14, and 15 of the Amended Complaint.

2. Counts 1, 4, 8, 11, 14, and 15 of the Amended Complaint [ECF No. 11] are **DISMISSED WITH PREJUDICE**.  Although Plaintiffs request leave to amend in generalized terms [ECF No. 51 p. 40], Plaintiffs do not explain what they could add or supplement to their current pleading to warrant repleading of these counts, and the Court finds that any repleading of these counts would be futile in any event for the reasons stated in this Order. *See generally Sibley v. Lando*, 437 F.3d 1067, 1073 (11th Cir. 2005).

3. Counts 6 and 12 of the Amended Complaint [ECF No. 11] are **DISMISSED WITHOUT PREJUDICE** because Plaintiffs conceivably may yet be able to allege facts to support these claims.

4. On or before **April 17, 2023**, Plaintiffs either shall (1) file a Second Amended Complaint consistent with this Order; or (2) file a notice indicating it elects not to file a Second Amended Complaint.

5. **This will be Plaintiffs' final opportunity to plead their claims**.  The filing of an Amended Complaint supersedes and replaces the original complaint. *See Reynolds v. Behrman Cap. IV L.P.*, 988 F.3d 1314, 1319 (11th Cir.), *cert. denied*, 142 S. Ct. 239 (2021).

6.  Defendant's Motion for Leave to File Supplemental Memorandum of Law in Support of their Motion to Dismiss [ECF No. 66] is **DENIED AS MOOT**.

7.  Defendants' Motion for Hearing [ECF No. 70] is **DENIED WITHOUT PREJUDICE**.

8.  On or before **April 24, 2023**, the parties shall file a Renewed Joint Scheduling Report that complies with the Court's Order [ECF No. 25] and takes into account any developments, discovery or otherwise, in the litigation since entry of the prior Joint Scheduling Report [ECF No. 39].

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 28th day of March 2023.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record