UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TWO ROADS DEVELOPMENT LLC, TRILAR   :
HOLDINGS LLC, and FLAGLER SOUTH   :
DEVELOPMENT LLC,   :
              *Plaintiffs*,   :
      v.   :
PALM BEACH ATLANTIC UNIVERSITY INC.,   :
FRISBIE GROUP LLC, FH3 LLC, WILLIAM   :
M.B. FLEMING, JR., PATRICK C. KOENIG,   :  Case No. 9:21-cv-82067-AMC
DAVID W. FRISBIE, ROBERT N. FRISBIE JR.,   :
and CODY S. CROWELL   :
              *Defendants*.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
  :
  :
  x

## SECOND AMENDED COMPLAINT

DOMNICK CUNNINGHAM & YAFFA
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Telephone: (561) 625-6260
Facsimile: (561) 625-6269

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.6235

**TABLE OF CONTENTS**

NATURE OF THE CASE ........................................................................................................ 2

PARTIES ................................................................................................................................. 5

JURISDICTION AND VENUE ............................................................................................... 6

FACTUAL ALLEGATIONS ................................................................................................... 7
    A.   West Palm Beach: A Real Estate Boom ....................................................... 7
    B.   Plaintiffs Identify the Opportunity to Build Luxury Waterfront Condos in West
        Palm Beach and Develop 1309 South Flagler Drive ..................................... 8
    C.   Plaintiffs Identify and Pursue a Unique Opportunity to Develop Adjoining
        Parcels Owned by PBA at 1315 and 1401 South Flagler Drive .................. 11
    D.   Plaintiffs Approach PBA With a Plan to Purchase and Develop the PBA
        Parcels, and Enter Into a Binding Letter of Intent With PBA ...................... 12
    E.   The Parties Negotiate, Mutually Agree to, and Finalize a Purchase and Sale
        Agreement for the Parcels .......................................................................... 15
    F.   The Scheme to Defraud and Misrepresentations Relating to the PBA Parcels ........... 19
    G.   The Easement *Quid Pro Quo* and the Defendants' Continuing Effort to Defraud
        Plaintiffs .................................................................................................... 33

CAUSES OF ACTION ......................................................................................................... 39
    FIRST CLAIM FOR RELIEF ....................................................................... 39
    (Breach of Contract of Letter of Intent, Exclusivity Provision –  Against Defendant
        PBA)........................................................................................................... 39
    SECOND CLAIM FOR RELIEF .................................................................. 40
    (Breach of Contract of Letter of Intent, Confidentiality Provision – Against
        Defendant PBA).......................................................................................... 40
    THIRD CLAIM FOR RELIEF (Fraud –  Against Defendants PBA and Patrick C.
        Koenig)....................................................................................................... 41
    FOURTH CLAIM FOR RELIEF (Aiding and Abetting Fraud –  Against Defendants
        Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell) .......... 43
    FIFTH CLAIM FOR RELIEF (Negligent Misrepresentation –  Against Defendants
        PBA and Patrick C. Koenig) ...................................................................... 46
    SIXTH CLAIM FOR RELIEF...................................................................... 47
    (Violations of 18 U.S.C. § 1832 –  Against All Defendants) ............................. 47
    SEVENTH CLAIM FOR RELIEF ............................................................... 49
    (Violation of Fla. Stat. §§ 688.001 *et seq.* –  Against All Defendants) ................. 49
    EIGHTH CLAIM FOR RELIEF (Tortious Interference with Contract –  Against
        Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S.
        Crowell) ..................................................................................................... 49
    NINTH CLAIM FOR RELIEF (Tortious Interference with Business Relationship –
        Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and
        Cody S. Crowell)........................................................................................ 56

JURY TRIAL DEMAND ..................................................................................................... 58

PRAYER FOR RELIEF ....................................................................................................... 58

Plaintiffs Two Roads Development LLC ("Two Roads"), Trilar Holdings LLC ("Trilar") and Flagler South Development LLC (together with Two Roads and Trilar, "Plaintiffs"), for their complaint against Palm Beach Atlantic University Incorporated ("PBA"), Frisbie Group LLC ("Frisbie Group"), William M.B. Fleming, Jr., Patrick Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody Crowell (collectively, "Defendants") allege as follows:

## NATURE OF THE CASE

1.      This is an action to remedy the unlawful and fraudulent real estate development scheme and theft of trade secrets perpetrated by Defendants in connection with the parcels at 1309 and 1311 South Flagler Drive and 134 Acacia Road (the "Forté Site") and the two adjoining parcels located at 1315 and 1401 South Flagler Drive (the "PBA Parcels").  Plaintiffs are experienced real estate developers who identified a unique opportunity to build a set of luxury waterfront condominium high-rises on these parcels, some of the last undeveloped and geographically significant lots on South Flagler Drive in West Palm Beach.  In 2017, after purchasing the Forté Site from its prior owners, Plaintiffs began negotiating with PBA to purchase the PBA Parcels.  As Plaintiffs shared with PBA, their plan was to develop the Forté Site and the PBA Parcels into luxury condominiums, replete with street-level amenities, an "art walk," and connectivity with a park, all of which would enhance and beautify the neighborhood.  PBA presented itself as a ready and able seller, willing to work with Plaintiffs in good faith to effectuate the sale.  Relying on this representation, Plaintiffs entered into a binding Letter of Intent ("LOI") with the university to negotiate confidentially and exclusively. Plaintiffs developed and shared with PBA their comprehensive plans for the property (themselves extremely valuable), performed market research, and identified and secured capital partners.  The parties negotiated for nearly a year, with their negotiations culminating in a mutually approved Purchase and Sale Agreement ("PSA") in April 2019.  The sale was

complete.  All that remained was a single signature from the university's president (Defendant William Fleming).

2.      What happened next is as shameful as it is shocking.  Despite informing Plaintiffs that the PSA was "all approved," PBA's counsel (Larry Alexander), and its Trustee and representative (Defendant Patrick C. Koenig) represented to Plaintiffs that Fleming was unable to physically countersign the contract due to a recent cancer diagnosis.  In reality, PBA was using the President's illness as an excuse to postpone executing the contract so it could back out of the deal and enter into a substantially similar contract with Frisbie Group.  Unbeknownst to Plaintiffs, Frisbie Group had decided to try to swoop in and steal the deal from Plaintiffs, and, despite the binding LOI, PBA began secret negotiations with Frisbie Group for purchase of the PBA Parcels.  Frisbie Group's agents ran a months-long, back-door lobbying campaign, making illicit deals with PBA Board Members, offering PBA representatives six-figure "success fees," and even offering to purchase another property from the university and then "gift" it right back.  PBA's agents, incentivized by these promises and deals, were in turn feeding confidential information about Plaintiffs' purchase offer and plans for the property to Frisbie Group.  PBA and its agents did all this in violation of its binding LOI with Plaintiffs.

3.      But despite having no intention of selling the PBA Parcels to Plaintiffs, PBA's conduct toward Plaintiffs indicated otherwise.  By keeping Plaintiffs in the dark, PBA was able to continue extracting trade secrets and confidential business information from Plaintiffs—namely, Plaintiffs' creative and valuable zoning, development, budget, capitalization plans for the parcels, and market research, all of which were developed at great cost to Plaintiffs.  The university then turned around and gave this valuable information right to its new partner: Frisbie Group.  As a result of Frisbie Group's interference with Plaintiffs' business relationship with PBA and its facilitation of a breach of contract between PBA and Plaintiffs, Frisbie Group

walked away with both the property and Plaintiffs' comprehensive and valuable development plans in hand.  Frisbie Group intends to build high-rise condominiums on the property worth hundreds of millions of dollars; when sold, Defendants will reap all of the benefits of Plaintiffs' experience, wisdom, sweat equity, and expenditures without paying them a dime.

4.      After Plaintiffs confronted Frisbie Group, Defendants David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell lied to and misled Plaintiffs about their secret dealings with PBA to cover the fraud, and then proposed a partnership that Plaintiffs believed Frisbie Group was pursuing in good faith as an olive branch to make amends for its prior bad acts.  But to Plaintiffs' great dismay and irreparable harm, that turned out to be a ruse to steal their trade secrets and confidential plans for the development of the PBA Parcels.  Frisbie Group never had any intent of partnering with Plaintiffs.  After months of supposedly collaborative conversations between Taylor Collins and Cody Crowell in which Collins shared invaluable market and development information to assist Frisbie Group in their first-ever Palm Beach high-rise development, Frisbie Group announced it would partner with someone else, the Hines Group.  This bait-and-switch was planned from the start and was designed to string Plaintiffs along just long enough to use their hard-earned development prowess to their advantage.

5.      But the Frisbies did not stop once they had Plaintiffs' plans and Plaintiffs' property. To ensure they reaped the benefits of their schemes, and supporting their consciousness of guilt, Defendants then conditioned the provision of routine easements needed by Plaintiffs for their development of the Forté Site on two unacceptable demands:  that Plaintiffs waive their right to take any legal action against Defendants for the scheme, and that Plaintiffs provide a blanket approval of future development plans for the PBA Parcels, sight unseen.  With these easements withheld, Plaintiffs have had to spend millions of dollars redesigning aspects of the Forté project.  Even more egregious, Frisbie Group has threatened to damage the reputation of

the Forté by telling brokers to abandon the building if Plaintiffs did not go along with Defendants' development plan, and David Frisbie, on behalf of himself and Frisbie Group, threatened to a Two Roads principal that if Plaintiffs came out against Frisbie Group's project, it would mean "war."

6.      To add insult to injury, in May 2021, Frisbie Group submitted its plans to the City of West Palm Beach for the development of the "Flagler Towers" to be built on the PBA Parcels stolen from Plaintiffs.  The plan encompasses key elements of the plan developed by Plaintiffs, including ideas too specific and unique to reasonably deny their source.  But unlike Plaintiffs' plan, it disregarded the City's established requirements for development and zoning waivers, height requirements, boundary setbacks, and neighborhood impacts, otherwise observed by all of the similarly situated developments on Flagler Drive, to the detriment of the surrounding community and most dramatically the Forté Site.  In other words, it appears that Defendants have designed their so-called "Flagler Towers" project to wreak significant havoc and harm on Plaintiffs, their business reputation, their customer relationships, and their public image, in order to destroy their competitor along the West Palm Beach waterfront.

7.      For all of these reasons, Plaintiffs bring this action for fraud, breach of contract, tortious interference with business relationships and contract, theft of trade secrets and confidential business information, and related causes of action.  They seek the full measure of compensatory and punitive damages.

## PARTIES

8.      Plaintiff Two Roads Development LLC is a Florida limited liability company.

9.      Plaintiff Trilar Holdings LLC is a Delaware limited liability company.

10.     Plaintiff Flagler South Development LLC is a Delaware limited liability company.

11.     Defendant Palm Beach Atlantic University Incorporated is a Florida company, with its principal place of business in West Palm Beach, Florida.

12.     Defendant Frisbie Group LLC is a Florida limited liability company.   On information and belief, its members are Cody Crowell and Robert Frisbie Jr.

13.     Defendant FH3 LLC is a Florida limited liability company.  On information and belief, its registered agents are Cody Crowell and Robert Frisbie Jr.

14.     Defendant William M.B. Fleming, Jr. is the former President of Palm Beach Atlantic University.

15.     Defendant Patrick C. Koenig is a real estate broker, co-founder of Flagler Realty & Development, Inc., a developer and manager of real estate projects, a Trustee of Palm Beach Atlantic University, and the Chair of its Real Estate Committee.

16.     Defendant David W. Frisbie is a founder of Frisbie Group LLC.

17.     Defendant Robert N. Frisbie Jr. is a Managing Director of Frisbie Group LLC.

18.     Defendant Cody S. Crowell is a Managing Director of Frisbie Group LLC.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Plaintiffs' claims under 18 U.S.C. § 1832.

20.     This Court has supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendant Palm Beach Atlantic University because its principal place of business is in West Palm Beach and it is incorporated in the state of Florida.

22.     This Court has personal jurisdiction over Defendant Frisbie Group because it has personal jurisdiction over members Cody Crowell and Robert Frisbie Jr., who have offices and regularly transact business in Palm Beach County and in the Southern District of Florida.

23.     This Court has personal jurisdiction over Defendant FH3 because it has personal jurisdiction over its registered agents Cody Crowell and Robert Frisbie Jr., who have offices and regularly transact business in Palm Beach County and in the Southern District of Florida.

24.     This Court has personal jurisdiction over Defendants William M.B. Fleming, Jr., Patrick C. Koenig, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell because each lives in, has offices in, committed tortious acts in, and/or regularly transacts business in Palm Beach County and in the Southern District of Florida.

25.     Venue in the Southern District of Florida is appropriate under 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the actions giving rise to the claims occurred, and it is the district in which property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

### A.  West Palm Beach: A Real Estate Boom

26.     Located on the eastern shore of the Florida Treasure Coast, West Palm Beach is a waterfront city that lies immediately to the west and adjacent to the town of Palm Beach.  West Palm Beach is separated from Palm Beach by three bridges and the Intracoastal Waterway.  Flagler Drives runs along the length of West Palm Beach's waterfront.

27.     Although once viewed as a relatively sleepy residential community, West Palm Beach is now one of the fastest-growing cities in the country.  In recent years, it has experienced a real estate and business boom, fueled by an influx of new businesses and residents seeking to take advantage of the area's year-round warm weather, lack of personal-income tax, and miles of beaches and waterfront properties overlooking the Atlantic Ocean.  Investors have poured

hundreds of millions of dollars into revitalizing West Palm Beach's commercial and business centers to offer new residents a range of cultural, recreational, and shopping opportunities.

28.     The COVID-19 pandemic only accelerated West Palm Beach's growth.   The acceptance of remote work arrangements has spurred the migration of wealthy out-of-state buyers who now have the option of working far from their offices.   While the pandemic decimated the commercial and residential real estate markets in many metropolitan cities, it had instead fueled demand for new homes in West Palm Beach.   That demand is expected to remain strong in coming years.

29.     But in 2016 and 2017, this boom was only just beginning.

**B.  Plaintiffs Identify the Opportunity to Build Luxury Waterfront Condos in West Palm Beach and Develop 1309 South Flagler Drive**

30.     The principals of Two Roads and Trilar Holdings have over 150 years of combined experience in developing, financing, and marketing residential and commercial real estate projects that span some of the most sought-after metropolitan areas in Florida, New York, Texas, and Connecticut.   These projects include office buildings, luxury high-rise condominiums, hospitality, market rate development, land development, and urban revitalization projects.   Plaintiffs have a proven track record of success in their real estate projects, and have had significant financial backing and consistently strong relations with the contractors they have employed.

31.     Beginning in or around 2016, Plaintiffs identified an opportunity and began to explore the possibility of building one or more ultra-luxury high-rise waterfront condominiums in a small area of West Palm Beach bounded by the Intercoastal Waterway to the east, PBA's campus to the north, a residential community of single-family homes to the south, and U.S. Route 1 to the west.   The development of any such properties in this area would require significant creativity from a zoning and planning perspective, due to strict zoning rules that prohibit the development

of the kind of high-rise buildings Plaintiffs envisioned.  The area, moreover, has very limited development opportunities due to its geographical constraints.

32.     Not to be deterred, Plaintiffs identified four waterfront parcels for potential development: 1309, 1311, 1315, and 1401 South Flagler Drive, respectively.  These parcels, which abut one another, each face east towards the Intercoastal Waterway, Palm Beach, and the Atlantic Ocean.  The parcels were occupied by various buildings that were constructed before the West Palm Beach real estate boom, including a dental office, PBA residence hall, parking garages, and smaller and older condominiums.  The parcels also neighbor the Family Church and the Norton Museum, which underwent a significant renovation and expansion announced in 2013, but which was only begun in 2018 and completed in 2019.

33.     Plaintiffs' first project together is a condominium development located at 1309 – 1311 South Flagler Drive, which has subsequently become known as the Forté.  Plaintiffs' plan for the 1.3-acre waterfront site is to create a world-class residential building rising 25 stories.  Each floor will have only two units—one facing north and one facing south.  The apartments are to range from 4,200 to 8,400 square feet and feature such luxury amenities as continuous glass walls, over 1,000 square feet of private outdoor space, and sweeping, unobstructed city and ocean views from every residence.  After further investigation, Plaintiffs identified a 1.38-acre parcel of land located at 1309 South Flagler Drive as the ideal site for the new condominium.

34.     At the time the Forté initially started to materialize, building an ultra-luxury high-rise condominium in this area carried significant risk.  While luxury homes have long-defined the lifestyle of Palm Beach, the same was not true for West Palm Beach.  Given West Palm Beach's reputation as the less flashy and less desirable neighbor to Palm Beach, many developers believed that wealthy buyers would have no desire to spend millions of dollars for a condominium that overlooked the Intracoastal Waterway instead of the Atlantic Ocean.  In contrast to the multi-

million dollar mansions lining the coast of Palm Beach, West Palm Beach's residential communities, including those along Flagler Drive, consisted predominantly of single-family homes catering to middle-income residents.

35.     There were also significant zoning hurdles.  The proposed high-rise condominium would be far taller and larger than the single-family homes and small condo projects that the West Palm Beach's Planning and Zoning Board had traditionally permitted on similarly sized lots. Because the 25-story condominium would be far bigger than city regulations allowed on a lot that was built on fewer than 1.4 acres, Plaintiffs would have to obtain a zoning waiver for the building. In order to do so, Plaintiffs would have to persuade city officials that the project's benefits justified the zoning waiver.  Furthermore, certain community members, including a nonprofit organization, Citizens for Thoughtful Growth, publicly opposed the project, on the grounds that a high-rise condominium would purportedly harm surrounding low-to-mid-rise neighborhoods.  Citizens for Thoughtful Growth had previously been successful in convincing the Planning and Zoning Board to reject other proposals for the construction of luxury condominiums on South Flagler Drive.

36.     Notwithstanding these challenges, Plaintiffs recognized the rare opportunity of constructing a condominium on one of the last available lots of waterfront property in West Palm Beach.  Plaintiffs thus moved forward with plans for developing the condominium, believing that they had the resources and expertise to generate sufficient demand from potential buyers.

37.     On or about December 15, 2017, Plaintiffs purchased the parcel of land located at 1309 South Flagler Drive.   Trilar and Two Roads formed a joint venture to develop the condominium, sharing the role as developers.  The estimated cost of the project is in excess of $200 million.

38.     Two large residential towers, the Bristol and La Clara, have been launched in recent years along the West Palm Beach waterfront in the vicinity of the Forté.  In 2016 and 2017, these

buildings were still in development, with the Bristol only starting to sell units, and La Clara not even breaking ground until 2019.  The Bristol initially struggled to sell units, demonstrating that success along the waterfront would be no easy task.

39.     Regulatory and logistical challenges, geographic constraints, and tepid early sales from a similar project would scare off most developers.  But Plaintiffs had a vision to transform the West Palm Beach waterfront, and were willing to take an enormous risk to see it through.  The Forté would be only the first step in bringing this vision to fruition.

### C.  Plaintiffs Identify and Pursue a Unique Opportunity to Develop Adjoining Parcels Owned by PBA at 1315 and 1401 South Flagler Drive

40.     PBA owned two neighboring parcels of land in West Palm Beach that are adjacent to Plaintiffs' property at 1309 South Flagler Drive.  As noted, the PBA Parcels are located at 1315 South Flagler Drive and 1401 South Flagler Drive.

41.     Plaintiffs recognized that the PBA Parcels presented a unique opportunity.  The PBA Parcels are one of the last remaining tracts of waterfront land in the area that could be developed into a luxury high-rise condominium.  As such, the PBA Parcels hold significant value to any developer.  But the PBA Parcels also hold tremendous value to Plaintiffs specifically, as the Parcels adjoin Plaintiffs' Forté Site.  Controlling the adjacent property would provide a number of benefits to Plaintiffs.  The benefits include, but are not limited to, the following:  First, the PBA Parcels in and of themselves were of tremendous inherent value for purposes of developing the land and selling residential units.  Second, Plaintiffs could use the PBA Parcels as staging grounds for their upcoming $200 million construction project on the Forté Site.  This would streamline the project immensely, simplifying the physical construction process, alleviating construction approval issues, and reducing interference with traffic.  Third, the Parcels would facilitate the planned development of the Forté Site and the PBA site as a single coordinated campus that would share public amenities and benefit the community.  Fourth, control of the PBA Parcels would

enable Plaintiffs to protect their building's sight lines and view corridors to the ocean.  Finally, the PBA Parcels would allow Plaintiffs to protect their ability to relocate utility easements running through each site both to facilitate construction design and staging and to avoid bad faith interference.  Without control of the easements and coordination of the utility locations, malicious neighbors could use their veto power over the easements as leverage against a neighbor, just as PBA and Frisbie Group eventually did.

42.     But unlocking the value and security that the PBA Parcels could provide would not be easy.  Plaintiffs would have to develop a comprehensive blueprint to develop the property, navigate zoning and city laws, and raise tens of millions of dollars in capital.

### D.  Plaintiffs Approach PBA With a Plan to Purchase and Develop the PBA Parcels, and Enter Into a Binding Letter of Intent With PBA

43.     As early as in or around 2016, Plaintiffs began informal discussions with PBA about development of the PBA Parcels (also referred to as the "Parcels").  Then, in or about 2017, representatives of Plaintiffs made two presentations to PBA about purchasing the Parcels.  Also in or about 2017, representatives of Plaintiffs met with PBA to discuss the potential for the development of the PBA Parcels.  Once Plaintiffs closed the massive Forté deal, PBA understood that Plaintiffs had the vision, expertise, and resources to handle development of the PBA Parcels as well.  Shortly after the Forté closing, PBA Trustee Patrick Koenig reached out to Plaintiffs to open negotiations for a deal for the Parcels.

44.     In or about January 2018, Two Roads managing partner Taylor Collins met with Koenig and attorney Larry Alexander, who represented PBA.  Collins laid out Plaintiffs' extensive track record on large developments and its business and finance partners.  He also explained how one of the most reputable asset managers in the world would fully fund the project; PBA would rely on Plaintiffs to put together a financing package as the school did not have the means to do

so.  After the meeting, PBA invited Plaintiffs to formally present their vision to develop the Parcels to a broader set of PBA Board Trustees.

45.     In preparation, Plaintiffs began to draw up a unique, creative, out-of-the-box plan to acquire and develop the Parcels.  They prepared a detailed, 24-page "Land Purchase and Preliminary Development Plan."  The proposal contained a detailed development plan; a detailed zoning analysis and proposal for "legislative steps" to permit the proposed development despite noncompliance with current zoning—including multiple amendments to relevant planning, land use, and zoning laws, and the rezoning of the property; a detailed capital plan timeline; and a "purchase proposal" with a proposed "Purchase Price" of $36,000,000 and a contract and due diligence period of 90 days.  On January 25, 2018, Collins and a Two Roads attorney presented this plan to Fleming, Koenig, PBA Trustee James C. Jenkins, and other Trustees and personnel. Later that same day, Collins emailed the presentation to PBA's Chief Operating Officer, John Kautz III, referencing "our offer to PBA on the subject property."

46.     Under this plan, Plaintiffs would work with the City of West Palm Beach to re-zone the PBA Parcels and amend its land use restrictions.  This involved a complicated process. Plaintiffs would move to amend the PBA Parcels' land use restrictions that barred large multi-family developments.  They would also move to rezone the Parcels from community service to multifamily use, and then to rezone the Parcels from multi-family use to residential planned development.  This would require three public hearings and presentations to the city's Planning Board and the City Commission.  Finally, after that process was completed, Plaintiffs would be able to break ground on the site to build their residential towers.  In doing so, they would utilize top architecture, landscaping, and construction firms, as well as many local West Palm Beach businesses and professionals.

47.     PBA wanted to move forward with Plaintiffs' plan.  The parties worked together over the next month to turn the initial offer into a formal proposal.  These discussions included numerous presentations to Koenig and Alexander.

48.     The parties then negotiated a Letter of Intent ("LOI") for the sale of the PBA Parcels to Plaintiffs.  A Two Roads attorney drafted the LOI, and this attorney and Collins exchanged numerous drafts with Alexander.  The key terms on which the parties negotiated were purchase price and timing.

49.     On or about June 11, 2018, Plaintiffs and PBA entered into the LOI, which the parties agreed "shall serve as the basis to move forward with negotiating more definitive documents, including a Purchase and Sale Agreement ('PSA'), to evidence and govern the transaction."  The LOI contained a Purchase Price of $41,500,000, and closing date "[o]n or before May 15, 2021, it being understood that if closing occurs prior to such date, Seller shall retain possession of the Property until May 15, 2021."  In other words, the parties understood and agreed that they would negotiate and enter into a PSA, which would culminate in the transfer of ownership of the Property to Plaintiffs, and that this process would take a considerable amount of time.

50.     The LOI included a confidentiality provision specifying that the "terms of th[e] LOI and the parties' discussions and exchanged written materials relating to the proposed transaction," including the "terms of the proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]" and "due diligence information and documents relating to the [PBA Parcels]," are proprietary and confidential, and may not "be shown or disclosed by either party . . . to any other person or entity, except to those employees, attorneys, accountants or advisors who have a need to know as a result of being involved in the proposed transaction."

51.     The LOI also included an exclusivity provision stating:

On acceptance of this LOI, [PBA] shall not entertain or enter into any other purchase agreement or financing for the [PBA Parcels] and each party agrees to

negotiate exclusively with the other to draft and enter into a Purchase and Sale Agreement as contemplated herein for a period of Ninety (90) days from the date of this LOI.  In the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other, in which event, neither party hereto shall therefore have any further liability, responsibility or obligation to the other under this LOI.

52.     Based on the plain terms of the LOI, the parties unambiguously intended that in the event that no agreement were reached during the initial 90-day period of the LOI, the exclusivity agreement would continue unless and until one of the parties "terminate[d] the negotiations and this LOI . . . upon written notice to the other."  Any liabilities, responsibilities or obligations that the parties had to each other, including those related to exclusivity, would continue to apply until such written termination.

53.     As detailed below, and unbeknownst to Plaintiffs until much later, PBA later took advantage of Plaintiffs, in violation of both the confidentiality provision and the exclusivity provision, by opening up negotiations with the Frisbie Group to sell them the parcels, and by sharing the substance of Plaintiffs' proposal with the Frisbie Group.

### E.  The Parties Negotiate, Mutually Agree to, and Finalize a Purchase and Sale Agreement for the Parcels

54.     Plaintiffs and PBA formally negotiated the PSA from in or about June 2018 through in or about April 2019, when it was signed by Flagler South Development LLC (on behalf of itself and the other Plaintiffs) and delivered to PBA.

55.     On or about August 20, 2018, Plaintiffs prepared and sent PBA the first draft of the PSA.  The parties extensively negotiated and revised the Agreement over the next four months, exchanging multiple drafts primarily between Alexander and Two Roads General Counsel Daniel G. Hayes.  On or about December 6, 2018, Plaintiffs met with PBA at the Jones Foster law office to negotiate additional terms relating to insurance, deed restrictions, and fixed deadlines for hard deposits.  Formal negotiations with PBA counsel extended to contract negotiations on PBA's

required deed restrictions with the Boston counsel for Plaintiffs' capital fund partner and to counsel for Plaintiffs on PBA's required brokerage releases (from an individual named Marius Fortelni and others).  Discussions also continued informally throughout this period.

56.     Throughout this period, Plaintiffs continued to invest extensive time, effort, and resources in anticipation of the project.  Plaintiffs assembled the presentation and due diligence materials required to secure various capital partners and financing to underwrite the $43 million purchase.  They developed a comprehensive plan to comply with city zoning and land use requirements.  They hired an architect to create a full model massing of the building and with Plaintiffs' civil engineer to prepare a plan for the building footprint and orientation, spending in excess of $100,000 in out-of-pocket costs, in addition to countless hours of in-house staff time.  Plaintiffs had prepared conceptual drawings, a shade analysis, and view corridor analysis of the proposed development to maximize the views of the buildings on the PBA site.  They developed a plan to acquire and develop a waterfront parcel adjacent to the PBA Parcels, 1201 South Flagler, owned by Joseph Nasser (the "Nasser Parcel").  As planned, a scenic art walk would loop around the property, featuring a sculpture garden and a large signature art piece on the Nasser Parcel waterfront that would serve as a cultural landmark for the neighborhood.  As part of this preparation, Plaintiffs commissioned a study to determine the cost and feasibility of placing a marina on the Nasser Parcel waterfront.  Plaintiffs also developed a creative vision for the campus as a whole, including the PBA Parcels with the Forté Parcels.  The Nasser Parcel sculpture garden would tie into the Art Walk on the Forté Parcels and continue around to connect with the Norton Art District.   Along South Flagler Drive, the property would include street-level amenities including a café, a public park, and an outdoor movie theater.  The campus would connect to the adjacent Pioneer Park and Norton Museum, further tying the area together.  Plaintiffs also had a proposal to co-brand the property with the neighboring Norton Museum.  In pursuit of this vision,

Collins met with the CEO and Deputy Director of the Norton Museum to discuss how Plaintiffs would offer open greenspace on the southern parcel leading to the Museum in exchange for the Museum's endorsement and support of the campus plan.  Collins also spoke with West Palm Beach city staff about renaming the area the "Norton Art Walk District."  He also approached the Mayor of West Palm Beach and select City Commissioners to lay the political groundwork for a zoning expansion of the Forté Residential Development Plan, premised on Plaintiffs' plan to transform the area into a cultural hub.  Collins shared all of these plans and ideas in frequent conversations with Koenig.  Plaintiffs also shared with PBA up-to-date sales information from the brokerage Douglas Elliman, and a market study from Concorde Group.

57.     In or about March 2019, the parties made concluding revisions to the Agreement, designating an escrow agent to receive and hold deposits for the transaction.  Plaintiffs' counsel then sent the final Agreement to Alexander for approval.  In response, on April 5, 2019, Alexander represented in writing, on behalf of PBA, that the deal was "all approved" and asked Plaintiffs to forward the executed agreement.

58.     On Thursday, April 18, Collins signed the Agreement, took a picture of the executed signature page, and sent it to Koenig, congratulating him on completion of the deal.  Two Roads General Counsel Hayes also emailed the executed counterpart of the Agreement to Alexander on April 18 and physically hand delivered two original counterparts to his office the following day.

59.     On Friday, April 19, PBA requested a last-minute final release of brokerage and procurement fees from Marius Fortelni, which Plaintiffs arranged for and which was subsequently signed and delivered to PBA by email.  After 16 months of discussions and 12 drafts of the PSA, the parties had a mutually agreed upon and finalized deal.

60.     On Wednesday, April 24, Alexander wrote to Hayes to "acknowledge receipt of your original Buyer executed Agreements."  He also stated that he had "passed the pdf copy to the Seller, however the University was closed for Easter last Friday and Monday."  Later that same day, Hayes wrote to Alexander to arrange for the delivery of the fully counter-signed PSA "[n]ow that the University is open."  He also informed Alexander that he had already "called capital to fund the Initial Deposit" with the escrow agent.  But PBA went silent.

61.     Finally, on or about May 2, Alexander wrote to Hayes that the delay was due to unspecified "health challenges" purportedly facing PBA president Fleming, claiming "due to health challenges of our President, I am unable to confirm signing next week."  But Alexander reassured Plaintiffs that Fleming had approved the final Agreement before his indisposition.  PBA representatives repeated these representations, both directly and indirectly—in writing and verbally—throughout the month of May.  In a face-to-face meeting, Koenig told Collins that the specific health challenge was that Fleming had been diagnosed with cancer.  Collins responded that he hoped Fleming was doing okay, that Koenig should let him know if Plaintiffs could help in any way, and he offered to connect Fleming with a cancer doctor.  But out of respect for Fleming, he did not press for additional details.  And over the next few weeks, out of concern and respect, Plaintiffs did not push for the return of the missing countersigned signature pages.  At the same time, Plaintiffs were concerned about the delay and surprised that no one else from PBA had countersigned the agreement in Fleming's stead.

62.     Suddenly, and without any explanation, on or about May 29, 2019, Alexander sent a letter to Plaintiffs purportedly terminating the LOI and PBA's other "obligations."  The termination letter stated in relevant part: "Please be advised that pursuant to Section 8 of the LOI, as no purchase and sale agreement has been entered into within ninety (90) days from the date of the LOI, PBA hereby terminates negotiations under the LOI, as well as all obligations either party

has to the other.  PBA may elect to enter into further negotiations with you regarding the purchase and sale of the property in the future and appreciates the opportunity it has had to work with you."

63.     This letter broke off 16 months of progress and work, after the parties had already mutually agreed to a PSA.  Based on PBA's repeated representations, Plaintiffs understood that the parties were working collaboratively and operating in good faith toward finalizing Plaintiffs' purchase of the PBA Parcels during this time.  Indeed, both Plaintiffs and PBA understood that they were continuing to work under the LOI and its confidentiality and exclusivity obligations. That is why, when PBA attempted to reverse its approval of the PSA and end the exclusivity period, it sent a letter "terminat[ing] negotiations under the LOI, as well as all obligations either party has to the other."

64.     Relying on this understanding and what it believed to be PBA's good faith representations, Plaintiffs invested considerable time and resources to negotiate and finalize the deal.  Among other things, they secured capital partners, devised a comprehensive plan to comply with city zoning and land use requirements, spent $100,000 on an architect to create a full model of the building and map its placement, and developed a creative vision to tie the property together with a scenic art walk and to co-brand the property with the Norton Museum.  And throughout these negotiations, Plaintiffs shared all of these trade secrets and confidential information with PBA under the mistaken belief, based on PBA's representations, that PBA would act in good faith and in conformance with its confidentiality and exclusivity obligations pursuant to the LOI.

**F.  The Scheme to Defraud and Misrepresentations Relating to the PBA Parcels**

65.     While Plaintiffs believed that PBA was engaged in good faith negotiations with them over this entire period, culminating in the mutually approved PSA, they would later learn that PBA, the Frisbie Group, and the other Defendants were in fact secretly working together to

execute an elaborate and sophisticated plan to defraud Plaintiffs, breach the LOI's exclusivity and confidentiality provisions, and utilize Plaintiffs' trade secrets for their own benefit.

*The Frisbies Get Involved*

66.     Frisbie Group and members of the Frisbie family have close and longstanding relationships with members of the PBA community, including Fleming, Koenig, and Peter Reed, a member of the PBA Real Estate Task Force.  The Frisbie family has spent recreational time with Fleming and others affiliated with PBA, and Fleming has even traveled to socialize with the Frisbie family at their compound in Nantucket, Massachusetts.  Similarly, Koenig attended a dinner hosted by David and Suzanne Frisbie at a local country club on or about February 27, 2019, after which Koenig thanked the Frisbies for the "incredible" wine and food.   Representatives of both organizations are members of the same social club: the Sailfish Club.

67.     The Frisbies were aware that PBA was putting a deal together with Plaintiffs for the PBA Parcels as early as December 2018, when the topic was brought up in a discussion between Koenig, Collins, and Frances Frisbie Criddle at a charity fundraiser at ER Bradley's in West Palm Beach.  Communications between various PBA representatives and Frisbie Group representatives demonstrate this knowledge.  Nevertheless, Frisbie Group decided they would try to steal the deal from Plaintiffs.  No later than March 2019, Frisbie Group and members of the Frisbie family began secret discussions with PBA and its representatives about Frisbie Group's interest in purchasing the PBA Parcels.

68.     On March 25, 2019, months after the Frisbies became aware of the potential deal between Plaintiffs and PBA, Robert Frisbie Jr. submitted an offer to purchase the PBA Parcels and an unrelated university property, the Mango Promenade, which Frisbie Group had already begun discussions on with PBA.  This offer added the PBA Parcels to a preexisting offer by Frisbie Group

20

on the Mango Promenade.  This offer was submitted in a letter directly to then-PBA President Fleming.

69.   The following day, Robert Frisbie Jr. received a text from Fritz Van der Grift, an agent of the Frisbies, explaining that the "Biggest challenge is that they're supposed to sign that contract with 2 Roads this week. Hope they will seriously consider this."  This text message makes clear that the Frisbies were on notice that Plaintiffs had been negotiating seriously with PBA, and that PBA was "supposed" to sign the Purchase and Sale Agreement with Plaintiffs in only a few days.  On March 28, Van der Grift sent the following messages detailing Plaintiffs' confidential offer and the parties' confidential negotiations (information that PBA was contractually obligated to protect from disclosure, but instead shared with third-party Van der Grift):

a.   "There [sic] offer was 31 btw."

b.   "PBA wanted 44, they offered in the 30's, they settled at 41."

c.    "We have a lot going for us. Apparently, several board members were not thrilled with this other company."

70.   In response, Robert Jr. replied, "Perfect. While we don't want to negotiate against ourselves our main objective should be to get in the drivers [sic] seat ASAP."

71.   On April 5, 2019, Van der Grift contacted PBA through its representative, Bill Blodgett, encouraging the school to consider Frisbie Group's offer.  Blodgett demurred, responding that there would be "really no point" in considering the Frisbies' offer in light of the university's plans to imminently enter into a PSA with Plaintiffs (by this date, the PSA with Plaintiffs had been "all approved" by the university).  In response, and in clear disregard for PBA's contractual obligations to Plaintiffs under the LOI and otherwise, Van der Grift doubled down and asked for an opportunity to present to the PBA Board of Trustees.  Van der Grift also told Blodgett

that the Frisbies would "essentially gift [the Mango Promenade] back to the University . . . ." in a clear effort to sway the university towards the Frisbies.

72.     On April 11, 2019, the Frisbies continued to pursue the PBA parcels with complete disregard for PBA's contractual and other obligations towards Plaintiffs, this time using back channels to access Jenkins, the Chairman of the PBA Board of Trustees.  Immediately upon his introduction to Jenkins, Frisbie Group representative Crowell made another attempt to convince PBA to abandon its obligations towards Plaintiffs and consider Frisbie Group's offer.

73.     On April 17, 2019, Crowell met with Jenkins in person.  On information and belief, Crowell used this meeting to further advocate for Frisbie Group's position and against PBA's continuing commitments to Plaintiffs.  Crowell followed up on his meeting with Jenkins with another email, insisting that the Frisbie Group offer best suited the needs of PBA, again in disregard for PBA's obligations towards Plaintiffs.  Additional meetings between representatives of PBA and the Frisbie Group took place on April 29, 2019 and April 30, 2019.

74.  On May 1, 2019 Robert Frisbie Jr. sent an email to Koenig and Jenkins, resubmitting Frisbie Group's March 25 offer and proposing a partnership between PBA and Frisbie Group.  On May 5, 2019, Frisbie Group yet again reupped their offer for the PBA parcels to Koenig and Jenkins, reaffirming the family's commitment to interfering with PBA and Plaintiffs' LOI, and aiding and abetting PBA's fraud.

*The Frisbies' Schemes*

75.  Throughout this time, Frisbie Group and the members of the Frisbie family engaged in a series of underhanded tactics to enable them to steal the deal from Plaintiffs.  Through other business opportunities, cash payments, and significant donations to the university, the Frisbies have built the relationships and provided the avenues of communications that enabled, provided

an opportunity for, and resulted in the scheme to defraud Plaintiffs.  These deals and donations also served as incentive and reward to all Defendants (with respect to the other deals) and to PBA specifically (with respect to the donations) for their participation in the scheme to defraud Plaintiffs.

76.  For example, on or about January 17, 2019, shortly before Frisbie Group began negotiating for the PBA Parcels, Robert Frisbie Jr. made a substantial donation to PBA, prompting an email from Fleming thanking Frisbie for his generosity.

77.  The Frisbies made multiple *quid pro quo* agreements with PBA insiders, including Reed and Koenig, to secure their assistance.

78.  Between February and August 2019, the Frisbies initiated a plan to pay Reed, a member of PBA's Real Estate Task Force, to push their agenda on the university and usurp the contract between PBA and Plaintiffs.  The relationship began no later than February 5, 2019, when Reed solicited Robert Frisbie Jr. to purchase from the university another property (called Mango Promenade), and offered his advice and counsel on the deal.  Eventually, this partnership turned its attention towards the PBA Parcels.  Reed played an indispensable role in advocating for the Frisbies at the expense of PBA's obligations to Plaintiffs.  The Frisbies offered to, or at least suggested they would, compensate Reed, through his brokerage firm, in return for his services as a backchannel to PBA decision-makers.  Reed characterized this fee as a "buyer-procuring cause commission," owed to him for facilitating the deal.  Specifically, he demanded a $100,000 "buyer introduction" fee, which he considered reasonable based on the "spirit" of his previous conversations with Frisbie Group.  Frisbie Group went along with this *quid pro quo*, but on July 24, 2019, perhaps recognizing the legal and ethical implications of paying a PBA insider to ensure the university abandoned its obligations towards Plaintiffs, Robert Frisbie Jr. attempted to recharacterize the payment to Reed as a "consulting" fee for Reed's advice on the project moving

forward but paid in advance.  In reality, however, the Frisbies' payment to Reed was an improper bribe used to interfere with the LOI between Plaintiffs and PBA.

79.     The Frisbies employed a similar improper method to enlist Koenig, another PBA insider, in their effort to steer PBA away from its LOI obligations and towards the Frisbies' own offer.  The Frisbies leveraged their personal relationship with Koenig to create yet another back channel to securing the PBA parcels for themselves.  Between April 23, 2019 and the termination of the LOI on May 29, 2019, Koenig (acting on behalf of the Frisbies) repeatedly engaged with PBA representatives, including Jenkins, to advocate for ending the university's relationship with Plaintiffs and turning instead towards the Frisbies.  For example, on May 15, 2019, before the LOI was terminated, Koenig assured the Frisbies that he was on their "team" and that he was having ongoing conversations with the Real Estate Task Force at PBA.  On information and belief, in exchange for Koenig's advocacy with the university, the Frisbies offered future business to Koenig in the form of paying Koenig on future deals to serve as a broker.  That promise came to fruition with a number of collaborative deals between Koenig and the Frisbies in the months following the PBA Parcels deal.  For example, in or about the first half of 2020, the Frisbies used Koenig as an "inside track" broker in their efforts to purchase property owned by the Myers Auto Group in West Palm Beach.  Later, in 2021, the Frisbies worked with Koenig as a broker on a number of other real estate transactions, including the contemplated sale of parcels collectively known as the "Braka Properties" and the potential purchase of 5400 North Flagler Drive.  In September 2021, Koenig and the Frisbies went into business together in a joint venture called Flatura LLC.  Flatura LLC was registered to 221 Royal Poinciana Way, Suite 1, a property owned and developed by the Frisbie Group, and at first, both the Frisbie Group and Flagler Realty, Koenig's real estate company, were listed as officers of Flatura.  After Plaintiffs filed their initial complaint in this case, however, Koenig was removed as an officer of this organization, indicating Defendants'

knowledge of the wrongfulness of their *quid pro quo* arrangement with Koenig.  Throughout the course of the relationship, Koenig acted on behalf of the Frisbies and, in effect, became their agent.  On May 5, 2021, he went so far as to violate his duties to PBA by disclosing to the Frisbies confidential, internal PBA communications involving PBA's new President, Debra Schwinn, that touched upon the Frisbies' interests (specifically, that she did not want to be too closely tied to the Frisbies) and that Schwinn did not want shared with the Frisbies.  Through their arrangement, the Frisbies established complete control, and Koenig acted at their behest.

80.  In sum, the Frisbie Group used every available back channel, personal connection, and business leverage point possible to secure the PBA Parcels deal for themselves, all in a blatant (and ultimately successful) attempt to have PBA violate its LOI commitments to Plaintiffs, and in furtherance of PBA's fraudulent stringing along of Plaintiffs.

### PBA Lies

81.  While all this was happening, Plaintiffs continued to negotiate with PBA in good faith.  PBA continued its negotiations with Plaintiffs, too.  It knew, after all, that it was contractually obligated to negotiate exclusively with Plaintiffs.  In fact, numerous of PBA's representatives, including Reed and Koenig, were licensed real-estate brokers, well-versed in their duties to PBA and aware of PBA's duty to Plaintiffs.  But in reality, PBA was scheming to have Frisbie Group step into Plaintiffs' shoes, with PBA eventually reneging on its completed deal with Plaintiffs and instead contracting to sell the PBA Parcels to Frisbie Group.

82.  After Van der Grift contacted Blodgett on April 5, for example, Blodgett elevated the Frisbies' offer to Fleming, despite representing to Van der Grift that there was "no point" in doing so.  Instead of dismissing the offer, as he was contractually obligated to do, Fleming asked to discuss it "directly" and "asap" with Blodgett, evidencing PBA's clear disregard for the exclusivity provision of the LOI with Plaintiffs.  This exchange occurred just one month before Plaintiffs were

told Fleming's ill health prevented him from signing the mutually agreed-upon PSA with Plaintiffs.

83.   Likewise, following Crowell's April 17 meeting with Jenkins, Jenkins had dinner with Koenig to "discuss[] the Flagler Land."  According to a report Jenkins later made to David Frisbie, Koenig expressed at this dinner that he "would like to have further conversations" with Frisbie Group about its offer and "ha[d] set a meeting" with Frisbie Group representatives for the following Tuesday.

84.   The numerous interactions between PBA, its representatives, and Frisbie Group before PBA's purported termination of its LOI with Plaintiffs illustrate the ways in which PBA continuously entertained and negotiated offers by the Frisbie Group despite being bound by the exclusivity provision of the LOI.

85.  In fact, PBA admitted and documented its breach of the exclusivity provision in meeting minutes prepared after a June 20, 2019 Real Estate Task Force meeting.  The minutes detail Jenkins's admission that "the University had received a competing offer from the Frisbie Group which prompted PBA to terminate its Letter of Agreement with Plaintiffs and initiate conversations with the Frisbie Group."  This statement, while acknowledging that the LOI continued to bind PBA until its termination, misrepresents the chain of events leading to the decision to terminate.  Rather than initiate conversations with Frisbie Group *after* this termination, PBA and its representatives had been engaging in conversation with Frisbie Group about purchasing the property for months *prior* to terminating the LOI.  As such, the minutes make clear that PBA was aware of their own wrongdoing and misrepresented their relationship with the Frisbies in an attempt to cover-up that wrongdoing.  Furthermore, the meeting minutes confirm that PBA lied about President Fleming's illness preventing PBA from executing the agreed-upon

PSA.  The minutes document not only President Fleming's attendance at the Real Estate Task Force meeting, but memorialize the full presentation he gave to the task force.

86.   But Plaintiffs were not aware of PBA's underhanded dealings.  Each of PBA's representations that the deal was near execution amounted to a lie to buy time.  At the same time Plaintiffs and PBA were negotiating the finalized PSA, representatives of the university— including President Fleming himself—were already actively negotiating a deal with Frisbie Group for the sale of the exact same land.  By roping Plaintiffs along as long as possible, PBA could continue to motivate Plaintiffs to spend time and money finalizing the plans for the project and pump them for confidential business information, including design plans for the property, market research, and construction cost calculations.  By May 29, 2019, knowing that Frisbie Group would take over and supplant Plaintiffs in the deal, PBA abruptly sent a termination letter to Plaintiffs.

*Frisbie Group Offers Plaintiffs a Sham Partnership*

87.   In or about July 2019, while traveling in Europe, a Two Roads principal was informed that the Frisbie Group had the PBA Parcel project "under contract."  The principal immediately called David Frisbie looking for answers and requesting that they meet to discuss Frisbie Group's conduct.  David Frisbie did not admit to any knowledge that Plaintiffs had been negotiating with PBA and claimed that PBA had approached Frisbie Group.  Neither statement was true.  David Frisbie invited Plaintiffs to visit the Frisbie family compound in Nantucket, Massachusetts, for a meeting.

88.   On or about August 6, 2019, Two Roads's principals flew to Nantucket, Massachusetts, to meet with members of the Frisbie Group and family at their compound, including David Frisbie, Suzanne Frisbie, Crowell, Robert Frisbie Jr., and Richard D.W. Frisbie. Over dinner, the Two Roads principals expressed their bewilderment that Frisbie Group had a deal with PBA given that Plaintiffs already had a contract and a done deal with PBA, as well as a capital

partner.  In response, David Frisbie and Robert Frisbie Jr. denied any knowledge of Plaintiffs'

dealings with PBA.  This was a lie.  The Two Roads principals also shared that Plaintiffs had

negotiated the price with PBA down to a certain figure, and asked if Frisbie Group was in the

"same ballpark."  David Frisbie responded, in sum and substance, "yes, the same ballpark."  David

Frisbie and Robert Frisbie Jr. also claimed that they had a nondisclosure agreement with PBA that

limited what they could say about the issue and made it so they could not discuss the issue any

further.

    89.    At this meeting, the parties present also discussed working together as co-developers;

Plaintiffs begrudgingly entertained this notion given the reality that Frisbie Group now had the

contract for the development that Plaintiffs had put so much time, money, and expertise into

designing and developing.  Plaintiffs expressed their objections to this turn of events, but with the

Frisbie Group now seemingly in control of the project, there appeared to be no other way to bring

to fruition the ideas and plans for the properties that Plaintiffs had been developing for 16 months,

and no other way not to lose out entirely on their investments and efforts.  Working together as co-

developers, moreover, could benefit Plaintiffs, the Frisbie Group, and the greater community.  A

development partnership could also reduce hurdles and headaches in the continuing construction

and development of Forté.  Frisbie Group could invest in Forté, and Plaintiffs could reciprocally

invest in the project on the PBA Parcels.  Preliminary discussions for this partnership continued

for the next few months.

    90.    On or about January 8, 2020, Koenig told Plaintiffs that PBA had executed a sale

contract with another developer.  Sensing an opportunity to extract favorable terms to use as

leverage in PBA's dealings with Frisbie Group, Koenig urged Plaintiffs to submit a back-up

contract.  Koenig even told Plaintiffs the business terms to include.  On or about January 10, 2020,

Plaintiffs submitted a proposed contract that included Koenig's suggested terms.  On or about January 15, 2020, PBA finally informed Plaintiffs that the PBA Parcels were not available for sale.

91.     Soon thereafter, Frisbie Group and Plaintiffs began more serious discussions about the proposed co-development.  Plaintiffs could not imagine that Defendants would use this apparent olive branch of a partnership to extract and steal confidential and proprietary business information from Plaintiffs.  In February 2020, Crowell visited the Two Roads office in furtherance of this apparent partnership, which Plaintiffs believed Frisbie Group was pursuing in good faith.  At Collins's suggestion, Crowell agreed to get PBA to match the contingencies and closing period in its contract for the PBA Parcels with the previously announced terms and provisions for the Forté contract, which mutually benefitted both parties.  Understanding based on Crowell's and Frisbie Group's words and actions that Frisbie Group was pursuing a mutually beneficial partnership, and operating under an understanding of confidentiality, Collins then shared Plaintiffs' detailed plans for the PBA Parcels, developed over a period of 16 months.  He shared the underwriting arrangements, disclosing their capital partners and explaining how the project would have been financed, and valuable market studies that were essential to the development. Collins shared key details about the building, including the planned square footage, subterranean parking design, and subcontracting bids Plaintiffs had already received.  Showing how the siting of the Flagler Towers buildings could benefit both developments, and hoping that the parties could reach a mutually beneficial agreement on siting, he shared Plaintiffs' detailed siting map for the PBA Parcels.  Plaintiffs even reviewed Frisbie Group's projections for the project and offered revised estimates based on their own work on the Forté.

92.     Collins also shared key information relating to the project's anticipated aesthetic and branding, including details about Plaintiffs' vision for street level amenities, including a café, the art walk, and connectivity to Pioneer Park.  Collins shared details about the planned

coordination with the Norton Museum, as well as Plaintiffs' efforts to market the cultural plan to the Mayor and City Commissioners. Collins also suggested that Frisbie Group and Plaintiffs could integrate the landscaping for the Forté and the new project so that it flowed as one campus. He explained that the neighboring waterfront property at 1301 South Flagler Drive was owned by Joseph Nasser and shared his timeline for buying out the Nasser Parcel to build a unique dock that could extend to front both properties. The planned art walk, featuring the sculpture garden and signature art piece, would encompass this waterfront property. Collins also provided Plaintiffs' information on various citizens groups and neighbors, with suggestions on how to approach and win over each player. In a subsequent meeting, Crowell and Robert Frisbie Jr. visited the Two Roads office in Miami, where they met others involved in Plaintiffs' plans and toured the Two Roads Miami sales center. The Frisbies had never completed a high-rise tower in the Palm Beach area, and as such, Collins' collaborative spirit was essential to getting their project off the ground.

93. In April 2020, after receiving this valuable and confidential trade secret information, Frisbie Group expressed a desire to recruit Hines Development, of which David Frisbie previously served as vice president and lead developer; Frisbie Group and Plaintiffs would serve as co-developers. Soon after, in May 2020, Frisbie Group cut out Plaintiffs from the co-development. Frisbie Group now merely offered that Plaintiffs could be passive investors in their project. But Frisbie Group would have complete control over the project.

94. In July 2020, Robert Frisbie Jr. and Crowell created FH3 LLC. At the time of filing the initial complaint, this entity was processing Frisbie Group's application for government approval of their development plans for the Parcels. No later than July 2022, Frisbie Group formed a new entity called Flagler Towers Project DEV LLC, a joint venture between Frisbie Group and the developer Hines Development, intended to close on the property. No partnership between Plaintiffs and Frisbie Group ever materialized.

*Defendants Share Plaintiffs' Trade Secrets and Confidential Information*

95.     After both PBA and Frisbie Group extracted serious quantities of confidential information from Plaintiffs, they shared this confidential information and trade secrets with one another.  They did so in violation of their agreements—both written and implied—to maintain the confidentiality of this information.

96.     As noted, the LOI included a confidentiality provision specifying that the "terms of th[e] LOI and the parties' discussions and exchanged written materials relating to the proposed transaction," including the "terms of the proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]" and "due diligence information and documents relating to the [PBA Parcels]," are proprietary and confidential, and may not "be shown or disclosed by either party . . . to any other person or entity, except to those employees, attorneys, accountants or advisors who have a need to know as a result of being involved in the proposed transaction."  In violation of these confidentiality obligations, during negotiations with the Frisbie Group, PBA passed along to Frisbie Group confidential information about Plaintiffs' proposed deal in violation of the LOI's confidentiality provision.  For example, in their March 28, 2019 text messages, Van der Grift and Robert Frisbie Jr. illustrated a specific, detailed knowledge of the negotiations between PBA and Plaintiffs, discussing the relevant offers, counteroffers, and settled price points. These messages also reveal that PBA board members shared with Van der Grift detailed information regarding the status of PBA's deliberations on Plaintiffs' offer, stating that "several [PBA] board members were not thrilled with this other company."  While Plaintiffs dispute the accuracy of this statement, it reveals that individuals at PBA were disclosing confidential information regarding the status of negotiations to Frisbie representatives.  Further, Van der Grift's April 5 email to Blodgett stated "[w]hen we submitted this LOI two weeks ago, my understanding was that the contract had not yet been signed," further evidencing PBA's disclosure of confidential

information regarding the state of its negotiations with Plaintiffs to Frisbie Group and its representatives.  And on May 15, 2019, Koenig provided Frisbie Group with insight into the state of negotiations between PBA and Plaintiffs, assuring the Frisbies that he was "on their team."  On information and belief, Frisbie Group accepted this information with knowledge of its confidentiality.

97.     On information and belief, PBA also shared with Frisbie Group information about Plaintiffs' proposed plans to develop the PBA Parcels, up-to-date sales information from the brokerage Douglas Elliman, and a market study from Concorde Group, trade secrets on which Plaintiffs had spent significant time, money, and effort to develop.

98.     Not only did Frisbie Group learn of Plaintiffs' development plans from PBA, but they also used false pretenses to extract trade secrets directly from Plaintiffs, as discussed above. Claiming that they were seeking a development partnership, Frisbie Group induced Plaintiffs to share their development plans, including in-depth market studies and other valuable information and tools necessary to develop a high-rise in West Palm Beach.  The Frisbies had never completed such a project before, and upon information and belief, required the expertise of Plaintiffs to move forward with their development.  And having led Plaintiffs by their words and actions into believing that they were pursuing a mutually beneficial partnership and were operating under an understanding of confidentiality, Frisbie Group led Plaintiffs to wrongly believe that the confidentiality of this information would be ensured without the need for a written confidentiality agreement.  Instead, Frisbie Group squeezed every bit of valuable information they could from Plaintiffs, then cut them out of the deal.  On information and belief, this was Frisbie Group's plan all along.  Far from acting as a "steward of the community," Frisbie Group committed these acts to steal the Plaintiffs' plans and lower their own development costs.

99.     In or about May 2021, Frisbie Group submitted plans to the city of West Palm Beach, calling for the creation of two 27-story towers, called the "Flagler Towers," to be built on the PBA Parcels, featuring 109 units, consisting of 100 condominiums and nine ground floor townhouses.  Each floor is proposed to have two units, with the average unit totaling about 5,000 square feet.  All units will have views of the city, the Intracoastal Waterway, Palm Beach, and the Atlantic Ocean.  The plan includes a street level café, an art walk looping around the property, connectivity to Pioneer Park, and a partnership with the Norton Museum to develop the property— all as Plaintiffs had disclosed to Frisbie Group.  Whether these individual aspects of Plaintiffs' plans were received directly from Plaintiffs under false auspices of trust and mutual interest, or from PBA in violation of the LOI, Frisbie Group passed the whole plan off as its own.  Plaintiffs received nothing in return.

### G. The Easement *Quid Pro Quo* and the Defendants' Continuing Effort to Defraud Plaintiffs

100.    Even after swindling Plaintiffs out of the PBA Parcels and misappropriating Plaintiffs' trade secrets, Defendants were not done.  To secure the success of the deal between them, Defendants needed Plaintiffs off their backs.  They engaged in a series of improper tactics to prevent Plaintiffs from seeking to reclaim their due.

*The Easement Quid Pro Quo*

101.    In an attempt to prevent Plaintiffs from taking any adverse legal action against PBA and Frisbie Group and to extract from Plaintiff a blanket approval of future development on the PBA Parcels, Defendants dangled their power to consent to the routine relocation of utility easements needed by Plaintiffs to move forward on their Forté project.

102.    In or about August 2019, Plaintiffs, their engineering group Kimley-Horn, and Florida Power & Light ("FPL"), reached out to PBA seeking a customary relocation of utility easements crossing Plaintiffs' development parcel to benefit the PBA Parcels.  The proposal

prepared by Plaintiffs and Kimley-Horn provided that PBA would receive the same utility service with changes made at Plaintiffs' expense.  On or about September 26, 2019, without explanation, PBA's counsel formally rejected any cooperation by PBA with Plaintiffs on relocation of the utility easements.

103.    On or about February 4, 2020, Plaintiffs renewed their request that PBA consent to the relocation of the utility easements.  Alexander informed Two Roads's General Counsel Hayes that in exchange for its consent, PBA first required that Plaintiffs deliver a legal release of any of Plaintiffs' claims against PBA for termination of the LOI—a request clearly reflecting PBA's consciousness of wrongdoing and desire to evade the legal consequences of its prior bad acts. Second, PBA demanded that Plaintiffs provide blanket approval of any proposed development of the PBA Parcels.  With such blanket approval, Frisbie Group could build their towers in a way that could crowd the Forté and potentially obstruct its views.

104.    On or about May 15, 2020, Alexander repeated the conditions that PBA set forth in February 2020.  Plaintiffs later relayed this conversation to Frisbie Group.  Frisbie Group told Plaintiffs that there was a misunderstanding and that Frisbie Group would work to clear it up.  But Frisbie Group never followed up with Plaintiffs to clear up this supposed misunderstanding.

105.    For another year, PBA refused to budge on the easements.  Internal Frisbie communications reveal that despite the efforts of Plaintiffs to reach some form of cooperation on the issue, the Frisbies never fully intended to participate.  Instead, a November 28, 2020 email from David Frisbie revealed that the Frisbies' communications with Plaintiffs were designed to make Plaintiffs "continue to believe [they] should cooperate" with the Frisbies out of their own self-interest, when in reality, the Frisbies had no plans to cooperate on the easement issue and were merely delaying.  At this point, Plaintiffs were boxed in.  They needed to move forward on the Forté project, but Defendants were determined to hold up construction until they extracted the

blanket development approval and a release of legal claims relating to their scheme.  Not willing to be bullied into submission, Plaintiffs redesigned and reengineered the Forté so that it would not require the easements—at great effort and a cost of what will end up being approximately $2 million.  If the easements are now granted, Plaintiffs will be saved from some of these expenses, but Defendants' actions will still cost them approximately $1.5 million, as much of this money has already been spent or is not recoverable.

106.    On or about April 21, 2021, Plaintiffs emailed Frisbie Group asking if there was some reason why PBA refused to cooperate with FPL on the relocation of the utility easements given that the request was "quite ordinary" and had "no impact or cost for the school or [Frisbies'] development."   That same day, Frisbie Group responded that PBA was "simply waiting on [Plaintiffs'] support" for Frisbie Group's proposed development on the PBA Parcels and surrounding initiatives "before consenting to the easement."  The next day, Hines and Frisbie Group internally discussed the need to get on the "same script" and to follow the lead of the Frisbies on the easement issue.  On April 23, 2021, an employee of the Hines Group provided his own thoughts on the easement situation, telling the Frisbies that they shouldn't "overplay our hands with [Two Roads]" in fear that Plaintiffs could "find out that they can solve [the easement dilemma] another way without [the Frisbies and Hines's] help and it ends up working against us politically."  Later, on April 28, 2021, a representative of Hines, the Frisbies' new development partner, admitted that the Defendants viewed the easements as "leverage" with Plaintiffs and that the easements did not seem overbearing to comply with.  These communications illustrate that the refusal to grant the easements were just another improper act in the Frisbies' campaign to steal the parcels from Two Roads and push through their own development, and that the Frisbies only planned to cooperate once the Plaintiffs found "another way" to continue development.

107.     On September 27, 2021, Kimley Horn, the engineering group working with both parties in this case, once again informed the Frisbies that complying with the Plaintiffs' easement requests would be a temporary and non-disruptive measure.  In doing so, Kimley Horn pointed to an email sent by FPL in 2018 detailing the exact same analysis, evidencing the Frisbies' longstanding, irrational, and improperly motivated resistance to the request.

108.     On September 30, 2021, just three days after being confronted with the irrationality of their longstanding position, the Frisbie Group postured as a good neighbor on a call with Plaintiffs and a capital partner, purporting to offer Plaintiffs the relocation of the easements they had previously sought with "no strings attached."  Frisbie Group only made this offer once Plaintiffs had found a way around the easements through the costly reengineering of the Forté.  In other words, Frisbie Group only offered to relocate the easements once it lost its value as a lever to extract approval of the development and a release of legal claims arising from the PSA negotiations and related events.  But, revealing the falsity of its offer, Frisbie Group has failed to follow through.

109.     Defendants cynically tried to use the easements as leverage over Plaintiffs, even though it would not harm or inconvenience Defendants at all to relocate the easements.  Plaintiffs did not bend to the pressure to forgo their legal rights in exchange for the easements, but Defendants' actions were improper and wrongful; their refusal to grant these routine easements, moreover, forced Plaintiffs to spend significant sums of money on the reengineering, and caused significant and costly delays in Plaintiffs' Forté project.

*The Frisbies' Threats*

110.     Defendants have also tried to extort Plaintiffs into submission by threatening their business.

111.    On May 13, 2021, Plaintiffs visited the Frisbie compound in Palm Beach to continue discussions over the easements.  There, they had a meeting with various members of the Frisbie family.  At this meeting, Suzanne Frisbie threatened, in sum and substance, that if Plaintiffs did not go along with Frisbie Group's unseen plan for the development, Frisbie Group would convince brokers in the market to abandon the Forté project.  Her threat amounts to extortion under Florida law.  This would not be the only time a representative of Frisbie Group and member of the Frisbie family in sum and substance threatened to harm Plaintiffs' reputations; in fact, this happened multiple times after Frisbie Group turned on Plaintiffs.

112.    On November 12, 2021, David Frisbie told a Two Roads principal that Frisbie Group refused to move their towers "even an inch" despite Plaintiffs' requests.  If Plaintiffs came out against Frisbie Group's development, David Frisbie explained, it would mean "war":  Frisbie Group would move its Flagler Towers forward, completely blocking Forté's views.  Rather than having to explain to their buyers that their view was slightly blocked by the Frisbie Group tower, David Frisbie emphasized, Plaintiffs would be forced to tell their buyers that the tower entirely blocks their southern facing views.  David Frisbie also doubled down on Suzanne Frisbie's threat, warning the Two Roads principal that if Plaintiffs did not go along with Frisbie Group's plans, Frisbie Group would tell buyers not to purchase units in the Forté.

*Rewriting History*

113.    Finally, Defendants have schemed to create a false record and narrative and undermine Plaintiffs' legal claims.

114.    In an August 15, 2021 email to Plaintiffs, David Frisbie tried to rewrite and whitewash the Frisbie Group and the Frisbie family members' bad behavior and their (as well as PBA's) involvement in the scheme to defraud Plaintiffs.  In spite of Defendants' prior egregious behavior relating to the scheme to defraud Plaintiffs, the theft of Plaintiffs' development deal, the

weaponization of routine utility easements, and the threat to hurt the Forté's sales if Plaintiffs did not go along with Frisbie Group's development plan, David Frisbie brazenly positioned Frisbie Group as an amiable neighbor, including in being "helpful" with the easements. David Frisbie also highlighted the "magnitude" of supposed "benefits" it claims it provided to Plaintiffs, alongside Frisbie Group's investment in the Cultural Quarter of the surrounding area, as reasons for Plaintiffs to write a letter of recommendation supporting Frisbie Group's Flagler Towers project.

*     *     *

115.    Plaintiffs spent 16 months and large sums of money developing a comprehensive plan for the development of the PBA Parcels. While assuring Plaintiffs that a deal was imminent, PBA broke its contractual obligations and began to negotiate with Frisbie Group. Frisbie Group and PBA then entered a contract substantially similar to Plaintiffs' PSA, with Frisbie Group later falsely denying any knowledge of Plaintiffs' prior negotiations with PBA. Frisbie Group then promised to partner with Plaintiffs on a combined development; after extracting even more confidential information from Plaintiffs, Frisbie Group discarded them. Defendants went on to condition necessary easements on Plaintiffs' release of claims arising from the termination of the LOI and a blanket approval of their development. Defendants even threatened to hurt the sales of the Forté if they did not comply. As a direct result of Defendants' actions, Plaintiffs have lost an invaluable, irreplaceable development project, years of work, and many millions of dollars in out-of-pocket costs. They have also suffered damages in the form of significant increased costs in the development of their adjacent Forté project due to the delays caused by Defendants, and they face the risk that Frisbie Group is building the towers in a way that damages the Forté project.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Breach of Contract of Letter of Intent, Exclusivity Provision –
### Against Defendant PBA)

116.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

117.    PBA entered into the LOI with Two Roads on or about June 11, 2018.  The LOI was a binding contract between the parties, for which consideration was given by each.

118.    The LOI bound the parties to an exclusivity provision, under which the parties could "not entertain or enter into any other purchase agreement or financing for the [PBA Parcels] and each party agrees to negotiate exclusively with the other to draft and enter into a PSA as contemplated herein for a period of Ninety (90) days from the date of this LOI.  [I]n the event the parties cannot reach an agreement, either party may terminate the negotiations and this LOI at their sole discretion upon written notice to the other, in which event, neither party hereto shall thereafter have any further liability, responsibility or obligation to the other under this LOI."

119.    PBA negotiated with Two Roads and Trilar under the exclusivity provision of the LOI from June 11, 2018 to May 29, 2019.  Based on the terms of the LOI, the parties unambiguously intended that in the event that no agreement was reached during the initial 90-day period of the LOI, the exclusivity agreement would continue unless and until one of the parties "terminate[d] the negotiations and this LOI . . . upon written notice to the other."  Any liabilities, responsibilities or obligations that the parties had to each other, including those related to exclusivity, would continue to apply until such termination.  PBA's May 29, 2019 letter explicitly terminating negotiations *under the LOI* further proves this mutual understanding.

120.    PBA breached the exclusivity provision by starting negotiations with Frisbie Group in or about March 2019, two months prior to terminating negotiations under the LOI.

121.    Plaintiffs were injured and suffered damages as a result of PBA's breach of the exclusivity provision, in an amount to be determined at trial.

122.    Plaintiffs' injuries include the lost expectancy of the PBA Parcels, the lost profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract of Letter of Intent, Confidentiality Provision – Against Defendant PBA)**

123.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

124.    The LOI, entered into by Plaintiffs and Two Roads on June 11, 2018—a binding contract between the parties, for which consideration was given by each—also included a confidentiality provision, which stated that the "terms of th[e] LOI and the parties' discussions and exchanged written materials relating to the proposed transaction," including the "terms of the proposed Purchase and Sale Agreement," "the proposed development of the [PBA Parcels]" and "due diligence information and documents relating to the [PBA Parcels]," are proprietary and confidential, and may not "be shown or disclosed by either party . . . to any other person or entity, except to those employees, attorneys, accountants or advisors who have a need to know as a result of being involved in the proposed transaction."

125.    On information and belief, PBA breached the confidentiality provision by sharing with Frisbie Group "the terms of the proposed [PSA]; the proposed development of the [PBA Parcels], and due diligence information and documents relating to the [PBA Parcels]."  This information, by the terms of the LOI, was confidential and proprietary.

40

126.    Two Roads and the other Plaintiffs were injured and suffered damages as a result of PBA's breach of the LOI's confidentiality provision, in an amount to be determined at trial.

127.    Plaintiffs' damages consist of their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**THIRD CLAIM FOR RELIEF**
**(Fraud –**
**Against Defendants PBA and Patrick C. Koenig)**

128.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

129.    In April and May 2019, PBA and Koenig repeatedly represented to Plaintiffs that the terms of the PSA had been finalized, that the PSA was "all approved," and that PBA planned and intended to move forward with Plaintiffs as its development partner.  Alexander (as attorney for PBA) and Koenig also repeatedly represented that the reason why PBA were not countersigning the PSA was due to the ill health of its President.

130.    Alexander's and Koenig's representations were false, and they knew them to be false.  PBA began negotiating with Frisbie Group for the purchase of the PBA Parcels in March 2019.  While telling Plaintiffs that the deal was "all approved," PBA continued to negotiate the sale of the PBA Parcels with Frisbie Group.  As explained above in Paragraphs 81–86, PBA had no firm intention of executing the contract with Plaintiffs provided it concluded its deal with Frisbie Group (but retaining at all times Plaintiffs' executed contract and its obligations thereunder).  PBA made these misrepresentations and omissions to Plaintiffs so that Plaintiffs would rely and act upon them.  PBA succeeded: Plaintiffs trusted PBA's representations that the deal would be finalized, and reasonably relied on them.  Having tricked Plaintiffs into waiting for execution, PBA could use their negotiations with Plaintiffs as leverage in their negotiations with

Frisbie Group.  Multiple representations in May 2019 that the delay in execution was due to the ill health of PBA's President were tactics to buy time until PBA was comfortable with its prospects with Frisbie Group.

131.   In addition to these affirmative misrepresentations, PBA violated its duty to disclose the material fact that it was negotiating with another party and did not intend to sell the Parcels to Plaintiffs.  This duty arose because PBA undertook to disclose information concerning its intentions for the PBA Parcels transaction, and because Plaintiffs had no opportunity to learn of these negotiations with Frisbie Group.  Plaintiffs reasonably relied on the affirmative misrepresentations and the lack of information about PBA's secret dealings to its detriment.

132.   In January 2020, PBA continued its pattern of fraud when it urged Plaintiffs to put forward another offer on the property.  Koenig suggested the terms, and Plaintiffs complied, submitting an offer with those terms.  Again, PBA roped Plaintiffs along, using the Plaintiffs' terms as leverage in its negotiations with Frisbie Group.  PBA's negotiations with Frisbie Group crystallized into a finalized deal with Frisbie Group just days after PBA asked for Plaintiffs' backup offer.  PBA had no firm intention of contracting with Plaintiffs; instead, it just wished to pump Plaintiffs for valuable information and discard them after extracting all it could.

133.   PBA's representations and omissions with respect to their commitment to the negotiations were material as they amounted to promises that the execution of a massive real estate transaction would be finalized.

134.   Plaintiffs justifiably relied upon the above misrepresentations and omissions of material fact in April and May of 2019.  Having been told that the deal was "all approved" and repeatedly assured that the deal would go through, Plaintiffs reasonably continued to spend time and money preparing to acquire and develop the Parcels.  In January 2020, Plaintiffs again reasonably relied upon PBA's suggestion that they still had a chance at purchasing the Parcels, as

Plaintiffs were submitting their backup offer on the terms and with exactly the concessions PBA requested.

135.    Plaintiffs were injured and suffered damages as a result of their reasonable reliance on PBA's and Koenig's misrepresentations and omissions, in an amount to be determined at trial. In particular, among other things, PBA's misrepresentations and omissions were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

136.    Plaintiffs' injuries include the lost expectancy of the PBA Parcels, the profits derived from the transaction, their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**FOURTH CLAIM FOR RELIEF**
**(Aiding and Abetting Fraud –**
**Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S.**
**Crowell)**

137.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

*Underlying Fraud*

138.    As articulated in Paragraphs 128–136 above, Defendants PBA and Patrick C. Koenig committed fraud against Plaintiffs through misrepresentations and omissions about their intent to sell the PBA Parcels to Plaintiffs and the reason for their failure to countersign the "all approved" PSA, which caused Plaintiffs' continued investment in the project in anticipation of their acquisition and development of the property.

*Knowledge of the Fraud*

139.    Defendants Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell were aware that PBA and Koenig were committing fraud against Plaintiffs by misleading Plaintiffs and stringing them along about PBA's actions and intentions.

140.    They demonstrated their awareness of this fraud through multiple written communications discussing their negotiations with PBA while at the same time acknowledging that PBA was (falsely) leading Plaintiffs to believe that PBA would shortly sign a PSA with Plaintiffs and move forward with the project with Plaintiffs.

141.    For example, in a March 26, 2019 text message, Frisbie associate Van der Grift informed Robert Frisbie Jr., that the "[b]iggest challenge" to the success of Frisbie Group's negotiations with PBA would be that PBA was "supposed to sign that contract with 2 Roads [that same] week."

142. Similarly, on or around April 5, 2019, PBA representative Blodgett told Van der Grift that there was "no point" in pursuing Frisbie Group's offer for the property due to PBA's agreement to negotiate only with PBA.  Yet various PBA representatives, including Reed and Jenkins, were entertaining meetings with Frisbie Group representatives at that time, informing Frisbie Group that PBA was not planning to honor its commitment to Plaintiffs.

*Substantial Assistance to the Fraud*

143.    Defendants Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell substantially assisted the fraud in a number of ways.  They pushed for, encouraged, and engaged in contract negotiations with PBA while knowing that PBA was misleading Plaintiffs to believe that PBA would shortly sign a PSA with Plaintiffs and move forward with the project with Plaintiffs, while misrepresenting the reason for its delay in doing so.  They incentivized the fraud by offering to purchase another property from the university and then return it to the school as a

"gift," making illicit deals with PBA Board Members, and offering a PBA representative a six-figure "success fee" for advocating on their behalf and at Plaintiffs' expense.

144.     They also assisted this fraud by making their own misstatements and omissions about PBA's deceitfulness towards Plaintiffs.  In a July 2019 phone call to a Two Roads principal, David Frisbie misrepresented his knowledge that Plaintiffs and PBA had been negotiating for the Parcels.  David Frisbie, Robert Frisbie Jr., and Crowell affirmatively denied any knowledge of these negotiations to the Two Roads principals during their visit to the Frisbie family compound in Nantucket on August 6, 2019.  These were lies, which covered up and assisted PBA's dishonesty to Plaintiffs.

145.     And once the fraud was revealed, Defendants Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell took action to help PBA and Koenig avoid consequences for their fraud. In April 2021, they offered approval of Plaintiffs' easement in exchange for Plaintiffs' support of the PBA/Frisbie plans for the PBA Parcels.  In May 2021, Frisbie Group agent Suzanne Frisbie threatened Plaintiffs' business if they did not support these plans.  In November 2021, Defendant David Frisbie threatened the Forté if Plaintiffs came out against Frisbie Group's development.

146.     Plaintiffs were injured and suffered damages as a result of these Defendants' aiding and abetting of PBA's and Koenig's fraud, in an amount to be determined at trial.  In particular, among other things, PBA's and Koenig's misrepresentations and omissions, which were aided and abetted by these Defendants, were the direct and proximate cause of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

147.     Plaintiffs' injuries include the lost expectancy of the PBA Parcels, the profits derived from the transaction, Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**FIFTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation –**
**Against Defendants PBA and Patrick C. Koenig)**

148.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

149.    PBA and Koenig made a series of misrepresentations to Plaintiffs relating to the purchase of the PBA Parcels, as described above in Paragraphs 128–133 which are incorporated by reference as if fully set forth herein.

150.    Among other things, PBA and Koenig engaged in negotiations with Frisbie Group while representing to Plaintiffs that PBA had approved and was finalizing the sale of the Parcels to Plaintiffs.   No reasonably prudent business exercising due care would make definite representations that a sale was imminent while negotiating with another party for that same property.  At the very least, given the circumstances PBA should have known not to affirmatively promise that the deal would reach execution.

151.    In addition to these affirmative misrepresentations, PBA violated its duty to disclose the material fact that it was negotiating with another party and did not intend to sell the Parcels to Plaintiffs.  This duty arose because PBA undertook to disclose information concerning its intentions for the sale and development of the PBA Parcels, and because Plaintiffs had no opportunity to learn of these secret negotiations with Frisbie Group.

152.    As described above in Paragraph 134, Plaintiffs justifiably relied upon the above misrepresentations and omissions of material fact.

153.    Plaintiffs were injured and suffered damages as a result of PBA's and Koenig's negligent misrepresentations and omissions, in an amount to be determined at trial.  In particular, among other things, these misrepresentations and omissions were the direct and proximate cause

of Plaintiffs' continued investment in anticipation of its acquisition and development of the PBA Parcels.

154.    Plaintiffs' injuries include the lost expectancy of the PBA Parcels, the profits derived from the transaction, their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**SIXTH CLAIM FOR RELIEF**
**(Violations of 18 U.S.C. § 1832 –**
**Against All Defendants)**

155.    Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

156.    Plaintiffs incurred significant costs to develop trade secrets with independent economic value unique to the Parcels.  These include, *inter alia*, the terms of the PSA; all due diligence documentation; the siting and massing plan, including blueprints, maps, and the work product of an architect; the comprehensive plan to comply with city zoning and land use requirements; plans to build a marina and dock on the Nasser Parcel; plans for integrating the property with its surroundings, including details about the art walk and co-branding with the Norton Museum, and strategic information on various citizens groups and neighbors.

157.    These trade secrets involved interstate commerce and related to a product that was intended for use in interstate commerce.  The plans involved out-of-state actors and resources, involved capital partners located outside the state of Florida, and involved a condominium that would be marketed beyond Florida.

158.    Plaintiffs took reasonable measures to keep this information a secret.  Plaintiffs did not publicize this information and maintained adequate security to protect their computers, files, documents, and other records that stored information relating to these trade secrets.  Plaintiffs

included a confidentiality provision in the LOI between Two Roads and PBA in an attempt to protect this information.

159.    PBA, Koenig, and Fleming misappropriated this information when they misrepresented their intentions to consummate the PSA with Plaintiffs.  PBA, Koenig, and Fleming continued to indicate their intentions of completing the deal with Plaintiffs while dealing with Frisbie Group, all the while receiving Plaintiffs' trade secrets and confidential business information throughout these negotiations.  On information and belief, PBA, Koenig, and Fleming violated their confidentiality obligations by sharing this information with Frisbie Group as early as March 2019.  On information and belief, Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., Crowell, and FH3 LLC used these trade secrets, which they knew were acquired by improper means, to reach an agreement with PBA and to plan Frisbie Group's and FH3's development of the PBA Parcels.

160.    Starting in or around August 2019, Plaintiffs and Frisbie Group, with the involvement and under the direction of David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell, began serious discussions around co-developing the PBA Parcels, under an implied confidentiality understanding.  Unbeknownst to Plaintiffs, Frisbie Group, with the involvement and under the direction of David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell, misrepresented Frisbie Group's intent to co-develop the property with Plaintiffs to obtain Plaintiffs' trade secrets and confidential business information.  Pursuant to this relationship, Plaintiffs shared their trade secrets and confidential information with Frisbie Group.  Frisbie Group and FH3 LLC enjoy the use of this valuable stolen information as they move forward with the development of the Flagler Towers.

161.    Plaintiffs were injured and suffered damages as a result, in an amount to be determined at trial.  Plaintiffs' damages consist of their significant investments in producing the

plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

## SEVENTH CLAIM FOR RELIEF
### (Violation of Fla. Stat. §§ 688.001 *et seq.* – Against All Defendants)

162.   Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

163.   Plaintiffs incurred significant costs to develop trade secrets with independent economic value unique to the Parcels, as set forth in Paragraph 156 above, which is incorporated by reference as if fully set forth herein.

164.   Plaintiffs took reasonable measures to keep this information a secret, as set forth in Paragraph 158 above, which is incorporated by reference as if fully set forth herein.

165.   Defendants misappropriated this information, as set forth in Paragraphs 159–160 above, which are incorporated by reference as if fully set forth herein.

166.   Plaintiffs were injured and suffered damages as a result, in an amount to be determined at trial.  Plaintiffs' damages consist of their significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

## EIGHTH CLAIM FOR RELIEF
### (Tortious Interference with Contract – Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell)

167.   Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

*Existence and Knowledge of Contract*

168.     Plaintiffs and PBA were bound by a valid and enforceable contract.  The June 2018 LOI was a binding agreement that signaled their formal intent to enter into a PSA for the Parcel and bound the parties to confidentiality and exclusivity provisions.

169.     Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell knew of this contract.  Between March 26, 2019, the day after the Frisbies' offer was first submitted, and March 28, 2019, Robert Frisbie Jr., a member of the Frisbie Group, exchanged text messages with Van der Grift, an agent of the Frisbies, regarding the Frisbies' efforts to secure the parcels for themselves.  On March 26, Van der Grift texted Robert Jr., "Biggest challenge is that they're supposed to sign that contract with 2 Roads this week. Hope they will seriously consider this."  On March 28, Van der Grift sent, *inter alia*, the following messages: "There [sic] offer was 31 btw." "PBA wanted 44, they offered in the 30's, they settled at 41." "We have a lot going for us. Apparently several board members were not thrilled with this other company." In response, Robert Jr. replied, "Perfect. While we don't want to negotiate against ourselves our main objective should be to get in the drivers [sic] seat ASAP."  These text messages with Van der Grift clearly acknowledge the existence of Two Roads's offer to purchase the parcels.  The texts similarly acknowledged that PBA was "supposed to sign" the contract with Two Roads, indicating an awareness of the existence of the LOI, which formalized the parties' intent to sign a PSA with one another.

170.     On April 5, 2019, Van der Grift, a self-acknowledged agent of Frisbie Group, was told that there was "really no point" in considering the Frisbies' offer for the PBA parcels, further confirming the Frisbies were aware of the LOI between Two Roads and PBA and its exclusivity provision.

171.     These communications evidence the Frisbies' knowledge of the LOI between Two Roads and PBA.

*Procurement of the Breach*

172.    Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell intentionally and unjustifiably interfered with this contract when Frisbie Group engaged with PBA to negotiate to purchase the Parcels.  These defendants engaged with PBA despite knowing PBA and Plaintiffs were bound by an exclusivity agreement and confidentiality agreement.

173.    For example, on March 25, 2019, months after the Frisbies became aware of the potential deal between Two Roads and PBA, Robert Frisbie Jr. submitted an offer to purchase the PBA parcels and a related university property, the Mango Promenade.

174.    On April 5, 2019, Van der Grift, an agent of the Frisbies, later followed up with PBA through its representative Blodgett and asked for the university to take another look at the Frisbies' offer.  Upon being confronted with PBA's obligation to adhere to its agreement with Two Roads, Van der Grift doubled down and asked for an opportunity to present their offer to the board of trustees.  Van der Grift also attempted to sweeten the deal for PBA, telling Blodgett that the Frisbies would be willing to "gift" the Mango Promenade back to the university if PBA chose to sell the parcels to the Frisbies.  Such conduct evidences a clear disregard for the contractual obligations of PBA.  Further, the Frisbies' brazen efforts actually did lead to a breach.  Despite representing to Van der Grift that there was "no point" in considering the Frisbies' offer, Blodgett, a representative of PBA, elevated the Frisbies' offer to then-President Fleming himself.  Instead of dismissing the offer, Fleming asked to discuss it "directly" and "asap" with Blodgett, evidencing PBA's clear disregard for the exclusivity provision of the LOI with Two Roads.  These emails alone illustrate a clear procurement of the breach of the LOI.

175.    Further, on April 11, 2019, the Frisbies continued to pursue the parcels with reckless disregard for any obligations PBA may have towards Two Roads by using back channels—this time, their mutual acquaintance Ryan Bridger—to access Jenkins, the Chairman of

the PBA Board of Trustees.  Immediately upon their introduction, Frisbie Group made another attempt to convince PBA to abandon its obligations towards Two Roads and consider Frisbie Group's offer.

176.   On April 17, 2019, Crowell met with Jenkins in person.  On information and belief, Crowell used this meeting to further advocate for Frisbie Group's position and against PBA's continuing commitments to Two Roads.  Crowell later followed up on this conversation with another email to Jenkins on April 22, 2019, insisting that the Frisbie Group offer best suited the needs of PBA.

177.   On April 24, 2019, the Frisbie Group successfully brought Koenig, a long-time friend of the Frisbie family, into the effort to secure the parcels for themselves and interfere with the contract between PBA and Two Roads.  Koenig, Jenkins, and Crowell met in person on April 30, 2019, and, on information belief, discussed breaking PBA's commitment to Two Roads and negotiating a deal for themselves.

178.   On May 5, 2019, Robert Frisbie Jr. re-sent the Frisbie Group's offer for the parcels to Koenig and Jenkins, reaffirming the family's commitment to interfering with PBA and Two Roads's LOI.

179.    Finally, on May 15, 2019, after bringing the Frisbie Group's offer to the board of trustees' attention, Koenig assured the Frisbies that he was "on [their] team."

180.   All of these communications occurred weeks in advance of PBA's termination of the LOI on May 29, 2019, and thus, constitute a breach of the LOI's exclusivity provision.  The Frisbies repeatedly and haphazardly encouraged PBA to abandon its LOI with Two Roads, and in doing so, directly caused a breach of the LOI.

*Improper Methods*

181.    Defendants' improper methods of interfering with the LOI defeat any kind of privilege or justification they might claim.

182.    On or about January 17, 2019, Robert Frisbie Jr. made a substantial gift to PBA, prompting an email from Fleming, the former President of PBA, thanking Frisbie for his generosity.  On information and belief, the gift, which was made mere months before the Frisbies' ultimate plan to interfere in the agreement between PBA and Two Roads was put into motion, was an improper attempt to bribe the university to forego its obligations towards Two Roads in favor of the Frisbie Group.

183.    Similarly, between February and August 2019, the Frisbies co-opted and paid off Reed, a member of the PBA board of trustees and its real estate task force, to push their agenda on the university and interfere with the contract between PBA and Two Roads.  As a member of PBA's real-estate task force and a practicing real estate professional, the Frisbies knowingly encouraged Reed to violate his duties as an agent of the university to promote their offer for the parcels.

184.    On or about February 5, 2019, Reed solicited Robert Frisbie Jr. to submit an offer to purchase the Mango Promenade from PBA, offering his advice and counsel on the deal.  Eventually, this engagement turned its attention towards the parcels at issue in this case, and Reed would play an indispensable role in inserting the Frisbies at the expense of PBA's obligations to Two Roads.  In return for his services as a back channel to PBA, the Frisbies offered to compensate Reed's brokerage firm.

185.    Reed advocated for Frisbie Group and played a role in steering the university away from its LOI with Two Roads.  This advocacy on behalf of—and secretly as an agent of—the Frisbie Group and the other Frisbie defendants, culminated in the ultimate termination of the LOI

with Two Roads, after which Reed told the university that the Frisbies were a "much better fit for PBA."

186.   On June 26, 2019, after yet another submission of the Frisbie Group's offer for the PBA parcels to PBA, Reed told the Frisbies that he awaited the Frisbies' decision on an appropriate fee for his services in facilitating the deal.  On July 3, 2019, Reed reminded the Frisbies of the fee arrangement and characterized the fee as a "buyer-procuring cause commission." On July 9, 2019, the Frisbies requested Reed meet them in person to discuss the fee arrangement.

187.   The meeting did not go well, and on July 19, 2019, Reed angrily expressed that he believed the Frisbies were undervaluing his contribution to the success of the deal with PBA and demanded a $100,000 "buyer introduction" fee based on the "spirit" of previous conversations between the parties.

188.   On July 24, 2019, Robert Frisbie Jr., recognizing the legal and ethical implications of paying a PBA insider to ensure the university abandoned its obligations towards Two Roads and offered the parcels to the Frisbies, attempted to recharacterize the payment to Reed as a "consulting" fee, paid in advance, in exchange for Reed's advice on the project moving forward. But the true nature of the payment is clear: In practice, the Frisbies' payment to Reed was an improper bribe paid in exchange for Reed acting as the Frisbies' agent in interfering with the LOI between Plaintiffs and PBA.

189.   Frisbie Group and the Frisbies employed a similar improper method to enlist Koenig in their effort to steer PBA away from its LOI obligations to the Plaintiffs and towards the Frisbies' own offer.  On information and belief, the Frisbies leveraged their personal relationship with Koenig, another PBA insider, to create yet another backchannel to securing the PBA parcels for themselves.   As a member of PBA's real-estate task force and a practicing real estate

54

professional, the Frisbies knowingly encouraged Koenig to violate his duties as an agent of the university to promote their offer for the parcels.

190.    On information and belief, between April 23 and the termination of the LOI with Two Roads, Koenig repeatedly engaged with PBA representatives, including Jenkins, to advocate for ending the university's relationship with Two Roads and turning instead towards the Frisbies. For example, on May 15, 2019, before the Two Roads LOI was terminated, Koenig assured the Frisbies that he was on their "team" and that he was having ongoing conversations with the real estate task force at PBA.

191.    On information and belief, in exchange for Koenig's advocacy with the university on Frisbie Group's behalf, the Frisbies offered to do future business with Koenig, specifically to engage him to consult on future deals.  That promise came to fruition with a number of collaborative deals between Koenig and the Frisbies in the months following the PBA Parcels deal. For example, in or about the first half of 2020, the Frisbie Group and Koenig worked together on securing a deal related to property owned by Myers Auto Group.  Later, in 2021, the Frisbie Group and Koenig worked together on a number of purchases such as a deal for the "Braka Properties," including 105 South Narcissus Avenue, 215 Clematis Street, and 118 South Clematis Street and the potential purchase of 5400 North Flagler Drive.  Koenig and the Frisbies have worked on a number of other deals and ventures, including a joint venture called Flatura LLC, a Florida-domiciled company first organized in September 2021.  Flatura LLC was registered to 221 Royal Poinciana Way, Suite 1, a property owned and developed by the Frisbie Group, and at first, both the Frisbie Group and Flagler Realty, Koenig's real estate company, were listed as officers of Flatura as of October 2021.   After Plaintiffs filed their initial complaint in this case, Koenig was removed as an officer of this organization, indicating Defendants' knowledge of the wrongfulness of their quid pro quo arrangement.

192.    The Frisbies' arrangements with Reed and Koenig constitute commercial bribery under Florida Statute § 838.16(1).  Even if not, their compensation of PBA insiders to procure a breach of the LOI, along with their donation to PBA intended to encourage the university to forgo its obligations towards Plaintiffs in favor of the Frisbie Group, is an improper method of conducting business.  As such, the Frisbies used improper methods to interfere with the LOI between PBA and Two Roads.  Defendants are therefore stripped of any privilege or justification.

193.    Beyond these individual arrangements, the Frisbie Group and the Frisbies saw an opportunity to reach a quick deal with PBA by utilizing Plaintiffs' detailed plan for the development, terms of the PSA, and due diligence documentation.  Frisbie Group's later involvement in using the easements to extract legal claims for PBA demonstrates that the Frisbie Group and PBA deal was built, either explicitly or implicitly, on an improper quid pro quo: Frisbie Group would get the PBA Parcel deal with Plaintiffs, but Frisbie Group would help PBA evade the probable legal consequences of PBA's decision to violate the exclusivity and confidentiality agreement with Two Roads.  Together, these actions amount to the improper behavior necessary for tortious interference with contract.

194.    These Defendants' interference resulted in PBA violating the LOI with Plaintiffs (and failing to sign the PSA).  Plaintiffs' damages include the lost expectancy of the Parcels, the profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

**NINTH CLAIM FOR RELIEF**
**(Tortious Interference with Business Relationship –**

**Against Defendants Frisbie Group, David W. Frisbie, Robert N. Frisbie Jr., and Cody S. Crowell)**

195.     Plaintiffs incorporate by reference Paragraphs 1–115 above, as if fully set forth herein.

196.     Plaintiffs and PBA had a business relationship from at least January 2018 until at least May 2019, evidenced by their intensive negotiations throughout this period, which culminated in the May 2019 PSA.

197.     Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell knew of this business relationship by at least December 2018, when an integral member of the Frisbie Group and Frisbie family, Frances Frisbie Criddle, heard about the negotiations in a conversation with Koenig and Collins at a party, six months after PBA and Plaintiffs entered into the LOI.

198.     Frisbie Group, David Frisbie, Robert Frisbie Jr., and Crowell intentionally and unjustifiably interfered with this business relationship when Frisbie Group engaged with PBA to negotiate to purchase the Parcels.  On information and belief, these Defendants engaged with PBA despite knowing PBA and Plaintiffs were bound by an exclusivity agreement and confidentiality agreement.  These defendants saw an opportunity to reach a quick deal with PBA by utilizing Plaintiffs' detailed plan for the development, terms of the PSA, and due diligence documentation. Frisbie Group's later involvement in using the easements to extract legal claims for PBA demonstrates that the Frisbie Group and PBA deal was built, either explicitly or implicitly, on an improper quid pro quo: Frisbie Group would get the PBA Parcel deal with Plaintiffs, but Frisbie Group would help PBA evade the probable legal consequences of PBA's decision to scrap the "all approved" PSA with Plaintiffs.  Together, these actions amount to the improper behavior necessary for tortious interference with a business relationship.

199.     These Defendants' interference resulted in PBA terminating its business relationship with Plaintiffs and purporting to back out of the PSA with Plaintiffs.  Plaintiffs'

damages include the lost expectancy of the Parcels, the profits derived from the transaction, and Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels.

## JURY TRIAL DEMAND

200.   Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants on all claims, and request a judgment providing the following relief:

A.   Judgment in Plaintiffs' favor and against Defendants on all causes of actions;

B.   For compensatory damages in an amount to be proven at trial, including but not limited to the value of the development project (including the lost expectancy of the Parcels and the profits derived by Defendants from the transaction); the value of and out-of-pocket expenses incurred in Plaintiffs' significant work on the project (including Plaintiffs' significant investments in producing the plan for the proposed development of the PBA Parcels, the terms of the PSA, and all due diligence information and documents relating to the PBA Parcels); the significant increased costs in the development of Plaintiffs' adjacent Forté project due to the delays caused by Defendants; and any realized risk that Frisbie Group is building the towers in a way that damages the Forté project;

C.   For punitive damages and exemplary damages according to proof at trial;

D.   For costs of suit incurred herein;

E.   For prejudgment interest;

F.   For attorneys' fees and costs, including as warranted by applicable laws; and

G.   For such other and further relief as the Court may deem to be just and proper.

Dated:
April 21, 2023

DOMNICK CUNNINGHAM & YAFFA

By:  /s/ Sean Domnick
    Sean C. Domnick
      sean@pbglaw.com
    Matthew T. Christ
      mtc@pbglaw.com

    2401 PGA Boulevard, Suite 140
    Palm Beach Gardens, FL 33410
    Telephone: (561) 625-6260
    Facsimile: (561) 625-6269

GIBSON, DUNN & CRUTCHER LLP

    Reed Brodsky
      RBrodsky@gibsondunn.com
      (*pro hac vice*)
    Akiva Shapiro
      AShapiro@gibsondunn.com
      (*pro hac vice*)
    Catherine McCaffrey
      CMcCaffrey@gibsondunn.com
      (*pro hac vice*)
    Michael McQueeney
      MMcQueeney@gibsondunn.com
      (*pro hac vice*)

    200 Park Avenue
    New York, NY 10166-0193
    Telephone: (212) 351-4000
    Facsimile: (212) 351-6235

*Attorneys for Plaintiffs Two Roads*
*Development LLC, Trilar Holdings LLC and*
*Flagler South Development LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all Counsel of Record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**By**: */s/ Sean Domnick*
Sean C. Domnick

## SERVICE LIST

Scott Hawkins, Esquire
**JONES FOSTER P.A.**
505 South Flagler Drive, Suite 1100
West Palm Beach, Florida 33401
Tel.: (561) 659-3000
Fax: (561) 650-5300
shawkins@jonesfoster.com

*Counsel for Defendants Palm Beach Atlantic
University Inc., William M.B. Fleming, Jr.,
and Patrick C. Koenig*

Eric M. George (*pro hac vice*)
Keith J. Wesley (*pro hac vice*)
Ryan C. Keech (*pro hac vice*)
Serli Polatoglu (*pro hac vice*)
**ELLIS GEORGE CIPOLLONE O'BRIEN
ANNAGUEY LLP**
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Tel.: (310) 274-7100
Fax: (310) 275-5697
egeorge@egcfirm.com
kwesley@egcfirm.com
rkeech@egcfirm.com
spolatoglu@egcfirm.com

*Counsel for Defendants Palm Beach Atlan-tic
University Inc., Frisbie Group LLC, FH3
LLC, William M.B. Fleming, Jr., Patrick C.
Koenig, David W. Frisbie, Robert N. Fris-bie,
Jr., and Cody Crowell*

**SHUBIN & BASS, P.A.**
46 S.W. First Street, Third Floor
Miami, Florida 33130
Tel.: (305) 381-6060
Fax: (305) 381-9457
jshubin@shubinbass.com
dfalce@shubinbass.com
jkatz@shubinbass.com

*Counsel for Defendants Frisbie Group LLC,
FH3 LLC, David W. Frisbie, Robert N. Fris-
bie, Jr., and Cody Crowell*

Sean C. Domnick, Esquire
Matthew T. Christ, Esquire
**DOMNICK CUNNINGHAM & YAFFA**
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
Tel.: (561) 625-6260
Fax: (561) 625-6269
mtc@pbglaw.com
sean@pbglaw.com

Reed Brodsky (*pro hac vice*)
Akiva Shapiro (*pro hac vice*)
Catherine McCaffrey (*pro hac vice*)
Michael McQueeney (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Tel.: (212) 351-4000
Fax: (212) 351-6235
RBrodsky@gibsondunn.com
AShapiro@gibsondunn.com
CMcCaffrey@gibsondunn.com
MMcQueeney@gibsondunn.com

*Counsel for Plaintiffs Two Roads Develop-
ment LLC, Trilar Holdings LLC and Flagler
South Development LLC*

1